# DICKE, BILLIG & CZAJA, PLLC

**Patent • Trademark • Copyright**
**ATTORNEYS**
Suite 2250 • Fifth Street Towers • 100 South Fifth Street • Minneapolis, Minnesota 55402
Telephone: (612) 573-2000    Facsimile: (612) 573-2005

John M. Weyrauch
Direct Dial: (612) 767-2511
jmweyrauch@dbclaw.com

May 21, 2013

*Via Express Mail*

Clerk of Court
United States Court of Appeals
 for the Federal Circuit
717 Madison Place, NW
Washington, D.C.  20439

Re:    In Re ICM, Inc., on Petition for a Writ of Mandamus to the United States District
       Court for the Southern District of Indiana, Indianapolis Division in
       Case No. 1:10-ml-02181-LJM-DML
       Related Case No. 1:10-ml-08000-LJM-DML
       Judge Larry J. Mckinney

Dear Clerk of Court:

Enclosed for filing are the following documents, along with 3 copies:

- **PETITION FOR WRIT OF MANDAMUS**
- **CERTIFICATE OF INTEREST**

A CD-Rom is also enclosed.

Yours very truly,

DICKE, BILLIG & CZAJA, PLLC

John M. Weyrauch
Enclosures
JMW/nja

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re ICM, Inc. _____ v. _____

No. 2013-____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
ICM, Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

ICM, Inc.

---

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

ICM, Inc.

---

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

---

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Paul P. Kempf, Peter R. Forrest, DICKE, BILLIG & CZAJA, PLLC, 100 South Fifth St., Suite 2250, Minneapolis, MN 55402

---

May 21, 2013                                          _____
_____                                      Signature of counsel
Date

John M. Weyrauch
                                                     _____
                                                     Printed name of counsel

Please Note: All questions must be answered

cc: _____

---

MISCELLANEOUS DOCKET NO. 2013-_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re ICM Inc.,

Petitioner.

On Petition for a Writ of Mandamus to the United States District Court for the Southern District of Indiana, Indianapolis Division in

Case no. 1:10-ml-02181-LJM-DML
Related Case No. 1:10-ml-08000-LJM-DML
Judge Larry J. McKinney

## PETITION FOR WRIT OF MANDAMUS

JOHN M. WEYRAUCH
PETER R. FORREST
PAUL P. KEMPF
DICKE, BILLIG & CZAJA, PLLC
100 South Fifth Street, Suite 2250
(612) 573-2000

Attorneys for Petitioner

May 21, 2013

# TABLE OF CONTENTS

I.    RELIEF SOUGHT ..................................................................5

II.   ISSUES PRESENTED ............................................................5

III.  STATEMENT OF FACTS ......................................................5

IV.   JURISDICTIONAL STATEMENT .........................................10

V.    STANDARD OF REVIEW.....................................................10

VI.   APPLICABLE LAW ..............................................................11

VII.  REASONS WHY THE WRIT SHOULD ISSUE .....................12

VIII. CONCLUSION ......................................................................19

# TABLE OF AUTHORITIES

## Cases

*Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980) .........................................10

*Cheney v. United States District Court*, 542 U.S. 367 (2004)................................11

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)...........................................................................................11

*Mallard v. U.S. Dist. Court for the Southern Dist. of Iowa*,
  490 U.S. 296 (1989)..........................................................................................10

*Steel Co., aka Chicago Steel & Pickling Co. v. Citizens For
  A Better Environment*, 523 U.S. 83 (1998)...........................................................14


*Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341 (Fed. Cir. 2005)................11

*Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993) ........................11

*HollyAnne Corp. v. TFT, Inc.*, 199 F. 3d 1304 (Fed. Cir. 1999) ..................... 11, 15

*In re Calmar, Inc.*, 854 F.2d 461 (Fed. Cir. 1988) ...............................................10

*In re EMC Corp.* 677 F.3d. 1671 (Fed. Cir. 2012) ("EMC I")....................... passim

*In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011)..........................................11

*In re Roberts*, 178 F.3d 181 (3d Cir. 1999) .........................................................11

*In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008) (en banc).................13

## Statutes

28 U.S.C. § 1295 ..................................................................................................10

28 U.S.C. § 1391 ..................................................................................................15

28 U.S.C. § 1391(c)(2)..........................................................................................15

28 U.S.C. § 1400(b) ..............................................................................................15

28 U.S.C. § 1406(a) ................................................................................................8

28 U.S.C. § 1407(a) ........................................................................................ 12, 13

28 U.S.C. § 1651 ..................................................................................................10

N.Y. C.P.L.R. § 302 (a) ........................................................................................16

## Rules

Fed. R. Civ. Pro. 12..................................................................................................8

Fed. R. Civ. Pro. 12(b)(1) ......................................................................................9

# INTRODUCTION

This petition concerns a patent declaratory judgment case brought by Petitioner ICM, Inc. ("ICM") in the District of Kansas (the "Kansas Action") against GS CleanTech Corporation ("CleanTech") and its parent Greenshift Corporation ("Greenshift") and transferred to the Southern District of Indiana under the Multi-District Litigation (MDL) rules. The questions raised in this petition for mandamus are whether the Southern District of Indiana, as the MDL transferee court considering the consolidated cases, legally erred and/or clearly abused its discretion by any of the following:

(1)     Not dismissing as moot CleanTech's motion to transfer the venue of ICM's first-filed Kansas Action to the Southern District of New York, because the transferee court has no authority to authorize such a transfer.

(2)     Issuing an improper advisory opinion on the "post-MDL proceedings" merits of the same motion, because the court lacked subject matter jurisdiction to consider such "post-MDL proceedings."

(3)     Assuming without any evidence that venue as to ICM's declaratory judgment Action was proper in the Southern District of New York, as required by law; and similarly assuming without evidence in the record (or even allegations which could be assumed to be true) where witnesses and sources of proof are located.

(4)     Basing its analysis of such "post-MDL proceedings" on an improper joinder of unrelated parties under Fed. R. Civ. Pro. 20(a) as interpreted by this Court in *In re EMC Corp.* 677 F.3d. 1671 (Fed. Cir. 2012) ("EMC I").

(5)    In the alternative, failing to consider ICM's cross-motion in the Kansas Action to enjoin the New York Action, where ICM's factual and legal justification for maintaining jurisdiction and venue in Kansas was fully briefed.

## I.    RELIEF SOUGHT

Petitioner ICM respectfully petitions this court for a writ of mandamus directing the MDL transferee court, the United States District Court for the Southern District of Indiana, to vacate-in-part its February 27, 2013 order considering CleanTech's motion to change the venue of the case to the Southern District of New York at the conclusion of MDL proceedings. (Attachment 1). Such proceedings are continuing before the transferee court pursuant to normal MDL procedures and timing, with opening summary judgment briefs not due until July 16, 2013 by CleanTech and until 45 days thereafter by all Defendants. (Attachment 2.) Thus, pretrial proceedings are not expected to wrap up before the transferee court has ruled on all summary judgment motions, such that the requested writ is timely presented for consideration.

## II.    ISSUES PRESENTED

The issues presented all pertain to whether the MDL transferee court below legally erred and/or clearly abused its discretion in ruling on CleanTech's motion under 28 U.S.C. § 1404(a) to transfer venue in Petitioner's first-filed Kansas Action.

## III.    STATEMENT OF FACTS

Petitioner ICM designs and builds ethanol production plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn byproducts known as thin stillage. (Attachment 3, ¶ 9). In

5

July 2009, certain customers of ICM received a letter from counsel for Greenshift (collectively, the "July Greenshift Letters") asserting that Greenshift was the owner of certain patent applications for which the customers were liable to Greenshift for pre-patent grant royalties pursuant to 35 U.S.C. § 154(d). (Attachment 4, published patent applications omitted). Specifically, the letters from Greenshift's counsel asserted that Greenshift owned U.S. Patent Application Serial No. 11/122,859 (the "'859 patent application") and U.S. Patent Application Serial No. 11/241,231 (the "'231 patent application"), both of which relate to corn oil recovery processes. (*Id.*). Copies of the published form of the '859 and '231 patent applications accompanied the letters. (*Id.*, attached published applications omitted). The July Greenshift Letters asserted that the activity of each ICM customer "falls squarely within the scope of the published claims of the Greenshift Applications," and that each customer is "liable under 35 U.S.C. § 154(d) once these patent applications issue." (*Id.*).

On or about August 6, 2009, ICM's counsel wrote a letter to Greenshift's counsel to address the letters ICM's customers received (the "August 6 Letter"). (Attachment 5). The August 6 Letter confronted Greenshift's assertion of liability under 35 U.S.C. § 154(d), noting that Greenshift failed to include mention of the limitations set forth in sub-section (2) of 35 U.S.C. § 154(d). The August 6 Letter then identified in detail how the claims in the '859 and '231 patent applications had been materially amended since each of the applications had been published, and that the Greenshift letters were therefore apparently sent with the intent to improperly interfere with ICM's business relationships. ICM's August 6 Letter asserted that ICM was prepared to take such steps as would be necessary to prevent any further customer interference. (*Id.*). ICM did not receive a response from Greenshift to the August 6 Letter.

In early October, Greenshift sent additional letters to customers of ICM asserting that the '859 and '231 patent applications were owned by Greenshift and that the customers were liable for royalties under 35 U.S.C. § 154(d) (collectively, the "October Greenshift Letters"). (Attachment 6, published patent applications omitted). The October Greenshift Letters further indicated that the '859 patent application had been allowed by the U.S. Patent and Trademark Office and would issue in the near future. (*Id.*). The October Greenshift Letters repeated the assertion that the activity of each ICM customer "falls squarely within the scope of the published claims of the Greenshift Applications," and that each customer is "liable under 35 U.S.C. § 154(d) once these patent applications issue." (*Id.*). One of the October Greenshift Letters was sent to Lifeline Foods, LLC, in St. Joseph, Missouri. Lifeline Foods is owned in part by ICM, and at that time ICM owned and operated centrifuge equipment in Lifeline Foods' facilities for the purpose of recovering corn oil. (Attachment 3, ¶ 12).

Upon examination of the U.S. Patent and Trademark Office records for the '859 patent application, ICM learned that the '859 patent application would issue as U.S. Patent No. 7,601,858 (the "'858 patent") on October 13, 2009. To halt further harmful communications from Greenshift to ICM's customers, and to resolve the issue of ICM's and its customers' freedom to practice corn oil recovery processes with ICM's centrifuge equipment, on October 13, 2009, ICM initiated an action against Greenshift and CleanTech in the U.S. District Court for the District of Kansas for Declaratory Judgment of Non-Infringement and Invalidity of the '858 patent, as well as various state and federal claims for unfair practices associated with Greenshift's communications.[1]

---

[1] ICM filed an amended complaint on October 14, 2009 to supplement ICM's allegations of ownership of centrifuge equipment in paragraph 12 of the amended complaint. (Attachment 3).

Separately on October 13, 2009, CleanTech initiated an action in the U.S. District Court for the Southern District of New York against GEA Westfalia Separator, Inc., and DOES 1-20, whose true names and capacities were stated to be unknown to CleanTech, for infringement of U.S. Patent No. 7,601,858 (the "SDNY action"). (Attachment 7).

Ten days later, on October 23, 2009, GS CleanTech reacted to ICM's Kansas Action by filing an Amended Complaint in the SDNY action naming ICM and its customer Lifeline Foods, LLC, as defendants. (Attachment 8). CleanTech's Amended Complaint alleged that "ICM has sold products to Lifeline Foods and one or more of the Defendants DOES 1-30 inclusive that contributorily infringe one or more of the claims of the '858 patent. ICM has also actively induced Lifeline Foods and one or more of the Defendants DOES 1-30 inclusive to infringe one or more of the claims of the '858 patent." (*Id.*, ¶ 13).

On November 5, 2009, ICM moved the Kansas District Court to enjoin CleanTech from prosecuting the SDNY action. (Attachment 9). Also on November 5, 2009, CleanTech cross-moved the Kansas District Court to dismiss ICM's Kansas Complaint pursuant to several bases under Fed. R. Civ. Pro. 12, or in the alternative to transfer venue to the Southern District of New York under 28 U.S.C. § 1406(a).[2] (Attachment 10). Thereafter, on December 14, 2009, ICM moved to stay its answer of CleanTech's Amended Complaint in the SDNY action. (Attachment 12). The SDNY Court granted ICM's motion to stay based in part on the fact that the issue of jurisdiction and venue over the dispute had been addressed

---

[2] Briefing on CleanTech's motion to dismiss was stayed pending jurisdictional discovery to address CleanTech's claim that venue in Kansas was improper because of a lack of personal jurisdiction over CleanTech. (Attachment 11). CleanTech subsequently withdrew its contention that there was no jurisdiction over CleanTech in Kansas. (Attachment 16). Briefing on the parties cross-motions was completed on March 22, 2010. (Attachment 11).

already to the Kansas Court and was for the Kansas Court to resolve. (Attachment 13).

Before the parties cross-motions in the Kansas Action were heard, The Kansas Action and the Southern District of New York Action were consolidated with other cases by the Panel on Multi-District Litigation (MDL) (the "Panel") and transferred to the Southern District of Indiana, as the transferee court, for pretrial proceedings.[3] ICM provided the transferee court with a status of the cross motions in its case summary. (Attachment 14 at pages 2-3).

Subsequently, as CleanTech received additional patents related to the original patent in suit, the transferee court allowed amendment of CleanTech's and ICM's respective complaints to include allegations to each new patent. CleanTech's reasserted its motion to dismiss each of ICM's amended complaints to address each newly added patent, although the substance of the supporting memorandum was substantially as filed in the Kansas Action. Specifically, on August 15, 2012, CleanTech moved to dismiss from ICM's Fifth Amended Complaint the Kansas state law claims, and also to dismiss each patent claim under Fed. R. Civ. Pro. 12(b)(1) as improperly pled, or alternatively—in a single paragraph argument that offered no factual or legal analysis that warranted a change of venue—to transfer the entire Kansas Case to the Southern District of New York. (Attachment 15 at 24.)

Six months later, on February 27, 2013, the transferee court entered an order denying CleanTech's motion to dismiss as to ICM's declaratory judgment claims and its Lanham Act claim, but granting the motion to dismiss the Kansas state claims. (Attachment 1). Also, erroneously concluding that CleanTech's request for a venue transfer was unopposed, the MDL Court granted CleanTech's motion to

---

[3] Among the cases consolidated were cases against ICM customers in the Northern District of Illinois, the Southern District of Indiana, and the District of Connecticut.

transfer venue to the Southern District of New York "for any post-MDL proceedings." (*Id.* at 20). The transferee court found that "[t]he possibility of consolidation with related litigation … weighs heavily in favor of … transfer to the Southern District of New York. Despite the advantages of this MDL with respect to this factor, the New York litigation has the greatest opportunity for consolidation after remand …." (*Id.* at 19-20 (internal quotation omitted)). Briefing on ICM's cross-motion to enjoin CleanTech from prosecuting the Southern District of New York Action was not considered or addressed by the transferee court.

## IV.    JURISDICTIONAL STATEMENT

This court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651. In addition, this court has jurisdiction under 28 U.S.C. § 1295 because the underlying action is a patent case.

## V.    STANDARD OF REVIEW

While mandamus is an extraordinary remedy, it is appropriately applied to correct a clear abuse of discretion or usurpation of judicial power, *In re Calmar, Inc.*, 854 F.2d 461, 464 (Fed. Cir. 1988), such as when there is no other avenue for the desired relief, *Mallard v. U.S. Dist. Court for the Southern Dist. of Iowa*, 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989), and the court's power to issue the writ is "clear and indisputable," *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980). Mandamus is the clearly available remedy for errors on venue considerations below. *See In re EMC Corp.* 677 F.3d. 1351 (Fed. Cir. 2012) ("*EMC* I"), at 1354 ("It is well established that mandamus is available to contest a patently erroneous error in an order denying transfer of venue.") (citing cases). This court has held that mandamus may issue when a trial court's venue orders amount to a "clear abuse of discretion." *In re Microsoft Corp.*, 630 F.3d 1361,

1363 (Fed. Cir. 2011) (applying regional circuit law). There is no fixed time to seek mandamus, especially absent prejudicial delay to an opponent or neglect or delay by the petitioner. *Cheney v. United States District Court*, 542 U.S. 367, 378-379 (2004).

## VI.    APPLICABLE LAW

The general rule in Federal courts favors the first-filed declaratory action. *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) ("The general rule favors the forum of the first-filed action, whether or not it is a declaratory action."). Exceptions are possible but must be supported by more than discretionary concerns of the trial court. *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) ("We apply the general rule favoring the forum of the first-filed case, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise.").

After a MDL action is remanded from the transferee court, it returns to the transferor court and the sole power to accomplish that return rests with the MDL Panel. *See In re Roberts*, 178 F.3d 181, 183 (3d Cir. 1999) ("The [Supreme] Court determined that § 1407(a) imposes a mandatory obligation on the Panel to remand transferred cases to the transferor court," *citing Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998)).

Transfers by district courts may be based on either proper venue, but inconvenience to the parties, or improper venue. "A district court can transfer venue under either 28 U.S.C. § 1404(a) or 28 U.S.C § 1406(a). Section 1404(a) allows a court where venue is proper to transfer a case to a more convenient forum. Section 1406(a) allows a court to either dismiss or transfer a case when venue is improper." *HollyAnne Corp. v. TFT, Inc.*, 199 F. 3d 1304 (Fed. Cir. 1999).

"Claims against independent defendants (*i.e.*, situations in which the defendants are not acting in concert) cannot be joined under Rule 20's transaction-or-occurrence test unless the facts underlying the claim of infringement asserted against each defendant share an aggregate of operative facts. To be part of the "same transaction" requires shared, overlapping facts that give rise to each cause of action, and not just distinct, albeit coincidentally identical, facts." *In re EMC Corp.* 677 F.3d. 1671 (Fed. Cir. 2012) ("EMC I").

## VII.    REASONS WHY THE WRIT SHOULD ISSUE

The transferee court legally erred and/or clearly abused its discretion in several ways.

First, by even considering a § 1404(a) venue transfer, instead of dismissing the motion for venue transfer outright, the transferee court operated outside its authority: only the MDL Panel can authorize a remand of a consolidated case, and when doing so the Panel *returns* the case to the transferor court; if venue elsewhere is in question, that is for the transferor court to decide at that time and upon motion pursuant to the procedures of the transferor court. This is the plain reading of 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated.") (proviso without application here omitted). This is also the position of the Supreme Court when reading that same section, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1988) ("§ 1407 not only authorizes the Panel to transfer for coordinated or consolidated pretrial proceedings, but obligates the Panel to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course"). And even more to the point, it is the Supreme

Court's interpretation of the interaction between § 1407 and motions to change venue under § 1404(a) as occurred in this case. *Id.* at 39 ("the question is not whether a change of venue may be ordered in a case consolidated under § 1407(a); on any view of § 1407(a), if an order may be made under § 1404(a), it may be made after remand of the case to the originating district court") (footnote omitted).

Thus, the transferee court below had no authority to consider the motion to change venue and should have denied it outright, or at least dismissed it as moot. Its failure to do so was legal error and a clear abuse of discretion. "A district court abuses its discretion if it relies on an erroneous conclusion of law." *EMC I*, *supra*, at 1355 (citing *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc)).

One upshot of the conclusion above is that ICM's original declaratory judgment action always was properly venued in the District of Kansas except for being transferred—but only temporarily—to the transferee court for MDL proceedings; it must return to that (proper) venue, and only then will a motion to change venue be ripe for consideration. This leads to the second, and similar, reason that the transferee court abused its discretion. Specifically, because the transferee court below had no authority to consider the motion to change venue, to the extent it sought to impose its ruling on that motion on future actions of the MDL Panel or the Kansas court, it made what amounts to an advisory opinion. The transferee court below couched its ruling in terms of potential entry after proceedings before it are concluded: "the New York litigation has the greatest opportunity for consolidation after remand …." (Attachment 1 at 18, emphasis underlined); "transfer of this action to the Southern District of New York for any post-MDL proceedings would best serve efficiency and is in the interests of justice" (*Id.*, emphasis underlined). But it is hornbook law that when a Federal

court does not have authority to decide matters it issues improper advisory opinions. Just as "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning," *Steel Co., aka Chicago Steel & Pickling Co. v. Citizens For A Better Environment*, 523 U.S. 83, 101 (1998), so too must this Court prevent the transferee court from considering "hypothetical venue" issues and advising other courts how to handle them.

Third, while the transferee court should not have even considered the patentee's motion in the alternative to transfer venue, as argued above, in doing so the transferee court made the unjustified assumption that venue in New York was proper at all. CleanTech's original motion to transfer filed in the Kansas Action solely invoked 28 U.S.C. §1406(a), arguing that venue was not proper in Kansas because there was no personal jurisdiction over CleanTech or Greenshift in Kansas. By the time the transferee court considered CleanTech's motion, CleanTech's motion was brought against ICM's Fifth Amended Complaint. However, in their motion which the transferee court ruled upon, CleanTech still invoked 28 U.S.C. §1406(a), making the limited argument that "If this Court is not inclined to dismiss all of ICM's claims, then, in the interest of justice, Defendants seek transfer of [ ] ICM's claims to the Southern District of New York for all post-MDL proceedings where the NY Patent Infringement case is pending. See 28 U.S.C. §1406(a)." (Attachment 15 at 24, quotation of 28 U.S.C. §1406(a) omitted). There was no showing that venue was proper in New York, only the unsupported assertion that New York is "a Court of proper venue and jurisdiction." (Attachment 10, at 28-29). In fact, CleanTech and Greenshift had withdrawn their allegations that they were not subject to personal jurisdiction in Kansas

(Attachment 16), and thus the basis on which they had asserted that venue was not proper in Kansas.

ICM believes that the citation to 28 U.S.C. §1406(a) was a briefing error. 28 U.S.C. §1404(a) authorizes transfer when the original venue is proper but another proper venue is suggested, whereas 28 U.S.C. §1406(a) authorizes transfer when the original venue is not proper at all. *HollyAnne Corp. v. TFT, Inc.*, 199 F. 3d 1304 (Fed. Cir. 1999). The real issue is that <u>neither</u> provision authorizes transfer to a district in which venue is not proper in the first place. See 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); 28 U.S.C § 1406(a) (authorizing "transfer [of] such case to any district or division in which it could have been brought."). And there are simply no facts in the record supporting CleanTech and Greenshift's allegation that venue is proper against ICM in the Southern District of New York.

CleanTech's New York complaint addresses venue only in a conclusory statement: "Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b)." (Attachment 7 at ¶ 17). But nothing in the remainder of the complaint alleges any fact that would support such a conclusion. At best, CleanTech argues that venue is proper in the Southern District of New York because personal jurisdiction over ICM is proper in New York (*id.* at ¶ 16), but that is also just another, equally unsupported, assertion without any factual support. Certainly it is true that, for venue purposes, a corporation such as ICM is "deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business." 28 U.S.C. § 1391(c)(2). But CleanTech's argument is that "personal jurisdiction over [ICM is permitted] because the claims arise from their transaction of business

15

within the state of its contracts to supply goods or services in the state," which is nothing more than a restatement of the New York long arm statue, N.Y. C.P.L.R. § 302 (a).[4] There are no factual allegations in the complaint to support any inference that "transaction of business" or "contracts" involving ICM have ever occurred in New York. Venue is not proper just because a party alleges that it is, but the transferee court again abused its discretion by assuming New York was a proper venue when nothing in the record supports that assumption.

Similarly, the transferee court found that the "convenience and availability of witness factor is neutral because either party would have to travel if the issues were litigated in the other party's one state." (Attachment 1 at 18). But nothing in the record establishes the location of either party's witnesses or sources of evidence; for example, the court had no evidence that CleanTech's witnesses are in New York just because CleanTech was a New York corporation at the time it filed in New York.

The fourth error was that the transferee court boiled down its venue transfer analysis to essentially the "possibility of consolidation factor" which it found "weighs heavily in favor of … transfer to the Southern District of New York" because (in part) "the New York litigation has the greatest opportunity for consolidation after remand because … another manufacturer of centrifuge systems and at least one of its customers are also defendants." (Attachment 1 at 18-19). In doing so, the transferee court abused its discretion by disregarding ICM's motion (brought originally in the District of Kansas) to enjoin the New York action

---

[4] "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services within the state …." N.Y. C.P.L.R. § 302 (a).

brought by CleanTech (Attachment 9), which is considered below; but before that, by contemplating at all that this litigation could be consolidated with a separate case involving wholly unrelated accused infringers who have also been sued under the same patents, the transferee court committed an error of law, specifically an improper joinder of unrelated parties under Fed. R. Civ. Pro. 20(a) as interpreted by this Court in *EMC I*, *supra*.

In *EMC I*, this Court found that improper joinder prevents "meaningful opportunity to present individualized defenses on issues such as infringement, willfulness, and damages because each defendant will have limited opportunities to present its own defense to the jury." (*Id.* at 1355.) The proper test established by this Court requires far more analysis than the transferee court performed below:

> [J]oinder is not appropriate where different products or processes are involved. Joinder of independent defendants is only appropriate where the accused products or processes are the same in respects relevant to the patent. But the sameness of the accused products or processes is not sufficient. Claims against independent defendants (*i.e.*, situations in which the defendants are not acting in concert) cannot be joined under Rule 20's transaction-or-occurrence test unless the facts underlying the claim of infringement asserted against each defendant share an aggregate of operative facts. To be part of the "same transaction" requires shared, overlapping facts that give rise to each cause of action, and not just distinct, albeit coincidentally identical, facts. The sameness of the accused products is not enough to establish that claims of infringement arise from the "same transaction." Unless there is an actual link between the facts underlying each claim of infringement, independently developed products using differently sourced parts are not part of the same transaction, even if they are otherwise coincidentally identical.

> In addition to finding that the same product or process is involved, to determine whether the joinder test is satisfied, pertinent factual considerations include whether the alleged acts of infringement

occurred during the same time period, the existence of some relationship among the defendants, the use of identically sourced components, licensing or technology agreements between the defendants, overlap of the products' or processes' development and manufacture, and whether the case involves a claim for lost profits.

*Id.* at 1359-60.

And while "[t]he district court enjoys considerable discretion in weighing the relevant factors" (*id.*), there is a clear abuse of that discretion when, as here, the transferee court simply does not consider the factors at all, or considers them but reaches the exact opposite conclusion that the "same transaction" test calls for, *i.e.*, that "the other New York defendants allege substantially similar counterclaims of non-infringement, invalidity and unenforceability as ICM does in its declaratory claims" is *not* the relevant measure of a "same transaction."

Fifth and finally, to the extent the transferee court had the authority to rule on CleanTech's venue transfer motion, the transferee court failed to consider ICM's cross-motion to enjoin the New York Action. The transferee court's ruling explicitly states that the court was considering only the motion to dismiss and fails to acknowledge the cross-motion to enjoin. (Attachment 1 at 1 (referring only to motion to dismiss or in the alternative to transfer).) But prior to the MDL proceedings, by joint motion (Attachment 17) as granted in modified form by the Kansas Court (Attachment 12), the motion to dismiss and the cross-motion to enjoin were merged into a common briefing schedule which accommodated the jurisdictional discovery relevant to both motions. As noted above, that discovery led to CleanTech's withdrawal of its allegation that it was not subject to personal jurisdiction in Kansas (Attachment 16), which formed the sole basis for its argument that venue was not proper in Kansas (and thus the Kansas Action should

18

be transferred to New York) (Attachment 10, at 28-29; *compare* Attachment 15, at 23 (advocating transfer without any rationale).) ICM's briefing on its' cross-motion provided factual and legal arguments justifying that jurisdiction and venue over ICM's declaratory judgment complaint was proper in Kansas and would achieve efficiencies in judicial resources by allowing CleanTech actions against ICM customers to be consolidated in the Kansas Action. The transferee court thus erred by failing to consider the full briefing of both parties on issues relevant to venue, and thereby abused its discretion.

## VIII. CONCLUSION

The transferred court clearly erred as matter of law and/or abused its discretion when it ruled on the motion to transfer ICM's first-filed declaratory judgment action to the Southern District of New York. It is respectfully requested that this court issue a writ of mandamus directing the transferee court to vacate those portions of its February 27, 2013 order.

Respectfully submitted,

Date:  May 21, 2013

John M. Weyrauch
Peter R. Forrest
Paul P. Kempf
DICKE, BILLIG & CZAJA, PLLC
100 South Fifth Street, Suite 2250
Minneapolis, Minnesota 55402
(612) 573-2000

Attorneys for ICM Inc.

19

## PROOF OF SERVICE

I hereby certify that on May 21, 2013, this Petition for Writ of Mandamus and

Certificate of Interest was served via US Postal Service Express Mail to:

The Honorable Larry J. McKinney
United States District Judge
United States District Court for the Southern District of Indiana
Birch Bayh Federal Building and United States Courthouse
46 East Ohio Street, Room 105
Indianapolis, IN 46204


Charles F. O'Brien
Michael Joseph Rye
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, CT 06103

JOHN M. WEYRAUCH

In re ICM Inc., Petitioner.
On Petition for a Writ of Mandamus

## ATTACHMENTS

| NO. | TITLE/DOCUMENT DESCRIPTION |
|---|---|
| 1 | Order on CleanTech's Motion to Dismiss ICM's Fifth Amended Complaint, filed February 27, 2013 in MDL Case 1:10-ml-02181-LJM-DML (Document 793) |
| 2 | Revised and Amended Order on Case Management for the '858 Patent Family, filed January 10, 2013 in MDL Case 1:10-ml-02181-LJM-DML (Document 780) |
| 3 | ICM's First Amended Complaint for Declaratory Judgment, filed October 14, 2009 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 4) |
| 4 | "July Greenshift Letters" dated July 15 and 16, 2009 (four letters total) |
| 5 | "August 6 Letter" by ICM Counsel dated August 6, 2009 |
| 6 | "October Greenshift Letters" dated October 7, 2009 (three letters total) |
| 7 | CleanTech's Complaint for Patent Infringement, filed October 13, 2009 in "New York Action" Case 1:09-cv-08642-LMM (Document 1) |
| 8 | CleanTech's First Amended Complaint for Patent Infringement, filed October 23, 2009 in "New York Action" Case 1:09-cv-08642-LMM (Document 6) |
| 9 | ICM's Memorandum in Support of Motion to Enjoin CleanTech's Prosecution of a Second-filed Action Against ICM, filed November 5, 2009 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 19) |
| 10 | CleanTech's Memorandum in Support of Motion to Dismiss ICM's Complaint or to Transfer, filed November 5, 2009 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 17) |
| 11 | ORDER Amending the Jurisdictional Discovery and Motion Briefing Schedules, filed February 23, 2010 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 31) |
| 12 | ICM's Memorandum in Support of Motion to Stay Response to CleanTech's Amended Complaint, filed December 14, 2009 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 34) |
| 13 | Memorandum and Order, filed January 6, 2010 in "New York Action" Case 1:09-cv-08642-LMM (Document 39) |

| 14 | Case Summary on Behalf of Defendants, filed October 20, 2010 in MDL Case 1:10-ml-02181-LJM-DML (Document 45) |
|----|----|
| 15 | CleanTech's Memorandum in Support of Motion to Dismiss ICM's Fifth Amended Complaint, or to Transfer, filed August 15, 2012 in MDL Case 1:10-ml-02181-LJM-DML (Document 432) |
| 16 | CleanTech's Notice to Withdraw its Fed.R.Civ. P.12(b)(2) Basis, filed February 23, 2010 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 32) |
| 17 | Joint Motion to Merge, filed November 30, 2009 in "Kansas Action" Case 6:09-cv-01315-WEB-KMH (Document 25) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: METHOD OF PROCESSING | ) | |
| ETHANOL BYPRODUCTS AND | ) | |
| RELATED SUBSYSTEMS ('858) PATENT | ) | No. 1:10-ml-02181-LJM-DML |
| LITIGATION | ) | |
| | ) | |
| RELATED CASE: | ) | |
| | ) | |
| 1:10-cv-08000-LJM-DML | ) | |

## <u>ORDER ON MOTION TO DISMISS FIFTH AMENDED COMPLAINT</u>

Patent holder GS CleanTech Corporation ("CleanTech"), and GreenShift Corporation ('GreenShift') (collectively "Plaintiffs"), Defendants in the declaratory judgment action filed by ICM Inc. that is part of this litigation under cause number 1:10-cv-8000-LJM-DML, have moved to dismiss ICM's Fifth Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Rules 12(b)(1) and 12(b)(6)") or, in the alternative, to transfer the case to the Southern District of New York. Dkt. Nos. 431/171.[1]  For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Plaintiffs' Motion.

### I.  <u>BACKGROUND</u>

On October 13, 2009, ICM filed its original Complaint for Declaratory Judgment against Plaintiffs and its first amended complaint shortly thereafter.  Dkt. Nos. 1 & 4. Plaintiffs moved to dismiss ICM's complaint and the motion was pending at the time the case was transferred to this Court as part of the Multi-District Litigation ("MDL").  *See* Dkt. Nos. 16, 41 & 42.  Shortly after transfer, ICM filed its Second Amended Complaint

---

[1] Unless otherwise noted, all references to docket numbers are to documents filed in Cause No. 1:10-cv-8000-LJM-DML.

("2d Am. Compl."). Dkt. No. 56. Plaintiffs' renewed its motion to dismiss ("MTD2"). Dkt. No. 58.

Before the Court could rule on MTD2, the Court granted in part ICM's motion to amend its complaint to add declaratory requests with respect to U.S. Patent No. 8,008,516 (the "'516 patent"). *See* Dkt. No. 194 (docketed out of order). Subsequently, on March 1 and March 15, 2012, ICM filed its Third, then its Fourth Amended Complaint for Declaratory Judgment ("4th Am. Compl."). *See* Dkt. Nos. 134 & 135. Plaintiffs promptly moved to dismiss ICM's 4th Am. Compl. ("MTD4"), and the motion was fully briefed by May 7, 2012. *See* Dkt. Nos. 139, 140, 143 & 144.

Again, before the Court could rule on MTD4, ICM moved to amend its Complaint to add declaratory requests with respect to U.S. Patent No. 8,008,517 (the "'517 patent"), which the Court granted. *See* Dkt. Nos. 158 & 159. On July 30, 2012, ICM filed its Fifth Amended Complaint for Declaratory Judgment ("5th Am. Compl."). *See* Dkt. No. 167. Plaintiffs timely moved to dismiss the 5th Am. Compl. ("MTD5"). *See* Dkt. No. 171.

According to the 5th Am. Compl., ICM designs and builds ethanol production plants for customers and promotes sells and installs centrifuge equipment to/for its customers to recover oil from corn byproducts. Dkt. No. 167, ¶ 9.

CleanTech is the owner of U.S. Patent Application Serial No. 11/122,859 (the "'859 application"), entitled "Method of Processing Ethanol Byproducts and Related Subsystems"), which was filed on May 5, 2005. *Id.* ¶ 2. The '859 application claims priority to U.S. Provisional Application Serial No. 60/602,050 ("'050 provisional application"), which was filed on August 17, 2004. *Id.* The '859 application eventually

issued on October 13, 2009, as U.S. Patent No. 7,601,858 (the "'858 patent"). *Id.* CleanTech is also the owner of U.S. Patent Application Serial Nos. 11/241,231 and 12/559,136 (the "'231 and '136 applications"), which eventually matured into U.S. Patent Nos. 8,008,516 and 8,008,517, respectively (the "'516 and '517 patents"). *Id.* ¶¶ 2 & 28. Both the '516 and the '517 patents claim priority to the '859 application. *Id.* ¶ 2.

ICM alleges that on or about July 15, 2009, GreenShift sent letters to certain ICM customers in which GreenShift falsely alleged that it owned the then-pending patent applications that later led to the '858 and '516 patents. *Id.* ¶ 10. ICM alleges that the letters also included false notice to ICM's customers for liability under 35 U.S.C. § 154(d) for installing systems and practicing corn oil recovery methods within the scope of published claims in the then-pending applications. *Id.* ICM also alleges that GreenShift failed to notify ICM's customers that they would be excluded from liability under 35 U.S.C. § 154(d)(2) if the claims of the issued patents were not substantially identical to the claims that appeared in the published applications. *Id.* ICM contends that GreenShift sent the letters to interfere with ICM's relationships with its customers. *Id.*

ICM asserts that on or about August 6, 2009, it notified GreenShift that the July 15 letters to ICM's customers had falsely and materially misrepresented any liability under § 154(d) because of substantial amendments made to the claims of the then-pending applications since their publication. *Id.* ¶ 11.

On or about October 7, 2009, GreenShift sent a second letter to several ICM customers, including Lifeline Foods LLC ("Lifeline"), again falsely alleging both ownership of the then-pending applications and liability for installing systems and

practicing corn oil recovery methods within the scope of the published claims of the applications. *Id.* ¶¶ 12-14. ICM owns and operates the centrifuge system installed at Lifeline. *Id.* ¶ 12.

ICM alleges that GreenShift's false and material misrepresentations to ICM's customers constitute unfair methods of competition under the Lanham Act and interference with ICM's existing and prospective business and contractual relationships and that ICM was damaged as a result. *Id.* ¶¶ 15-17.

ICM also contends that David Cantrell ("Cantrell"), a co-inventor of the '858 patent, delivered to Agri-Energy, LLC ("Agri-Energy") via an email dated August 1, 2003, a letter dated July 31, 2003, all of which is attached to the 5th Am. Compl. *Id.* ¶ 26 & Ex. C, thereto. The email is from Cantrell to Jay Sommers with attachments named: "Quote 11jul03 rev2.doc; Ethanol Payback Profitability Information.xls." *Id.* Ex. C. The July 31, 2003, letter is from Vortex Dehydration Technology, LLC ("VDT") and offers Agri-Energy a "No-Risk trial 'Oil Recovery System'" for 60 days at the end of which Agri-Energy will either purchase the system or return it to VDT. *Id.* Cantrell was the purported signatory of the letter as "Exec VP" of VDT. *Id.* ICM asserts that prior to July 31, 2003, Cantrell was in possession of test results that established that oil could be easily separated from concentrated thin stillage by mechanical processing. *Id.* ¶ 27.

ICM further contends that in a declaration to the U.S. Patent & Trademark Office ("PTO") dated November 5, 2010, in connection with the '231 and '136 applications that eventually matured into the '516 and '517 patents, respectively, Cantrell stated that on August 18, 2003, he hand-delivered the July 31, 2003, VDT letter to Agri-Energy during

a meeting. *Id.* ¶ 28. Based on Cantrell's declaration, CleanTech argued to the PTO that the letter was not material to the '231 and '136 applications. *Id.*

In addition, ICM alleges that in a declaration to the PTO dated July 10, 2012, in connection with U.S. Patent Application Serial No. 13/107,197 (the "'197 application"), Cantrell admitted that he delivered the July 31, 2003, letter to Agri-Energy via email on August 1, 2003. *Id.* ¶ 29.

ICM asserts that during prosecution of the '859 application that matured into the '858 patent, CleanTech knowingly and intentionally withheld information from the PTO regarding the August 1, 2003, delivery of the July 31, 2003, letter to Agri-Energy. *Id.* ¶ 30. Similarly, ICM contends that CleanTech knowingly and intentionally withheld the same information during prosecution of the '231 application that matured into the '516 patent. *Id.* ¶ 32. Withholding such information, ICM alleges, was made with the intent to deceive the PTO about a written offer to sell a system for recovering oil from concentrate thin stillage via mechanical separation more than one year prior to the August 17, 2004, filing date of the '050 provisional application. *Id.* ¶ 33.

Thus, ICM alleges that each of the claims of the '858, the '516 and the '517 patent is invalid and/or unenforceable for failure to satisfy the provisions of 35 U.S.C. §§ 101, 102, 103 and 112 and 37 C.F.R. § 1.56. *Id.* ¶ 35.

The Court takes judicial notice that at the time ICM filed the 5th Am. Compl., July 30, 2012, in its Third Amended Complaint, Plaintiffs had asserted claims of contributory patent infringement of the '858 and '516 patents against ICM; and infringement of those patents by ICM's customers, including but not limited to Cardinal Ethanol, LLC. *See* Master Dkt. No. 234, at ¶¶ 14-24.

## II.    MOTION TO DISMISS STANDARDS

This cause is before the Court as a result of a forum transfer by the Multidistrict Litigation Panel.  Because pleading requirements are a matter of federal law, the Court uses the law of the transferee court, the Seventh Circuit or the Federal Circuit (depending upon the issue), for the relevant Federal Rule of Civil Procedure 12(b) ("Rule 12(b)") standards.  *See Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 623 (N.D. Ill. 2008).  Plaintiffs have moved to dismiss Count I of the 5th Am. Compl. pursuant to Rule 12(b)(6); it has moved to dismiss Count II pursuant to Rule 9(b) and pursuant to Rule 12(b)(1).

Under the Supreme Court's directive in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to survive Plaintiffs' Rule 12(b)(6) motion for failure to state a claim upon which relief may be granted, ICM must provide the grounds for its entitlement to relief with more than labels, conclusions or a formulaic recitation of the elements of a cause of action.  *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  The Court assumes that all the allegations in the 5th Am. Compl. are true, but the "allegations must be enough to raise a right to relief above the speculative level."  *Id.*  The touchstone is whether the 5th Am. Compl. gives Plaintiffs "fair notice of what the … claim is and the grounds upon which it rests."  *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Further, pursuant to Rule 9(b) and Federal Circuit precedent, a claim for inequitable conduct before the PTO "must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) (following the lead of the Seventh Circuit in Rule 9(b) cases).  The "knowledge" and "intent"

6

elements of an inequitable conduct claim may be averred generally; however, the Federal Circuit "requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.* (citations omitted).

Under Rule 12(b)(1), for dismissal based on lack of standing, the Federal Circuit requires a plaintiff to allege that (1) it has suffered an "injury in fact" or "an invasion of a legally protected interest;" (2) "a causal connection between the injury and the conduct complained of;" and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Paradise Creations, Inc. v. U.V. Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "[S]tanding . . . must be present at the inception of the lawsuit." *Id.* Moreover, later events do not make standing retroactive. *See Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1384-85 (Fed. Cir. 2010). However, the operative "focus . . . are the facts existing at the time the complaint *under consideration* was filed." *Prasco, LLC v. Medicis Pharma. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (quoting *GAF Bldg. Mat'ls Corp. v. Elk Corp.*, 90 f.3d 479, 483 (Fed. Cir. 1996)) (emphasis by *Prasco* court; further citations omitted).

Although procedurally the Court is bound by Seventh Circuit or Federal Circuit law, matters raised in the 5th Am. Compl. under state law must be analyzed under the law of the transferor forum, Kansas. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE & PROCEDURE § 3866 (2007) ("Wright & Miller").

III.   **DISCUSSION**

A.   **Count I Alleging Unfair Competition Under the Lanham Act, 15 U.S.C. § 1125(a), and Kansas Common Law; and Tortious Interference with Contractual and Business Relationships**[2]

**Lanham Act Claim -** In Count 1, ICM alleges that Plaintiffs' false and material misrepresentations to ICM's customers constitute unfair methods of competition, interferes with ICM's existing and prospective business and contractual relationships, and that ICM has suffered injury as a result. Dkt. 167, at ¶¶ 15-17. Plaintiffs argue that ICM has failed to show that their statements were false and ICM's conclusory allegations are devoid of the factual enhancements necessary to satisfy federal pleading standards. Specifically, Plaintiffs assert that ICM has admitted that it and/or its customers infringe one or more claims in the published patent applications, thus substantiating Plaintiffs' right to pursue pre-issuance royalties under 35 U.S.C. § 154(d). Further, Plaintiffs aver that ICM has not pled sufficient facts to substantiate the damages or bad faith elements of a Lanham Act claim; that ICM's unfair competition claim is not cognizable in Kansas; and that ICM's allegations fail to satisfy any elements of an interference with business claim in Kansas.

The Court concludes that, while sparse, Count 1 of ICM's 5th Am. Compl. states a claim under the Lanham Act.[3]  Plaintiffs assert that ICM has "admitted" infringement by

---

[2] Plaintiffs have also moved to dismiss an allegation of deceptive trade practices under the Kansas Consumer Protection Act ("KCPA"), Dkt. No. 172, at 15; however, there is no claim under the KCPA in the 5th Am. Compl. since it appears ICM withdrew that claim in March 2010. *See* Dkt. Nos. 35, at 18 & 183-1, at 18.

[3] The Lanham Act provides, in relevant part:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any

both it and its customers, which negates any claim that the statements in GreenShift's letters are false. In fact, both parties assert that its version of the "facts" is true. On a motion to dismiss, however, the Court must take the allegations in the complaint as true. *See Twombly*, 550 U.S. at 555. In its 5th Am. Compl., ICM alleges that there were at least two material misrepresentations in the GreenShift letters: that GreenShift had an ownership interest in the subject patent applications; and that ICM and/or its customers infringed the applications, as amended. 5th Am. Compl. ¶¶ 10-14. Moreover, ICM alleges that these allegedly false statements were made to ICM's customers through the mail and caused ICM damages. *Id.* ¶¶ 10-17. Taken as true, these allegations state a claim for false advertising because they allege that Plaintiffs made false statements or misleading representations of fact in connection with its patented method, in commerce, that is likely to cause confusion about the characteristics of the patented method and such statements have injured ICM. *See Laser Diode Array, Inc. v. Paradign Lasers, Inc.*, 964 F. Supp. 90, 95-96 (W.D.N.Y. 1997) (collecting cases supporting the proposition that a party falsely representing patent rights will support a claim under the Lanham Act); *see also Spotless Enter., Inc. v. Carlisle Plastics, Inc.*, 56 F. Supp. 2d 274, 278-88 (E.D.N.Y. 1999) (concluding, after an in-depth analysis, that

---

combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which …

* * *

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Lanham Act claims may be pled against a patentee alleging infringement).  The Court declines Plaintiffs' invitation to address the factual disputes raised in their motion, which is improper on a motion to dismiss where all allegations in the complaint are taken as true and draw all reasonable inferences in ICM's favor.  *See, e.g.*, *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

**Kansas Common Law Unfair Competition Claim -** With respect to ICM's state law claim for unfair competition, Plaintiffs assert that no Kansas court has recognized such a tort for the conduct alleged here; therefore, the Court should dismiss that claim. ICM contends that lower Kansas courts have adopted the Restatement (Third) of Unfair Competition (the "Restatement") when addressing other types of alleged unfair competition; therefore, absent contrary appellate law, the Court should apply the Restatement here.  ICM asserts that its allegations support a claim under section 2 of the Restatement.[4]

Although the Court agrees with ICM that district courts in Kansas have concluded that the Kansas Supreme Court would adopt the Restatement, *see Airport Sys. Int'l, Inc. v. Airsys ATM, Inc.*, 144 F. Supp. 2d 1268, 1270-71 (D. Kan. 2001) (predicting that the Kansas Supreme Court would adopt the Restatement and recognize a claim for misuse of trade secrets or other confidential information); *ICE Corp. v. Hamilton Sunstrand*

---

[4] Section 2 of the Restatement provides:

> One who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services or commercial activities that is likely to deceive or mislead prospective purchasers to the likely detriment of another under the rule stated in § 3 is subject to liability to the other for relief appropriate under the rules stated in §§ 35-37.

Restatement (Third) of Unfair Competition § 2 (1995).

*Corp.*, No. 05-4135-JAR, 2007 WL 4570930, at *7 (D. Kan. Dec. 27, 2007) (applying the Restatement to a claim for unfair competition), the 5th Am. Compl. merely references a common law claim for unfair competition in a title.  There are no specific allegations regarding any such state law claim, under the Restatement or otherwise, in the enumerated paragraphs of the 5th Am. Compl.  In contrast, paragraph 16 of the 5th Am. Compl. at least references the Lanham Act as well as interference with ICM's existing and prospective business and contractual relationships.  Further, when advocating for a change in the law or a new cause of action, a litigant needs more than just bare bones allegations to survive a motion to dismiss.  *Cf. Kirskey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041-42 (7th Cir. 1999) (stating that "a claim that does not fit into an existing legal category needs more argument by the plaintiff to stave off dismissal, not less").  Here, not only are the factual allegations supporting a Kansas common law unfair completion claim sparse, there is no specific reference to such a claim tied to any factual allegations.  Under this circumstance, the Court must agree with Plaintiffs that ICM has failed to state a claim of unfair competition under Kansas common law.

**Tortious Interference with Contractual & Business Relationships Claim** – Like with its Lanham Act claim, ICM's claim that Plaintiffs tortuously interfered with its business and contractual relationships[5] by sending the GreenShift letters containing

---

[5] The elements of tortious interference with contract in Kansas are:  "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom."  *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004) (citations omitted).

In comparison, the elements of tortious interference with prospective business advantage or relationship are: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the

material misrepresentations is sparse on connections between facts and the legal standards.  Further, other than a conclusory statement that the GreenShift letters were sent to "certain customers of Plaintiff ICM," ICM names only one of those "certain customers," Lifeline Foods.  *See* 5th Am. Compl. ¶¶ 10 & 12.  Moreover, the 5th Am. Compl. makes only one, similarly conclusory statement about any contractual obligations the GreenShift letters purportedly impaired.  *Id.* ¶ 14.  It is unclear from the conclusory allegations what existing or prospective business advantage the GreenShift letters impaired.  The 5th Am. Compl. states that "ICM designs and builds plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil," *id.* ¶ 9, but there is no allegation that the letters prevented ICM from fulfilling contractual commitments or that a customer cancelled orders because of the GreenShift letters or there was some other interference with ICM's "designing and building" or "promoting, selling and installing centrifuges."

Even ICM's allegations with respect to Lifeline do not sufficiently allege an interference with ICM's contractual or business relationship to it.  According to the relevant allegation, the GreenShift letter referred to the allegedly infringing system that was already installed, not a contract waiting for fulfillment.  *Id.* ¶ 12.  Further, ICM states that it has an ownership interest in Lifeline and runs the allegedly infringing process, but asserts nothing about how the GreenShift letters interfered with this ownership interest.

---

defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct.

*Id.* (citations omitted).  Both causes of action "are predicated on malicious conduct by the defendant."  *Id.* (citations omitted).

ICM's conclusory allegations fail to put Plaintiffs on notice of exactly how the GreenShift letters interfered with ICM's contractual or prospective business relationships; therefore, those claims should be dismissed.

## B.   Count II For Declaratory Judgment Of Non-Infringement, Patent Invalidity & Unenforceability

In Count II of the 5th Am. Compl., ICM seeks a declaratory judgment of non-infringement of the '858, '516 and '517 patents; and a declaration that the patents are invalid and/or unenforceable.  ICM contends that CleanTech's and GreenShift's acts of sending the GreenShift letters constitute allegations of infringement by ICM and its customers and of indirect infringement by ICM through its customers of the '858 patent. 5th Am. Compl. ¶ 25.  Further, ICM alleges that Plaintiffs have "stated [their] intention to assert the '516 [p]atent against ICM," and that Plaintiffs are licensing the '858, '516 and '517 patents as part of a group of patents for which a license is necessary to avoid liability for patent infringement.  *Id.*  With the similarity of the '517 patent claims to Claim 8 of the '858 patent, ICM avers that Plaintiffs are alleging that ICM and its customers infringe the '517 patent as well.  *Id.*  ICM alleges that prior to commencing an action for infringement against ICM, Plaintiffs had no way to know the amount of oil that remained in the concentrated thin stillage stream leaving the centrifuge at any of ICM's customers.  *Id.* at ¶ 23.

In addition, ICM contends that the intentional withholding of the July 31, 2003, VDT letter during prosecution of the '858, '516 and '517 patents, invalidates or makes unenforceable each and every claim of the patents.  *Id.* at ¶¶ 26-34.

The Court has taken judicial notice that at the time ICM filed the 5th Am. Compl., July 30, 2012, in its Third Amended Complaint, Plaintiffs had asserted claims of

contributory patent infringement of the '858 and '516 patents against ICM; and infringement of those patents by ICM's customers, including but not limited to Cardinal Ethanol, LLC. *See* Master Dkt. No. 234, at ¶¶ 14-24.

**Inequitable Conduct Under Rule 9(b) –** Plaintiffs argue that the 5th Am. Compl. fails to allege why the July 31, 2003, VDT letter is material and how the examiner would have used this information to assess the patentability of the patent claims. In addition, Plaintiffs assert that the allegations do not give rise to an inference of scienter as required by the Federal Circuit.[6]

Plaintiffs require too much.[7] The materiality of an offer to sell more than one year prior to the priority date of August 17, 2004, is made obvious in the 5th Am. Compl. by ICM's reference to a failure of Plaintiffs to satisfy the requirements of 35 U.S.C. § 102. 5th Am. Compl. ¶ 34. Materiality is further supported by the allegation that at first, the inventors denied delivery of the letter prior to the August 17, 2004, date in order to assure the PTO that it was immaterial to the then-pending applications. *Id.* ¶ 28. But later, the inventors admitted to the PTO that Cantrell had delivered the letter well prior to August 17, 2003. *Id.* ¶ 29. These facts, taken together, establish how a patent examiner would have used the letter to assess viability of the applications.

Further, the 5th Am. Compl. specifically identifies that Cantrell and/or CleanTech knowingly and intentionally withheld information about the delivery of the July 31, 2003,

---

[6] "The relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of the withheld material information or the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Exergen*, 575 F.3d at 1327 (citing *Hebert v. Lisle Corp.*, 99 f.3d 1109, 1116 (Fed. Cir. 1996); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)).

[7] ICM makes no argument in rebuttal to Plaintiffs' Rule 9(b) challenge; however, under the circumstances presented here, the Court cannot characterize Plaintiffs' argument for dismissal of the inequitable conduct claim plausible.

VDT letter to a potential customer on August 1, 2003, in part, because Cantrell provided a declaration to the PTO contending otherwise and disavowing its materiality to any then-pending application.  *Id.* ¶¶ 30, 32.  There is also an averment that such was done with the intent to deceive the PTO about an offer to sell made more than one year prior to the August 17, 2004, filing date of the '050 provisional application.  *Id.* ¶ 33.  The contradictory statements by the patentees provided to the PTO are enough to infer the scienter element under the Federal Circuit standard enunciated in *Exergen*.

**Standing Under Rule 12(b)(1) & The Case Or Controversy Requirement –** Plaintiffs argue that the GreenShift letters were not sent to ICM, therefore, there was no actual controversy between the parties regarding the patents-in-suit at the time ICM filed suit.  In addition, Plaintiffs assert that, even if the Court concludes that ICM had standing to bring the suit, it should decline to hear ICM's declaratory judgment claims in favor of the later-filed infringement action filed by Plaintiffs in New York; or, alternatively, the Court should transfer ICM's declaratory action to New York once these MDL proceedings have concluded.  ICM claims that it has sufficiently alleged facts to support standing to bring its declaratory claims.

The Court concludes that ICM has pled enough facts to satisfy the case and controversy requirements of a declaratory judgment action because the GreenShift letter to Lifeline alleged infringing activities performed by ICM.  Under *MedImmune Inc. v. Genentech Inc.*, 547 U.S. 118 (2007), jurisdiction over a declaratory judgment action is proper when the dispute is "definite and concrete, touching the legal relations having adverse legal interests and that it be real and substantial and admit of specific relief through a decree of a conclusive character . . . ."  *Id.* at 774 n.11 (citing *Aetna Life Ins.*

*Co. v. Haworth*, 300 U.S. 227, 240 (1937)).  *See also Micron Tech. v. Mosaid Techs.*, 518 F.3d 897, 900-01 (Fed. Cir. 2008) (discussing jurisdiction over declaratory judgment actions decided in *MedImmune*).  The 5th Am. Compl. specifically states that the allegedly infringing acts occurring at Lifeline were acts of ICM:  "ICM owns and operates the centrifuge system installed at Lifeline Foods to conduct the corn oil recovery process."  5th Am. Compl. ¶ 12.  Thus, the second GreenShift letter was an allegation of infringement against ICM and put ICM on notice that GreenShift might file an infringement action and was seeking pre-issuance damages, against anyone practicing the method disclosed in the '050 provisional application.  This was a "definite and concrete" threat against ICM that was "real and specific" and could be remedied by a declaration of non-infringement of the method practiced by ICM at Lifeline.

Even if this were not the case, the Court disagrees with Plaintiffs' reading of the *Prasco* case, which is cited in Plaintiffs' brief at page 20.  Dkt. No. 172.  Plaintiffs assert that *Prasco* stands for the proposition that the relevant time is the date the original complaint is filed.  *Id.*  However, as cited in the standards section above, *Prasco* specifically states that the "proper focus for determining jurisdiction are the facts existing at the time the complaint under consideration was filed."  *Prasco*, 537 F.3d at 1337 (citations omitted).  The 5th Am. Compl. under consideration here was filed on July 30, 2012, a time at which Plaintiffs had asserted infringement and contributory infringement claims against ICM along with infringement claims against multiple ICM customers.  *See* Master Dkt. No. 234, ¶¶ 14-24.  Therefore, the Court concludes that ICM had standing both at the time it filed the original complaint and at the time it filed the 5th Am. Compl. to assert its declaratory judgment claims in Count II.

## C.   DISCRETIONARY DISMISSAL OF DECLARATORY CLAIMS OR TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK FOR ALL POST-MDL PROCEEDINGS

Plaintiffs request that, if ICM's declaratory claims survive, the Court should exercise its discretion to dismiss them in favor of the mirror, patent infringement complaint Plaintiffs filed in the Southern District of New York.  Plaintiffs assert that "it would be unjust and inefficient to allow ICM's anticipatory suit to proceed."  Dkt. No. 172, at 22.  In addition and in the alternative, Plaintiffs argue that transfer of the entire action to the Southern District of New York would serve the interests of justice.

ICM asserts that Plaintiffs have failed to justify deviation from the first-to-file rule and its declaratory claims should be heard in the court in which they were filed.  It makes no argument with respect to transfer of the entirety of its suit post-MDL proceedings.

Although the Court declines Plaintiffs' invitation to dismiss ICM's declaratory claims, it agrees that transfer of the entirety of this suit to the Southern District of New York after resolution of the MDL issues would best serve the interests of justice.  Generally, there must be a well-founded reason to decline jurisdiction over a properly-pled declaratory judgment action.  *See Elecs. For Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345 (Fed. Cir. 2005).  Further, "'[t]he purpose of the Declaratory Judgment Act … in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights.'"  *Micron Tech.*, 518 F.3d at 903 (quoting *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987)).  Moreover, when there are competing forum interests, such as is the case here where Plaintiffs' patent infringement claims against ICM was filed in New York a few days after ICM filed

the declaratory action, the Court "needs to consider the 'convenience factors' found in a transfer analysis under 28 U.S.C. § 1404(a)." *Id.* at 902-03. These factors include: (1) ICM's intention to preempt Plaintiffs' infringement suit; (2) the convenience and availability of witnesses; (3) the absence of jurisdiction over all necessary or desirable parties; and (4) the possibility of consolidation with related litigation. *Id.* at 904 (citing *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993)).

On balance, these factors weigh in favor of the retention of jurisdiction over ICM's declaratory claims and in favor of transfer to the Southern District of New York. As discussed above, the second GreenShift letter sent to Lifeline threatened ICM's legitimate business interests and put ICM on notice of potentially infringing activity. However, there is little factual basis in the 5th Am. Compl. from which the Court can conclude that Plaintiffs knew of ICM's stake in Lifeline, which lends weight to Plaintiffs' argument that ICM intended to preempt Plaintiffs' infringement suit. This is particularly true in light of the Plaintiffs' assertion that Lifeline is not in Kansas.

The convenience and availability of witness factor is neutral because either party would have to travel if the issues were litigated in the other party's home state. Further, as previously discussed, if Lifeline is not in Kansas and the GreenShift letter sent to it forms, in part, the basis for the declaratory action, there is no evidence that those witnesses would be any more inconvenienced if the action is in New York than Kansas. Moreover, it is unclear which court would have jurisdiction over more of the necessary parties; therefore, this factor is also neutral.

The "possibility of consolidation with related litigation" factor, however, weighs heavily in favor of both retaining discretionary jurisdiction over the declaratory claims

and transfer to the Southern District of New York.  Despite the advantages of this MDL with respect to this factor, the New York litigation has the greatest opportunity for consolidation after remand because ICM's customers (not Lifeline by name) have been sued in the New York case and another manufacturer of centrifuge systems and at least one of its customers are also defendants.  *See* Master Dkt. No. 679, ¶¶ 7 & 17. Further the other New York defendants allege substantially similar counterclaims of non-infringement, invalidity and unenforceability as ICM does in its declaratory claims. *See* Master Dkt. Nos. 716, ¶¶ 10-142; 717, ¶¶ 10-142.  Therefore, the New York litigation provides for additional opportunities for consolidation of issues during any proceedings on the merits after remand.

For these reasons, the Court concludes that dismissal of ICM's declaratory claims is unwarranted; however, transfer of this action to the Southern District of New York for any post-MDL proceedings would best serve efficiency and is in the interests of justice.

IV.     **CONCLUSION**

The Court concludes that ICM Inc.'s claims in Count I under Kansas state law should be dismissed with prejudice; however, its claim under the Lanham Act may proceed. Further, ICM Inc.'s declaratory judgment claims in Count II are properly pled and the transferor court will retain jurisdiction over them on remand; however, it is in the interests of justice to transfer this proceeding to the Southern District of New York after the Multidistrict Litigation proceedings. GS CleanTech Corporation's and GreenShift Corporation's Motion to Dismiss is hereby **GRANTED in part and DENIED in part** as set forth herein.

IT IS SO ORDERED this 27th day of February, 2013.


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to all registered counsel of record via CM/ECF.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: METHOD OF | ) | |
| PROCESSING ETHANOL | ) | |
| BYPRODUCTS AND RELATED | ) | |
| SUBSYSTEMS ('858) PATENT | ) | |
| LITIGATION | ) | |
| | ) | CASE NO:  1:10-ml-02181-LJM-DML |
| THIS DOCUMENT RELATES TO: | ) | |
| 1:10-cv-0180-LJM-DML | ) | |
| 1:10-cv-8000-LJM-DML | ) | |
| 1:10-cv-8001-LJM-DML | ) | |
| 1:10-cv-8002-LJM-DML | ) | |
| 1:10-cv-8003-LJM-DML | ) | |
| 1:10-cv-8004-LJM-DML | ) | |
| 1:10-cv-8005-LJM-DML | ) | |
| 1:10-cv-8006-LJM-DML | ) | |
| 1:10-cv-8007-LJM-DML | ) | |
| 1:10-cv-8008-LJM-DML | ) | |
| 1:10-cv-8009-LJM-DML | ) | |
| 1:10-cv-8010-LJM-DML | ) | |
| 1:10-cv-8011-LJM-DML | ) | |

## Revised and Amended Order on Case Management
## For the '858 Patent Family

On January 9, 2013, the magistrate judge conducted a telephone status conference with the parties to address case management issues for all patents in suit.  The court has determined that the '858 patent family (consisting of patents '858, '516, '517, and '484) will continue to be governed by a case management order separate from the '037 patent.  As to the '037 patent, the court has determined to accelerate the deadlines for claims construction matters, which will affect other case deadlines for that patent.  The court will issue a separate order for the '037 patent.

As the court previously advised the parties, it intends to address *all* liability issues with respect to the '858, '516, '517, and '484 patents that are appropriate for summary judgment

consideration at one time.   The court now sets the following revised deadlines for all liability

issues in connection with the '858, '516, '517, and '484 patents.[1]  This entry replaces the schedule

contained in Docket 756.

| **Event** | **Revised Deadline** |
|---|---|
| Contemporaneous exchange of amended infringement and invalidity contentions | February 11, 2013[2] |
| Identification of experts for party having burden of proof on issue for which expert testimony will be used | February 15, 2013 |
| Initial expert reports for party having burden of proof on issue for which expert testimony is proffered | March 15, 2013 |
| Rebuttal expert reports | May 15, 2013 |
| Close of fact and expert discovery on liability | June 17, 2013 |
| Summary judgment motions by the patent holders (referred to as "plaintiffs" hereafter) addressed to infringement** | July 16, 2013 |
| Cross-motions for summary judgment by the parties alleged to infringe the patents (referred to as "defendants" hereafter) addressed to invalidity and affirmative defenses | **deadline addressed below |

---

[1]      During the January 9, 2013 telephone conference, counsel for CleanTech advised that it intends to file a motion for summary judgment against one defendant, Adkins Energy, on contract claims that are independent of patent infringement and patent invalidity issues.  If CleanTech decides to file such a motion, it must do so by February 19, 2013.  Briefing will proceed on that motion according to Local Rule 56-1, and is not governed by the summary judgment briefing protocol established in this entry for the patent issues.

[2]      The court recognizes that amended contentions and the identification of experts may depend, in large part, on the content of the court's revisited claims construction ruling but expects that, given the parties' current understanding of the issues, the parties can act quickly and meet these deadlines once the court issues its ruling.

## Summary Judgment Briefing

\*\*The court adopts a four-brief protocol for the summary judgment briefing with the patent holders (hereafter referred to as "plaintiffs" in this entry, though recognizing that the patent holders are not the denominated plaintiffs in all cases) going first in all instances. The court assumes that any such motions for summary judgment by the plaintiffs will be focused on infringement issues. The plaintiffs must file *one brief* in support of all their motions for summary judgment. The page limit for the plaintiffs' brief is 90 pages. To clarify further, the court contemplates that the patent holders will file a short, separate motion for each individual case in which they seek summary judgment on infringement. They will file, however, only one brief that encompasses the summary judgment arguments and evidence in support of all the motions. To the extent some evidence and arguments pertain to a particular motion against a particular defendant, that evidence and argument will be identified by a separate heading within the brief. Otherwise, the evidence and argument applicable to the claims against all (or most) defendants should be presented just once. The plaintiffs must file just one appendix that contains all evidentiary materials they cite in support of their motions.

The defendants (meaning the parties alleged to have infringed) then have 45 days from service of the plaintiffs' opening brief to respond to the plaintiffs' motions *and* to file and serve any cross-motions for summary judgment related to invalidity and any other affirmative defenses to infringement they believe are amenable to summary judgment. A defendant must combine in one consolidated filing all arguments in response to the plaintiffs' motion and in support of its cross-motion for summary judgment. In addition, the defendants are required to the greatest extent possible to submit one coordinated brief among them that contains their consolidated arguments in opposition to the plaintiffs' motions and in support of their cross-motions. (The

extra 15 days' response time is designed to meet the need for collaboration among the defendants).  The page limit for the coordinated brief is 90 pages.  Any separate brief by any defendant must be limited to arguments not contained in the coordinated brief, and the page limit is 15 pages.  The defendants also are required to the greatest extent possible to submit one coordinated appendix of evidence cited in their briefs.  Any separate appendix must be limited to evidence not contained in the coordinated appendix.

The plaintiffs then have 30 days from service of the defendants' brief(s) to file one consolidated brief replying in support of their initial motions and responding to the defendants' motion(s).  Even if some defendants filed separate briefs, the plaintiffs must include their arguments in reply and in response in one brief.  The page limit for this brief is 50 pages.  Any new evidentiary materials must be contained in a single appendix.

The defendants then have 21 days from service of the plaintiffs' brief to file their reply brief(s) in support of their cross-motions.  Again, the defendants are required to the greatest extent possible to submit one coordinated brief among them that contains their arguments in reply to their motions for summary judgment.   Any separate reply brief by any defendant must be limited to arguments not contained in the coordinated brief.  The page limit for the coordinated reply brief is 50 pages.  The page limit for any separate reply brief is 10 pages.

All briefs must include a table of contents and all appendices must include a descriptive index.

### Additional Instructions

For all briefs and appendices, the filing party must deliver a copy (on three-hole punch paper and contained in a binder) by mail or hand delivery to Judge McKinney's chambers.  The hard-copy appendices must include tab dividers.

All electronic filing of summary judgment motions, briefs, and appendices are to be made *only* in the Master Docket under Case No. 1:10-ml-2181-LJM-DML.  The clerk of the court will undertake the task of making duplicate filings in individual cases where appropriate.

So ORDERED.

Date:  01/10/2013

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system

As permitted by Local Rule 5-5(b)(2), the court will not distribute copies of this order to those attorneys not registered for electronic notification via CM/ECF.

5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

_____
                                              )
                                              )
ICM, INC.,                                    )
                                              )        Civil Action No.  09-1315-WEB-
KMH                                           )
                                              )
        **Plaintiff,**                        )
                                              )        **FIRST AMENDED**
        v.                                    )        **COMPLAINT FOR**
                                              )        **DECLARATORY JUDGMENT**
GS CLEANTECH CORPORATION                       )
GREENSHIFT CORPORATION,                        )
                                              )        **JURY TRIAL REQUESTED**
        **Defendants.**                        )
_____)

Plaintiff ICM, Inc. ("ICM"), for its Complaint against defendants GS CleanTech

Corporation ("CleanTech") and GreenShift Corporation ("GreenShift") states and alleges as

follows:

<u>**PARTIES**</u>

1.      ICM is a Kansas Corporation having its principal place of business at 310 North

First Street, Colwich, Kansas.

2.      Defendant CleanTech is a Delaware Corporation having its principal place of

business at 1 Penn Plaza, Suite 1612, New York, New York.  CleanTech is the owner of U.S.

Patent Application Serial No. 11/122,859 (the "'859 patent application"), entitled "Method of

Processing Ethanol Byproducts and Related Subsystems."  The '859 patent application was

published as U.S. Patent Application Publication No. 20060041152 on February 23, 2006 and

subsequently issued as U.S. Patent No. 7,601,858 (the "'858 Patent") on October 13, 2009.  A

true and correct copy of the '858 Patent is attached hereto as Exhibit A.  CleanTech is also the

owner of U.S. Patent Application Serial No. 11/241,231 (the "'231 patent application"), entitled

"Methods of Processing Ethanol Byproducts and Related Subsystems," which published as U.S. Patent Application Publication No. 20060041153 on February 23, 2006 (the "'153 patent application publication").

3.      Defendant GreenShift is a Delaware Corporation having its principal place of business at 1 Penn Plaza, Suite 1612, New York, New York.  Upon information and belief, GreenShift is a holding company and owns 100% of Defendant CleanTech.

<div align="center">

**JURISDICTION AND VENUE**

</div>

4.      This is an action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367.

6.      This Court has personal jurisdiction over Defendants because they transact business in this jurisdiction.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

<div align="center">

**PRELIMINARY ALLEGATIONS**

</div>

8.      The present action involves an actual dispute between Plaintiff and Defendants over Plaintiff's right to sell and/or use equipment to practice corn oil recovery methods that are in part the subject of the claims of the '858 Patent and the '153 patent application publication.

9.      Plaintiff ICM designs and builds ethanol production plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn byproducts.

10.      On or about July 15, 2009, Defendant GreenShift sent letters to certain customers of Plaintiff ICM (the "July 15 letters") alleging ownership of the '858 and '231 patent

applications and notifying such customers of liability for installing systems and practicing corn

oil recovery methods within the scope of published claims in the '858 and '231 patent

applications under 35 U.S.C. § 154(d).   Upon information and belief, GreenShift and/or

CleanTech knew that the intended recipients of the July 15 letters were customers of ICM and

that ICM had installed the centrifuge systems used in the corn oil recovery processes.

11.     On or about August 6, 2009, ICM through its patent counsel notified Defendant

GreenShift in writing that the July 15 letters to ICM customers falsely and materially

misrepresented any liability under 35 U.S.C. § 154(d) by virtue of substantial amendments made

to the claims of the '858 and '231 patent applications since the publication date of the '858 and

'231 patent applications.

12.     Thereafter, on or about October 7, 2009, Defendant GreenShift sent a letter to

Lifeline Foods LLC (the "October 7 letter"), alleging ownership of the '858 and '231 patent

applications and notifying Lifeline Foods of liability for installing systems and practicing corn

oil recovery methods within the scope of published claims in the '858 and '231 patent

applications under 35 U.S.C. § 154(d).   Upon information and belief, GreenShift knew that

Lifeline Foods was a customer of ICM and was 49% owned by ICM.   Upon information and

belief, GreenShift and/or CleanTech knew that ICM had installed the centrifuge systems in

Lifeline Foods' facility.   ICM owns and operates the centrifuge systems installed in Lifeline

Foods' facility to conduct the corn oil recovery processes.

13.     At the time of the July 15 letters, Defendant GreenShift knowingly

misrepresented itself as the owner of the '858 and 231 patent applications.   At the time of the

October 7 letter, Defendant GreenShift knowingly misrepresented itself as the owner of the '858

and '231 patent applications.

14.     At the time of the July 15 letters and the October 7 letter, the claims pending in the '858 and '231 patent applications had been materially amended such that no claim in such patent applications was substantially identical to the claims pending in such patent applications at the time of publication.  Defendant GreenShift knowingly and/or intentionally misrepresented that ICM's customers had liability under 35 U.S.C. § 154(d) in a manner calculated to interfere with the business relationship and/or contractual relationship between ICM and its customers in regard to sales and installation of centrifuge systems for use in corn oil recovery processes.

## COUNT I
## UNFAIR COMPETITION/INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS AND CONTRACTUAL RELATIONSHIP/DECEPTIVE TRADE PRACTICES

15.     The allegations of paragraphs 1-14 are incorporated by reference as if fully set forth herein.

16.     Defendant GreenShift's acts constitute unfair methods of competition, interference with ICM's existing and prospective business and contractual relationships and unfair or deceptive acts or practices.

17.     ICM has suffered injury as a result of GreenShift's unfair, deceptive and misleading acts in an amount in excess of $75,000.

18.     ICM is entitled to injunctive relief, and/or all other available statutory remedies, including attorney fees and costs under Kansas Stat. § 50-634.

## COUNT II
## FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT, PATENT INVALIDITY

19.     The allegations of paragraphs 1-18 are incorporated by reference as if fully set forth herein.

20.     Defendants CleanTech and GreenShift's acts defined above constitute direct allegations of patent infringement against ICM's customers with respect to the '858 Patent and indirect patent infringement allegations against ICM with respect to the '858 Patent by virtue of ICM's promotion, sale and installation of centrifuge systems used in a corn oil recovery process used by ICM's customers that is the subject of claims of the '858 Patent.

21.     Each of the claims of the '858 Patent is invalid for failure to satisfy the provisions of at least 35 U.S.C. § 103.

22.     Plaintiff ICM is entitled to a declaration of non-infringement of the '858 Patent.

### REQUEST FOR JURY TRIAL

23.     Plaintiff requests a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ICM prays that:

A.     The Court declare that GreenShift's acts constitute unfair methods of competition, interference with ICM's existing and prospective business and contractual relationships and unfair or deceptive acts or practices and award ICM its damages in an amount to be determined;

B.     The Court declare invalid each of the claims of the '858 Patent;

C.     The Court issue an injunction against GreenShift, CleanTech and anyone acting in privity or concert with them from charging infringement or instituting any legal action for infringement of the '858 Patent against ICM or anyone acting in privity with ICM, including the successors, assigns, agents, suppliers, manufacturers, contractors and customers of ICM;

D.     ICM be awarded its costs in this action;

E.     ICM be awarded attorneys' fees in this action pursuant to 35 U.S.C. § 285; and

F.     ICM be awarded such other relief as the Court deems just and equitable.

**<ins>Trial Location Designation</ins>**

Plaintiff requests that the trial of this action be held in Wichita, Kansas.

Dated:   October 14, 2009

DICKE, BILLIG & CZAJA, PLLC
John M. Weyrauch (221,879) (*pro hac vice to be filed*)
Michael A. Bondi (237,309) (*pro hac vice to be filed*)
100 South Fifth Street, Suite 2250
Minneapolis, MN 55402
Telephone: (612) 767-2512
Facsimile: (612) 573-2005


By:   <ins>s/Charles E. Millsap</ins>
Charles E. Millsap (# 9692)
Fleeson, Gooing, Coulson & Kitch, L.L.C.
1900 EPIC Center
301 N. Main
Wichita, KS 67202
Tel:  (316) 267-7361
E-mail:  cmillsap@fleeson.com

ATTORNEYS FOR PLAINTIFF

# Exhibit A



US007601858B2

(12) **United States Patent**
Cantrell et al.

(10) **Patent No.:**  **US 7,601,858 B2**
(45) **Date of Patent:**  **Oct. 13, 2009**

(54) **METHOD OF PROCESSING ETHANOL BYPRODUCTS AND RELATED SUBSYSTEMS**

(75) Inventors: **David Fred Cantrell**, Lakemont, GA (US); **David J. Winsness**, Alpharetta, GA (US)

(73) Assignee: **GS Cleantech Corporation**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 578 days.

(21) Appl. No.: **11/122,859**

(22) Filed: **May 5, 2005**

(65) **Prior Publication Data**

US 2006/0041152 A1     Feb. 23, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/602,050, filed on Aug. 17, 2004.

(51) Int. Cl.
*C11B 1/00* (2006.01)
(52) U.S. Cl. ....................................................... **554/8**
(58) Field of Classification Search .................. 554/8
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,206,024 A | 7/1940 | Brown | |
| 2,216,904 A | 10/1940 | Brown | |
| 2,216,905 A | 10/1940 | Brown et al. | |
| 2,263,608 A | 11/1941 | Brown | |
| 2,446,913 A | 8/1948 | Erlich | |
| 2,524,718 A | 10/1950 | Stark | |
| 2,615,029 A | 10/1952 | Rosten | |
| 2,663,718 A | 12/1953 | Strezynski | |
| 3,721,568 A | 3/1973 | Wilson | |
| 3,950,230 A | 4/1976 | Greenfield et al. | |
| 4,341,713 A | 7/1982 | Stolp et al. | |

| | | | |
|---|---|---|---|
| 4,407,955 A | 10/1983 | Muller et al. | |
| 4,944,954 A | 7/1990 | Strop et al. | |
| 5,250,182 A | 10/1993 | Bento et al. | |
| 5,269,947 A | 12/1993 | Baskis | |
| 5,316,782 A | 5/1994 | Zimlich, III | |
| 5,662,810 A | 9/1997 | Willgohs | |
| 5,801,140 A | 9/1998 | Langley et al. | |
| 5,958,233 A | 9/1999 | Willgohs | |
| 5,998,641 A | 12/1999 | Ganguli et al. | |
| 6,146,645 A | 11/2000 | Deckers et al. | |
| 6,433,146 B1 | 8/2002 | Cheryan | |

(Continued)

OTHER PUBLICATIONS

Singh, et al., "Extraction of Oil from Corn Distillers Dried Grains with Solubles", 1998, Transactions of the ASAE, Bol. 41(6), pp. 1175 and 1176.*

(Continued)

*Primary Examiner*—Deborah D Carr
(74) *Attorney, Agent, or Firm*—Cantor Colburn LLP

(57) **ABSTRACT**

In one aspect of the invention, a method recovers oil from a concentrated byproduct, such as evaporated thin stillage formed during a dry milling process used for producing ethanol. The method includes forming a concentrate from the byproduct and recovering oil from the concentrate. The step of forming the concentrate may comprise evaporating the byproduct. Further, the step of separating the oil from the concentrate may comprise using a centrifuge and, in particular, a disk stack centrifuge. Other aspects of the invention include related methods and subsystems for recovering oil from thin stillage.

**16 Claims, 4 Drawing Sheets**



## US 7,601,858 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,761,914 B2 | 7/2004 | Deckers et al. |
| 2003/0093832 A1 | 5/2003 | Szarka et al. |
| 2003/0180415 A1 | 9/2003 | Stiefel et al. |
| 2004/0081654 A1 | 4/2004 | Schryvers et al. |
| 2004/0082044 A1 | 4/2004 | Prevost et al. |
| 2004/0087808 A1* | 5/2004 | Prevost et al. ................. 554/9 |

### OTHER PUBLICATIONS

Yokoyama, et al. "Liquid Fuel Production from Ethanol Fermentation Stillage" 1986, The Chemical Society of Japan, pp. 649-652.*
Minowa, T. et al., Oil Production form Buchwheat Stillage by Thermochemical Liquefactional, 1993, national Inst. for Resources and Environment, Ibaraki (Japan), STN, Abstract, NTIS database.*
Yokoyama, et al., "Liquid Fuel Production from Ethanol Fermentation Stillage", 1986, The Chemical Society of Japan, pp. 649-652.
"Disk Stack Centrifuge Technology," Alfa Laval website, www.alfalaval.com. Aug. 3, 2004.
N. Singh and M. Cheryan, Extraction of Oil from Corn Distillers Dried Grains with Solubles, Transactions of the ASAE, 1998, pp. 1775-1777, vol. 41(6).
Y. Dote et al., Liquefaction of Stillage from Ethanolic Fermentation and Upgrading of Liquefied Oil, Trans. Mat. Res. Soc. Jpn., 1994, pp. 285-288, vol. 18A.

(No Author Available), "Thermochemical Liquefaction", article by Wisconsin Biorefining Development Initiative, www.wisbiorefine.org, p. 1-4, undated.
International Search Report dated Mar. 11, 2008.
International Search Report dated Aug. 20, 2008.
Alfa Laval, "NS 934 DD Decanter," PFT00017EN 0207, PFT00018EN 0207, PFT00007EN 0207, 6 pags., 1999.
(No Author Available) "Thermochemical Liquefaction" article by Wisconsin Biorefining Development Initiative, www.wisbiorefine.org. pp. 1-4, undated, 2004.
(No Author Available), "Thermochemical Liquefaction", article by Wisconsin Biorefining Development Initiative, www.wisbiorefine.org, pp. 1-4, undated, 2004.
Mcintyre, Craig., "Measurement solutions for Ethanol Producers", A white paper by Endress+Hauser, Inc., Copyright 2003, pp. 1-10.
Jacques et al. "The Alcohol Textbook" 3rd Edition, published 1999, Part 1 of 4 Parts, 53 pgs.
Jacques, et al., "The Alcohol Textbook", 3rd Edition, published 1999, Part 2 of 4 Parts, 50 pgs.
Jacques, et al., "The Alcohol Textbook", 3rd Edition, published 1999, Part 3 of 4 Parts, 50 pgs.
Jacques, et al., "The Alcohol Textbook", 3rd Edition, published 1999, Part 4 of 4 Parts, 42 pgs.

* cited by examiner

Whole Stillage
"Mechanical Separation"
CASE 1
"BEFORE"
Moisture Content of Distillers Wet Grains: 65.0%
Solids Concentration in Thin Stillage: 6.70%
Moisture Concentration in Syrup: 80.0%
GPM Lbs/Hr
Total Capacity 145 72,210
- Total Moisture 118 58,702
- Total Solids 27 13,508
Distillers Wet Grains
GPM Lbs/hr %
Total Volume 57.5 28,634
Moisture: 37.4 18,612 65.0%
Total Solids 20.1 10,022 35%
Thin Stillage
GPM Lbs/hr %
Total Volume 87.5 43,576
Moisture: 80.5 40,090 92%
Oil Content: 1.1 566 1.3%
Solids: 5.9 2,920 6.70%
Evaporator Removes
26,146 Lbs/hr of Water, or
53 GPM of Water
$50.98 Operating Cost ($/hr)
Syrup
GPM Lbs/hr %
Total Volume 35.0 17,430
Moisture: 28.0 13,944 80.0%
Oil Content: 1.1 566 3.2%
Solids: 5.9 2,920 17%
Dried Product - having 10% moisture content (lbs/hr): 15,009
Moisture to Evaporate (lbs/hr): 31,055
or, in GPM: 62.4
Fuel Required in Dryer (in Decatherms): 52.4
Dryer Operating Cost @ $5.00 Decatherm ($/hr): $262.22
Product Value ($/hr): $600.36

*Fig. 1*

Whole Stillage
"Mechanical Separation"
CASE 1
"AFTER"
Moisture Content of Distillers Wet Grains: 65.0%
Solids Concentration in Thin Stillage: 6.70%
Moisture Concentration in Syrup: 80.0%
GPM Lbs/Hr
Total Capacity 145 72,210
- Total Moisture 118 58,702
- Total Solids 27 13,508
Distillers Wet Grains
GPM Lbs/hr %
Total Volume 57.5 28,634
Moisture: 37.4 18,612 65.0%
Total Solids 20.1 10,022 35%
Thin Stillage
GPM Lbs/hr %
Total Volume 87.5 43,576
Moisture: 80.5 40,090 92%
Oil Content: 1.1 566 1.3%
Solids: 6.9 2,920 6.70%
12
Evaporator Removes
26,146 Lbs/hr of Water, or
53 GPM of Water
$50.98 Operating Cost ($/hr)
10
Syrup
GPM Lbs/hr %
Total Volume 35.0 17,430
Moisture: 28.0 13,944 80.0%
Oil Content: 1.1 566 3.2%
Solids: 6.9 2,920 17%
Syrup (lbs/hr): 16,892
Moisture: 82.5%
Moisture (lbs/hr): 13,944
Oil Content (lb/hr): 28
Solids Content (lbs/hr): 2,920
14
Lbs/hr GPM
Oil Recovered (lbs/hr): 538 1.1
Oil Value ($/hr): $102
16
Dried Product - having 10% moisture content (lbs/hr): 14,411
Moisture to Evaporate (lbs/hr): 31,115
or, in GPM: 62.5
Fuel Required in Dryer (in Decatherms): 52.5
Dryer Operating Cost @ $5.00 Decatherm ($/hr): $262.73
Product Value ($/hr): $576.46

*Fig. 2*



| Whole Stillage "Mechanical Separation" | | CASE 2 "BEFORE" |
|---|---|---|
| Moisture Content of Distillers Wet Grains: | | 60.0% |
| Solids Concentration in Thin Stillage: | | 3.67% |
| Moisture Concentration in Syrup: | | 60.0% |

| | GPM | Lbs/Hr |
|---|---|---|
| Total Capacity | 145 | 72,210 |
| - Total Moisture | 118 | 58,702 |
| - Total Solids | 27 | 13,508 |

**Distillers Wet Grains**

| | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 56.9 | 28,325 | |
| Moisture: | 34.1 | 16,995 | 60.0% |
| Total Solids | 22.8 | 11,330 | 40% |

**Thin Stillage**

| | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 88.1 | 43,885 | |
| Moisture: | 83.7 | 41,707 | 95% |
| Oil Content: | 1.1 | 566 | 1.3% |
| Solids: | 3.2 | 1,612 | 3.67% |

| Evaporator Removes | | |
|---|---|---|
| 38,440 | Lbs/hr of Water, or | |
| 77 | GPM of Water | |
| $74.96 | Operating Cost ($/hr) | |

**Syrup**

| | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 10.9 | 5,445 | |
| Moisture: | 6.6 | 3,267 | 60.0% |
| Oil Content: | 1.1 | 566 | 10.4% |
| Solids: | 3.2 | 1,612 | 30% |

| | |
|---|---|
| Dried Product - having 10% moisture content (lbs/hr): | 15,009 |
| Moisture to Evaporate (lbs/hr): | 16,761 |
| or, in GPM: | 37.7 |
| Fuel Required in Dryer (in Decatherms): | 31.7 |
| Dryer Operating Cost @ $5.00 Decatherm ($/hr): | $158.41 |
| Product Value ($/hr): | $600.36 |

*Fig. 3*

| Whole Stillage "Mechanical Separation" | | CASE 2 "AFTER" |
|---|---|---|
| Moisture Content of Distillers Wet Grains: | | 60.0% |
| Solids Concentration in Thin Stillage: | | 3.67% |
| Moisture Concentration in Syrup: | | 60.0% |
| | GPM | Lbs/Hr |
| Total Capacity | 145 | 72,210 |
| - Total Moisture | 118 | 58,702 |
| - Total Solids | 27 | 13,508 |

| Distillers Wet Grains | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 56.9 | 28,325 | |
| Moisture: | 34.1 | 16,995 | 60.0% |
| Total Solids | 22.8 | 11,330 | 40% |

| Thin Stillage | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 88.1 | 43,885 | |
| Moisture: | 83.7 | 41,707 | 95% |
| Oil Content: | 1.1 | 566 | 1.3% |
| Solids: | 3.2 | 1,612 | 3.67% |

| Evaporator Removes | |
|---|---|
| 38,440 | Lbs/hr of Water, or |
| 77 | GPM of Water |
| $74.96 | Operating Cost ($/hr) |

| Syrup | GPM | Lbs/hr | % |
|---|---|---|---|
| Total Volume | 10.9 | 5,445 | |
| Moisture: | 6.6 | 3,267 | 60.0% |
| Oil Content: | 1.1 | 566 | 10.4% |
| Solids: | 3.2 | 1,612 | 30% |

| Syrup (lbs/hr): | 4,907 |
|---|---|
| Moisture: | 66.6% |
| Moisture (lbs/hr): | 3,267 |
| Oil Content (lb/hr): | 28 |
| Solids Content (lbs/hr): | 1,612 |

| | Lbs/hr | GPM |
|---|---|---|
| Oil Recovered (lbs/hr): | 538 | 1.1 |
| Oil Value ($/hr): | $102 | |

| | |
|---|---|
| Dried Product - having 10% moisture content (lbs/hr): | 14,411 |
| Moisture to Evaporate (lbs/hr): | 18,821 |
| or, in GPM: | 37.8 |
| Fuel Required in Dryer (in Decatherms): | 31.8 |
| Dryer Operating Cost @ $5.00 Decatherm ($/hr): | $158.92 |
| Product Value ($/hr): | $576.46 |

*Fig. 4*

US 7,601,858 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD OF PROCESSING ETHANOL BYPRODUCTS AND RELATED SUBSYSTEMS

This application claims the benefit of U.S. Provisional Patent Application Ser. No. 60/602,050, filed Aug. 17, 2004, the disclosure of which is incorporated herein by reference.

## COPYRIGHT STATEMENT

A portion of the disclosure of this document contains material subject to copyright protection. No objection is made to the facsimile reproduction of the patent document or this disclosure as it appears in the Patent and Trademark Office files or records, but any and all rights in the copyright(s) are otherwise reserved.

## TECHNICAL FIELD

The present invention relates generally to recovering oil and, more particularly, to recovering oil from a byproduct of the dry milling process used to form ethanol.

## BACKGROUND OF THE INVENTION

Over the past thirty years, significant attention has been given to the production of ethyl alcohol, or "ethanol," for use as an alternative fuel. Ethanol not only burns cleaner than fossil fuels, but also can be produced using grains such as corn, which are of course renewable resources. At present, approximately sixty-nine "dry milling" plants in the United States produce over two billion gallons of ethanol per year. Additional plants presently under construction are expected to add over four hundred million gallons to this total in an effort to meet the current high demand.

As noted in the foregoing discussion, a popular method of producing ethanol is known as "dry milling," and in the United States is typically practiced using corn. As is well known in the industry, the dry milling process utilizes the starch in the corn or other grain to produce the ethanol through fermentation, and creates a waste stream comprised of byproducts termed "whole stillage" (which may be further separated into products known as distillers wet grains and "thin stillage"). Despite containing valuable oil, this whole stillage has for the most part been treated as waste and used primarily to supplement animal feed (mostly in the form of distillers dried grains with solubles (DDGS), which is created by evaporating the thin stillage, recombining the resulting concentrate or syrup with the distillers wet grains, and drying the product to have a low moisture content; see, e.g., U.S. Pat. Nos. 5,662,810 and 5,958,233, the disclosures of which are incorporated herein by reference).

Efforts to recover the valuable oil from this byproduct have not been successful in terms of efficiency or economy. For example, one approach involves attempting to separate the oil from the thin stillage before the evaporation stage, such as using a centrifuge. However, spinning the thin stillage at this stage does not produce usable oil, but rather merely creates an undesirable emulsion phase requiring further processing. Moreover, the volume of thin stillage present is generally 2 to 10 times greater than the syrup, which requires considerable capital to purchase the number of centrifuges required. Together, these obstacles make attempts to recover oil from thin stillage highly inefficient and uneconomical.

U.S. Pat. No. 5,250,182 (the disclosure of which is incorporated herein by reference) describes the use of filters for removing substantially all solids and recovering lactic acid and glycerol from the thin stillage without the need for evapo-

ration. Despite eliminating a step in the conventional process, the proposal results in a more complicated arrangement requiring multiple filtration steps. Wholesale elimination of the evaporator in the vast majority of existing plants is also unlikely and otherwise uneconomical. Filters, and especially the microfiltration and ultrafiltration types proposed in this patent, are also susceptible to frequent plugging and thus disadvantageously increase the operating cost. For these reasons, the filtration process proposed in this patent has not gained widespread commercial acceptance.

Accordingly, a need exists for a more efficient and economical manner of recovering oil from a byproduct containing it, such as thin stillage created during the dry milling process used to produce ethanol.

## SUMMARY OF THE INVENTION

In accordance with one aspect of the invention, a method of processing a concentrated byproduct of a dry milling process for producing ethanol, such as by using corn, is disclosed. In its most basic form, the method comprises recovering oil from the concentrated byproduct.

In one embodiment, the byproduct comprises thin stillage, and the method includes the step of evaporating the thin stillage to form a concentrate. The recovering step may further comprise separating the oil from the concentrate using a disk stack centrifuge. Preferably, the recovering step comprises: (1) providing the concentrated byproduct at a temperature of between about 150 and 212° F. and, most preferably, at a temperature of about 180° F.; and/or (2) providing the concentrated byproduct having a pH of between about 3 and 6 and, most preferably, between about 3.5 and 4.5. Additionally, it is preferred that the concentrated byproduct have a moisture content greater than 15% by weight, more preferably a moisture content greater than 50% and less than 90% and, most preferably, a moisture content between about 60-85%. The step of recovering the oil from the concentrated byproduct produces syrup, and the method may further include the step of recovering oil from the syrup.

In accordance with another aspect of the invention, a more specific method of processing concentrated thin stillage created by a dry milling process for producing ethanol, such as from corn, is disclosed. The method comprises recovering oil from the concentrated thin stillage having a moisture content of less than about 90% by weight.

In one embodiment, the recovering step comprises separating the oil from the concentrate using a disk stack centrifuge. The method may further include the step of drying the concentrate after the removing step.

In accordance with still another aspect of the invention, a method of recovering oil from thin stillage is disclosed. The method comprises evaporating the thin stillage to create a concentrate having a moisture content of greater than 15% by weight and less than about 90% by weight. Oil is then recovered by centrifuging the concentrate, preferably using a disk stack centrifuge.

In accordance with yet another aspect of the invention, a method of processing whole stillage is disclosed. The method comprises recovering thin stillage including oil and solids from the whole stillage, concentrating the thin stillage including the solids, and recovering oil from the concentrate.

In one embodiment, the step of recovering the thin stillage includes using a separator selected from the group consisting of a press, extruder, a decanter centrifuge, and a screen centrifuge. The concentrating step may comprise processing the thin stillage to a temperature of between about 150 and 212° F., a pH of between about 3 and 6, and a moisture content of

US 7,601,858 B2

**3**

less than 90%. The step of recovering oil comprises separating the oil from the concentrate using a centrifuge. The recovering and concentrating steps may be performed in a continuous fashion. The method may further include drying the concentrate after recovering oil.

In accordance with a further aspect of the invention, a subsystem for use in a system for producing ethanol by dry milling and creating thin stillage as a byproduct is disclosed. The subsystem comprises an evaporator for evaporating the thin stillage to form a concentrate, and a centrifuge for receiving the concentrate and recovering oil therefrom. Preferably, the concentrate has a moisture content of less than about 90% by weight, and the centrifuge is a disk stack type.

Still a further aspect of the invention is a subsystem for use in a system for producing ethanol by dry milling and creating thin stillage as a byproduct. The subsystem comprises an evaporator for evaporating the thin stillage to form a concentrate and means for recovering oil from the concentrate. In one embodiment, the recovering means comprises a centrifuge and, most preferably a disk stack centrifuge.

Yet a further aspect of the invention is the combination of a concentrate formed from thin stillage including oil and a centrifuge for removing at least a portion of the oil from the concentrate. Preferably, the concentrate has a moisture content of greater than 15% by weight and less than about 90% by weight, and the centrifuge is a self-cleaning bowl type of disk stack centrifuge, a nozzle bowl disk stack centrifuge, or a horizontal centrifugal decanter

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partially schematic flow chart illustrating the processing of co-products formed during the ethanol extraction process;

FIG. 2 is a partially schematic flow chart illustrating the recovery of oil from a syrup formed by evaporating the thin stillage;

FIG. 3 is a schematic view similar to FIG. 1; and

FIG. 4 is a schematic view similar to FIG. 2.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with one aspect of the invention, a method recovers oil from a byproduct resulting from the production of ethanol using a dry milling technique (which is extensively described in the above-referenced '182 patent). The byproduct, known as "thin stillage," is recovered by separating the distillers wet grain from the "whole stillage" leftover after fermentation is complete. As is known in the art, this mechanical separation may be accomplished using a press/extruder, a decanter centrifuge, or a screen centrifuge. Moisture is then removed from the unfiltered thin stillage to create a concentrate or syrup, such as through evaporation. Advantageously, usable oil is then easily recovered from this concentrated form of the byproduct through relatively simple mechanical processing, without the prior need for multiple stages of filtration or other expensive and complicated undertakings.

In one embodiment, oil is recovered from the concentrate by passing it through a centrifuge and, in particular, a disk stack centrifuge (and most preferably a self-cleaning bowl type). Preferably, the concentrate fed to the disk stack centrifuge is at a temperature of between about 150 and 212° F. (and ideally 180° F.) and a pH of between about 3 and 6 (ideally between about 3.5 and 4.5). As a result of the preceding evaporation step, the concentrate has a moisture content of greater than 15% and less than about 90%, more preferably

**4**

between 30% and about 90%, and ideally about 60-85% by weight. Under these process conditions, the disk stack centrifuge is able to separate the oil in usable form from the concentrate in an efficient and effective manner, despite the relatively high level of solids present (which may be recovered from the centrifuge in a continuous or intermittent fashion, depending on the particular process conditions).

Besides creating usable oil, the concentrate or syrup recovered from the disk stack centrifuge is considered more valuable. This is because the post-evaporation processing to recover or remove the oil improves the efficiency of the drying process used on the combined concentrate syrup and distillers wet grains. A stable, flowable product for supplementing animal feed results, which thus further complements the value of the oil recovered.

Two examples are presented below to demonstrate the efficacy of the above-described method.

## EXAMPLE 1

Reference is made to FIGS. 1 and 2 to illustrate schematically a first example demonstrating the efficacy of the present method.

FIG. 1 represents one technique for processing whole stillage resulting from dry milling corn to create distillers dried grains with solubles. The whole stillage leftover after deriving the ethanol is mechanically separated into distillers wet grains (approx. 35% solids) and thin stillage (approx. 6.7% solids), such as by using a centrifugal decanter. The thin stillage is then introduced to an evaporator to create a syrup having a moisture content of approximately 80% by weight and about 17% solids by weight. The syrup is then recombined with the distillers wet grains, introduced to a drum dryer, and dried to reduce the overall moisture content to approximately 10% by weight. An estimated total value of the resulting distillers dried grains with solubles is $600.36 per hour.

FIG. 2 represents the inventive method and a related subsystem 10 for implementing it. Initial processing of the whole stillage is done in the same fashion, and the mechanically separated thin stillage is delivered to the evaporator 12 forming part of the subsystem 10. The resulting concentrate or syrup having a moisture content of approximately 80% by weight and a solids content of approximately 17% by weight is delivered to a disk stack centrifuge 14, and preferably a "solids ejecting" one, such as an Alfa Laval Model No. AFPX 510, AFPX 513, or AFPX 617 or equivalent device. At an infeed rate of approximately 35 gallons per minute, this centrifuge 14 recovers usable oil at a rate of 538 pounds per hour and produces syrup having a having a moisture content of 82.5% by weight, but with far less oil in view of the preceding recovery step.

Recombining the syrup (which is substantially free of oil) from the centrifuge 14 with the distillers wet grains and drying in a drum dryer 16 to a moisture content of 10% by weight results in a product having a value of $576.46 per hour. However, the 538 pounds per hour of oil recovered has a product value of approximately $102 per hour. Accordingly, the total product value using the inventive method is $678.46 per hour, which is approximately 12% greater than the $600.36 per hour product value resulting from use of the conventional set-up shown in FIG. 1. Moreover, removal of the majority of the oil before the drying step makes the process more efficient, and results in an estimated energy savings of approximately 10%, or $26.27 per hour. As a result, product value per hour ($678.46) less the estimated dryer operat-

US 7,601,858 B2

5

ing cost ($236.46 per hour with the 10% savings) and less the estimated evaporator operating cost ($50.98 per hour) is about $391.02 per hour.

## EXAMPLE 2

Reference is made to FIGS. 3 and 4, which illustrate a prophetic comparison between one processing method and the inventive method. The set-up is essentially the same as shown in FIGS. 1 and 2, but a more effective centrifugal decanter is used than the one used in Example 1. As a result, the syrup introduced to the disk stack centrifuge 14 would have a moisture content estimated at 60% by weight. While this does not impact the product value figures, the syrup from the centrifuge 14 has a moisture content of only 66.6% by weight, as compared to 82.5% by weight in Example 1. As a result, the cost per hour of drying this syrup when combined with the distillers wet grains to achieve an end product having a moisture content of less than 10% is only $158.92, or approximately 40% less. Assuming a savings in dryer efficiency of 10%, the product value per hour ($678.46) less the estimated dryer operating cost ($143.03 per hour) and less the estimated evaporator operating cost ($74.96 per hour) is $460.46 per hour. This represents an approximate 15% increase over the corresponding value calculated for Example 1.

As should be appreciated, the above-described method and subsystem of the preferred embodiment essentially require the addition of a centrifuge downstream of the evaporator in the conventional system for processing thin stillage (which centrifuge may thus be considered a "means for" recovering oil from thin stillage). Accordingly, instructions on how to implement the above-described method (including the optimum process variables) may be provided along with a centrifuge for use in an ethanol plant for forming the novel subsystem 10 disclosed herein. Such instructions result in the most efficient implementation of the method, as compared to the situation where the scientists or engineers at the plant must experiment with the centrifuge to determine the optimum process conditions required to achieve a favorable result.

The foregoing description provides illustration of the inventive concepts. The descriptions are not intended to be exhaustive or to limit the disclosed invention to the precise form disclosed. Modifications or variations are also possible in light of the above teachings. For example, the syrup recovered from the centrifuge may be evaporated and processed again in a further effort to recover oil before drying. Moreover, in addition to a self-cleaning bowl type of disk stack centrifuge, a nozzle bowl disk stack centrifuge would work as a means for recovering oil from the concentrate, as would a horizontal centrifugal decanter (which may be especially beneficial when the moisture content of the concentrate is less than 50% by weight) or other like devices for separating oil from a substance including suspended solids. Moreover, besides corn, the present invention may have utility with any other grain used in a dry milling process for producing ethanol, such as for example, milo. The embodiments described above were chosen to provide the best application to thereby enable one of ordinary skill in the art to utilize the inventions in various embodiments and with various modifications as are suited to the particular use contemplated. All such modifications and variations are within the scope of the invention.

The invention claimed is:

1. A method of recovering oil from thin stillage, the method comprising, in sequence:

6

evaporating the thin stillage to remove water and form a concentrated byproduct; and

recovering oil from the concentrated byproduct by heating and mechanically processing the concentrated byproduct to separate the oil from the concentrated byproduct, wherein the concentrated byproduct has a moisture content of greater than 30% and less than 90% by weight.

2. The method of claim 1, wherein the mechanical processing comprises separating the oil from the concentrated byproduct using a disk stack centrifuge.

3. The method of claim 1, wherein the recovering step is performed on the concentrated byproduct at a temperature of between about 150 and 212° F.

4. The method of claim 1, wherein the recovering step is performed on the concentrated byproduct at a temperature of about 180° F.

5. The method of claim 1, wherein the recovering step is performed on the concentrated byproduct having a pH of between about 3 and 6.

6. The method of claim 1, wherein the recovering step is performed on the concentrated byproduct having a pH of between about 3.5 and 4.5.

7. The method of claim 1, wherein the concentrated byproduct has a moisture content between about 60-85%.

8. A method of recovering oil from thin stillage, comprising, in sequence: evaporating the thin stillage to create a concentrate having a moisture content of greater than 30% by weight and less than about 90% by weight; and centrifuging the concentrate to recover oil.

9. The method according to claim 8, wherein the step of centrifuging the concentrate comprises using a disk stack centrifuge.

10. A method of processing whole stillage, comprising: recovering thin stillage from the whole stillage, the thin stillage including oil and solids; concentrating the thin stillage including the solids to produce a thin stillage concentrate, wherein the thin stillage concentrate has a moisture content of greater than 30% and less than 90% by weight; and recovering oil from the concentrate by a process consisting essentially of heating and mechanically processing the concentrate to separate the oil from the concentrate.

11. The method of claim 10, wherein the step of recovering the thin stillage includes using a separator selected from the group consisting of a press, extruder, a decanter centrifuge, and a screen centrifuge.

12. The method of claim 10, wherein the concentrating step comprises processing the thin stillage to a temperature of between about 150 and 212° F., a pH of between about 3 and 6.

13. The method of claim 10, wherein the step of recovering oil comprises separating the oil from the concentrate using a centrifuge.

14. The method of claim 10, wherein the recovering and concentrating steps are performed in a continuous fashion.

15. The method of claim 10, further including the step of drying the concentrate after the step of recovering the oil.

16. In a method for processing corn to produce ethanol and concentrated thin stillage, the improvement comprising the step of recovering a product consisting essentially of oil from the concentrated thin stillage by heating and mechanically processing the concentrated thin stillage to separate the oil from the concentrated thin stillage.

* * * * *



# Cantor Colburn LLP

*Intellectual Property Attorneys*

Peter R. Hagerty
phagerty@cantorcolburn.com
Partner

**ATLANTA**
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

**WASHINGTON DC**
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

**HARTFORD**
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

**DETROIT**
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

www.cantorcolburn.com

July 15, 2009

**VIA CERTIFIED MAIL #7006 2150 0004 1398 2208**
**RETURN RECEIPT REQUESTED**

Raymond Defenbaugh
Big River Resources, LLC
15210 103rd Street
West Burlington, IA 52655

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT BIG
RIVER RESOURCES, LLC; OUR REF. NO.: GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above identified GreenShift Applications are enclosed for your review.

It has come to our attention that Big River Resources, LLC may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications.

Specifically, we have been advised that Big River Resources, LLC has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. This activity falls squarely within

**Cantor Colburn** LLP

*Intellectual Property Attorneys*

BIG RIVER RESOURCES, LLC
July 15, 2009
Page 2

the scope of the published claims of the GreenShift Applications. Big River Resources, LLC is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

(A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ....

(B)    had actual notice of the published patent application...."

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans.    If, after reviewing these published applications, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc    David Winsness, Chief Technology Officer, GreenShift



# Cantor Colburn LLP
*Intellectual Property Attorneys*

Peter R. Hagerty
phagerty@cantorcolburn.com
Partner

ATLANTA
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

WASHINGTON DC
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

HARTFORD
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

DETROIT
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

www.cantorcolburn.com

July 15, 2009

**VIA CERTIFIED MAIL #7006 2150 0004 1398 2192**
 **RETURN RECEIPT REQUESTED**

Raymond Defenbaugh
Big River Resources Galva, LLC
110 SE 2nd Street
Galva, IL 61434

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT BIG
       RIVER RESOURCES GALVA, LLC; OUR REF. NO.:
       GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above identified GreenShift Applications are enclosed for your review.

It has come to our attention that Big River Resources Galva, LLC may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications.

Specifically, we have been advised that Big River Resources Galva, LLC has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the

# Cantor Colburn LLP

*Intellectual Property Attorneys*

**BIG RIVER RESOURCES GALVA, LLC**
July 15, 2009
Page 2

concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Big River Resources Galva, LLC is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

      (A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ....

      (B)    had actual notice of the published patent application...."

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
.PRH/glk

cc    David Winsness, Chief Technology Officer, GreenShift



# Cantor Colburn LLP

*Intellectual Property Attorneys*

*Peter R. Hagerty*
phagerty@cantorcolburn.com
Partner

**ATLANTA**
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

**WASHINGTON DC**
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

**HARTFORD**
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

**DETROIT**
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

*www.cantorcolburn.com*

July 16, 2009

**VIA CERTIFIED MAIL #7006 2150 0004 1396 8714**
 **RETURN RECEIPT REQUESTED**

Steve Roe
Little Sioux Corn Processors, LP
4808 F Avenue
Marcus, IA 51035

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT
       LITTLE SIOUX CORN PROCESSORS, LP; OUR REF. NO.:
       GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above identified GreenShift Applications are enclosed for your review.

It has come to our attention that Little Sioux Corn Processors, LP may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications.

Specifically, we have been advised that Little Sioux Corn Processors, LP has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the

# Cantor Colburn LLP

*Intellectual Property Attorneys*

**LITTLE SIOUX CORN PROCESSORS, LP**
July 16, 2009
Page 2

concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Little Sioux Corn Processors, LP is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

    (A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ….

    (B)    had actual notice of the published patent application…."

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc      David Winsness, Chief Technology Officer, GreenShift



# Cantor Colburn LLP

*Intellectual Property Attorneys*

Peter R. Hagerty
phagerty@cantorcolburn.com
Partner

ATLANTA
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

WASHINGTON DC
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

HARTFORD
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

DETROIT
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

www.cantorcolburn.com

July 15, 2009

**VIA CERTIFIED MAIL #7006 2150 0004 1398 2222**
**RETURN RECEIPT REQUESTED**

Jeff Painter
Cardinal Ethanol, LLC
1554 North 600 East
Union City, IN 47390

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT
       CARDINAL ETHANOL, LLC; OUR REF. NO.: GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above identified GreenShift Applications are enclosed for your review.

It has come to our attention that Cardinal Ethanol, LLC may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications.

Specifically, we have been advised that Cardinal Ethanol, LLC has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Cardinal

Cantor Colburn LLP

*Intellectual Property Attorneys*

CARDINAL ETHANOL, LLC
July 15, 2009
Page 2

Ethanol, LLC is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

(A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ….

(B)    had actual notice of the published patent application…."

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc    David Winsness, Chief Technology Officer, GreenShift

# DICKE, BILLIG & CZAJA, PLLC

### Patent • Trademark • Copyright
### ATTORNEYS
Suite 2250 • Fifth Street Towers • 100 South Fifth Street • Minneapolis, Minnesota 55402
Telephone: (612) 573-2000    Facsimile: (612) 573-2005

Michael A. Bondi
Direct Dial: (612) 767-2512
mbondi@dbclaw.com

August 6, 2009

Peter R. Hagerty, Esq.
Cantor Colburn LLP
1180 Peachtree Street
Atlanta, GA 30309

      Re:    Greenshift Letters

Dear Mr. Hagerty:

We represent ICM, Inc. ("ICM") with respect to intellectual property matters. We write in response to the letters of July 15, 2009, that you sent on behalf of Greenshift Corporation "(Greenshift") to Big River Resources LLC and Big River Resources Galva LLC. To the extent that Greenshift has sent letters to other ICM licensees, customers and/or vendors that have not been brought to our attention, this response also applies to those such letters.

Your letters identified the following published pending patent applications that are allegedly owned by Greenshift:

|   | Applic. No. | Publication No. |
|---|-------------|-----------------|
| 1 | 11/122,859 | 2006/0041152 |
| 2 | 11/241,231 | 2006/0041153 |

Greenshift markets equipment for use in conjunction with ethanol production plants in competition with ICM. As such, even though the letters referenced above were not sent to ICM, the letters were clearly intended to interfere with the relationship between ICM and its licensees, customers and/or vendors. ICM intends to vigorously protect such relationships from interference by Greenshift.

We take issue with the merit of the points set forth in your letters for the reasons set forth below:

Peter R. Hagerty, Esq.
August 6, 2009
Page 2

**(1)     Ability to Obtain Reasonable Royalty Pursuant to 35 U.S.C. § 154(d)**

Your letters reference Subsection (1) of 35 U.S.C. § 154(d) but fail to acknowledge the restrictions on these provisional rights that are set forth below in Subsection (2):

> (2) RIGHT BASED ON SUBSTANTIALLY IDENTICAL INVENTIONS.- The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

In interpreting the preceding provision, courts have held that where the claims were substantively changed from the claims published, no valid provisional rights existed.

US Patent Publication No. 2006/0041152 ("The '152 Publication") included 6 independent claims. In response to a restriction requirement, independent claims 22 and 25 were withdrawn from prosecution and appear to currently remain withdrawn as of the date of this letter. Independent claim 11 was canceled during the examination process.

During the examination of this patent application, independent claims 1, 14 and 16 have each been amended at least once and associated arguments were presented on why the amended claims were distinguishable from the cited patents. Additionally, independent claim 31, which was added during examination, has not been included in a published patent application.

US Patent Publication No. 2006/0041153 ("The '153 Publication") included 6 independent claims. In response to a restriction requirement, independent claims 47 and 49 were withdrawn from prosecution and appear to currently remain withdrawn as of the date of this letter. Independent claims 40 and 42 have been canceled during the examination process.

During the examination of this patent application, independent claims 31 and 43 have each been amended at least once and associated arguments were presented on why the amended claims were distinguishable from the cited patents.

Accordingly, each of the independent claims in the '152 Publication and the '153 Publication has been withdrawn, canceled or amended. In light of the restrictions set forth in U.S.C. § 154(d)(2), Greenshift does not have a valid basis to potentially claim the right to reasonable royalties during the pendency of these patent applications.

As such, it is apparent that Greenshift letters were sent to ICM licensees with the intent to improperly interfere with ICM's business relationships. If Greenshift takes any further actions to interfere with ICM's business relationships, ICM is prepared to take the necessary steps to stop such interference.

Peter R. Hagerty, Esq.
August 6, 2009
Page 3

### (2)    Mischaracterization of Prevost

In Response to the citation of Prevost, U.S. Patent Publication No. 2004/0087808 ("Prevost") during the examination before the U.S. Patent & Trademark Office, Greenshift amended its claims and submitted arguments attempting to distinguish the claims from Prevost. On page 9 of the Response dated September 15, 2008, for the '152 Publication patent application, it was alleged that:

> Applicants have carefully studied Prevost and can find no teaching or suggestion of a <u>post evaporation process</u> for recovering oil from the concentrated byproduct by heating and mechanical as in claim 1 and 16 or by centrifuging as in claim 14.

(emphasis in original)

Paragraph [0014] from Prevost reads as follows:

> The syrup can be added to the wet distillers grain prior to the drying step and be processed under the same conditions as the wet distillers grains as described above.  An oil removal step can be performed on either the thin stillage before evaporation or on the syrup after evaporation.  If performed prior to evaporation, an oil removal process such as centrifugation is preferred whereas after evaporation a solvent extraction process is preferred to extract at least a portion of the oil from the syrup.

The preceding passage clearly appreciates that oil removal can be done on the thin stillage before evaporation <u>or</u> on the syrup (concentrated thin stillage) after evaporation.  This passage also clearly references that centrifugation may be used for oil removal.

While the preceding passage indicates that centrifugation is preferred if oil removal is done prior to evaporation, Prevost does not indicate that it is not possible to use centrifugation to remove oil from the syrup (concentrated thin stillage) after evaporation.

Prevost lists the preferred technique for removing oil after evaporation is solvent extraction.  Because of the size of commercial ethanol production plants, persons of skill in the art would appreciate that solvent extraction is not desired for use in this situation because using solvent extraction on such a large scale would necessitate that the ethanol plant obtain a tier II emissions permit from the Environmental Protection Agency.  Obtaining such a permit can be quite time consuming and costly and, as such, is generally desired to be avoided if other options are available that do not require obtaining this type of permit.

On Page 8 of the Response dated September 15, 2008, for the '152 Publication patent application, it was noted that "the obviousness inquiry also requires consideration of common knowledge and common sense" citing KSR Int'l Co. v. Teleflex Inc. that was decided by the US Supreme Court.

Peter R. Hagerty, Esq.
August 6, 2009
Page 4

In light of the preceding comments, it is our opinion that a court would find obvious claims that include (1) evaporation of thin stillage and (2) recovery of oil from the concentrated thin stillage using heat and mechanical processing (centrifuging) using common knowledge and common sense based upon the preceding comments.

As you are no doubt aware, misrepresentations to the U.S. Patent & Trademark Office may impact the validity of any patents that could issue from the patent applications referenced above.

### (3)     Concentration of Thin Stillage

Based upon our review of the prosecution history of the '152 Publication and the '153 Publication, it appears that Greenshift believes the use of concentration of thin stillage in an ethanol production facility is a new concept. The prior art supports just the opposite conclusion.

For some time, it has been known in the ethanol production industry that concentration of thin stillage is desirable. First, thin stillage has a lower value than more concentrated forms such as dried distillers grains and dried distillers grains with solubles. A person of skill in the art would appreciate that one suitable technique for concentrating thin stillage is evaporation.

Second, concentrating thin stillage enables a higher percentage of water to be recycled in the ethanol production plant, which reduces the amount of water than must be added to the ethanol production plant.

While it is possible to cite numerous documents in support of this proposition, two such representative documents are *The Alcohol Textbook* (3rd ed. © 1999 Altech Inc.) and *Measurement Solutions for Ethanol Producers* (© 2003 Endress+Hauser, Inc.). A copy of the preceding documents is enclosed herewith.

In light of the preceding materials and comments, it is our opinion that there is no support for the emphasis on concentration of thin stillage as being a unique aspect of the invention.

### (4)     Oil Recovery from By-Products of Distillation Processes

Based upon our review of the prosecution history of the '152 Publication and the '153 Publication, it appears that Greenshift believes the oil recovery from by-products of distillation processes is a new concept. To the contrary, the prior art supports just the opposite conclusion.

Recovering oil from the by-products of distillation processes is discussed in the following representative items:

Peter R. Hagerty, Esq.
August 6, 2009
Page 5

| Patent No. | Filing Date | Summary |
|---|---|---|
| 2,216,905 | 8/12/1938 | Describes recovering oil from distillers' slop. Primarily focuses on drying and then solvent extracting. |
| 2,615,029 | 2/24/1950 | Discusses recovering oil from distillers' slops such as distillers' thin slop. One grain that may be used in conjunction with this process is corn. This patent indicates that a three-way centrifuge may be used. This patent does not discuss concentrating the thin slop. |
| 2,663,718 | 4/20/1950 | Describes recovering oil from distillery slop using a three-way centrifuge. |
| 4,341,713 | 4/18/1980 | Describes a process for recovering oil from corn germ using a three-way centrifuge. The starting material used in this process is wet milled corn germ. While this patent does not discuss recovering the oil from stillage, it does indicate that those in the grain processing field recognized in 1980 that oil can be recovered from corn components using a centrifuge. |

In light of the preceding materials and comments, it is our opinion that there is no support for the emphasis on oil recovery from by-products of distillation processes as being a unique aspect of the invention.

## CONCLUSION

Based upon the preceding comments, ICM has serious questions on the ability of Greenshift to obtain enforceable patent protection for the concepts in the '152 Publication and the '153 Publication.

ICM is prepared to vigorously defend any further actions by Greenshift including but not limited to Greenshift's attempts to interfere with the relationship between ICM and its current and potential licensees, customers and/or vendors.

Very truly yours,

DICKE, BILLIG & CZAJA, PLLC

Michael A. Bondi

cc: ICM Inc.



# Cantor Colburn LLP

*Intellectual Property Attorneys*

*Peter R. Hagerty*
phagerty@cantorcolburn.com
Partner

**ATLANTA**
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

**WASHINGTON DC**
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

**HARTFORD**
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

**DETROIT**
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

*www.cantorcolburn.com*

October 7, 2009

*VIA FEDERAL EXPRESS*

Lifeline Foods
Attn: Bill Becker
   President and CEO
2811 South 11th Street
St. Joseph, MO 64503

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT
       LIFELINE FOODS; OUR REF. NO.: GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above-identified GreenShift Applications are enclosed for your review.

It should be noted that related pending U.S. Patent Application Nos. 12/559,136 filed on 09-14-2009 and 11/122,859 filed on May 5, 2005 are believed to include claims that are substantially identical to the published '152 application. It should also be noted that several claims from the '152 application have been allowed by the U.S. Patent and Trademark Office and will issue as a U.S. Patent in the near future (the "Issuing Claims").

# Cantor Colburn LLP

*Intellectual Property Attorneys*

It has come to our attention that Lifeline Foods may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications and/or the Issuing Claims.

Specifically, we have been advised that Lifeline Foods has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Lifeline Foods is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

    (A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ....

    (B)    had actual notice of the published patent application...."

In addition to the reasonable royalties that may accrue from the date of publication of the patent application to actual issuance to the extent permitted in 35 U.S.C. § 154(d), whoever, without authority, uses any patented invention within the United States during the term of the patent infringes the patent. Damages for infringement under 35 U.S.C. § 284 are no less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs. In some instances, the Court has discretion to increase damages up to three times the amount found or assessed.

# Cantor Colburn LLP

*Intellectual Property Attorneys*

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications and the Issuing Claims, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc    David Winsness, Chief Technology Officer, GreenShift



# Cantor Colburn LLP
*Intellectual Property Attorneys*

*Peter R. Hagerty*
phagerty@cantorcolburn.com
Partner

**ATLANTA**
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

**WASHINGTON DC**
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

**HARTFORD**
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

**DETROIT**
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

*www.cantorcolburn.com*

October 7, 2009

*VIA FEDERAL EXPRESS*

Raymond Defenbaugh
Big River Resources LLC
15210 103rd Street
West Burlington, IA 52655

RE:     CORN OIL EXTRACTION SYSTEM AND PROCESS AT BIG
        RIVER RESOURCES LLC; OUR REF. NO.: GSC00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above-identified GreenShift Applications are enclosed for your review.

It should be noted that related pending U.S. Patent Application Nos. 12/559,136 filed on 09-14-2009 and 11/122,859 filed on May 5, 2005 are believed to include claims that are substantially identical to the published '152 application. It should also be noted that several claims from the '152 application have been allowed by the U.S. Patent and Trademark Office and will issue as a U.S. Patent in the near future (the "Issuing Claims").

It has come to our attention that Big River Resources LLC may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications and/or the Issuing Claims.

**Cantor Colburn** LLP

*Intellectual Property Attorneys*

Specifically, we have been advised that Big River Resources LLC has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Big River Resources LLC is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

(A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ….

(B)    had actual notice of the published patent application…."

In addition to the reasonable royalties that may accrue from the date of publication of the patent application to actual issuance to the extent permitted in 35 U.S.C. § 154(d), whoever, without authority, uses any patented invention within the United States during the term of the patent infringes the patent. Damages for infringement under 35 U.S.C. § 284 are no less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs. In some instances, the Court has discretion to increase damages up to three times the amount found or assessed.

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications and the Issuing Claims, you are interested in integrating GreenShift's patent pending extraction technologies

# Cantor Colburn LLP

*Intellectual Property Attorneys*

**BIG RIVER RESOURCES LLC**
October 7, 2009
Page 3

into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc    David Winsness, Chief Technology Officer, GreenShift



# Cantor Colburn LLP

*Intellectual Property Attorneys*

Peter R. Hagerty
phagerty@cantorcolburn.com
Partner

**ATLANTA**
1180 Peachtree Street
Suite 2050
Atlanta, GA 30309
phone: 404-607-9991
fax: 404-607-9981

**WASHINGTON DC**
1800 Diagonal Road
Suite 510
Alexandria, VA 22314
phone: 703-236-4500
fax: 703-236-4501

**HARTFORD**
20 Church Street
22nd Floor
Hartford, CT 06103
phone: 860-286-2929
fax: 860-286-0115

**DETROIT**
201 W. Big Beaver Road
Suite 1101
Troy, MI 48084
phone: 248-524-2300
fax: 248-524-2700

*www.cantorcolburn.com*

October 7, 2009

*VIA FEDERAL EXPRESS*

Steve Roe
Little Sioux Corn Processors, LP
4808 F Avenue
Marcus, IA 51035

RE:    CORN OIL EXTRACTION SYSTEM AND PROCESS AT
       LITTLE SIOUX CORN PROCESSORS, LP; OUR REF.
       NO.: GSC'00018-G

Dear Sir or Madam:

This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. A very serious matter has recently been brought to our attention.

GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above-identified GreenShift Applications are enclosed for your review.

It should be noted that related pending U.S. Patent Application Nos. 12/559,136 filed on 09-14-2009 and 11/122,859 filed on May 5, 2005 are believed to include claims that are substantially identical to the published '152 application. It should also be noted that several claims from the '152 application have been allowed by the U.S. Patent and Trademark Office and will issue as a U.S. Patent in the near future (the "Issuing Claims").

It has come to our attention that Little Sioux Corn Processors, LP may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications and/or the Issuing Claims.

Cantor Colburn LLP

*Intellectual Property Attorneys*

**LITTLE SIOUX CORN PROCESSORS, LP**
October 7, 2009
Page 2

Specifically, we have been advised that Little Sioux Corn Processors, LP has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. This activity falls squarely within the scope of the published claims of the GreenShift Applications. Little Sioux Corn Processors, LP is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.

The United States Patent Laws provide in 35 U.S.C. § 154(d):

"(1)    IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued-

(A)    (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ....

(B)    had actual notice of the published patent application...."

In addition to the reasonable royalties that may accrue from the date of publication of the patent application to actual issuance to the extent permitted in 35 U.S.C. § 154(d), whoever, without authority, uses any patented invention within the United States during the term of the patent infringes the patent. Damages for infringement under 35 U.S.C. § 284 are no less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs. In some instances, the Court has discretion to increase damages up to three times the amount found or assessed.

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. If, after reviewing these published applications and the Issuing Claims, you are interested in integrating GreenShift's patent pending extraction technologies

**Cantor Colburn** LLP

*Intellectual Property Attorneys*

**LITTLE SIOUX CORN PROCESSORS, LP**
October 7, 2009
Page 3

into your ethanol production facilities under a mutually beneficial agreement, please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

Sincerely,

Peter R. Hagerty
PRH/glk

cc     David Winsness, Chief Technology Officer, GreenShift

JUDGE SCHEINDLIN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GS CLEANTECH CORPORATION | |
| Plaintiff, | '09 CIV 8642 |
| | Civil Action No. |
| v. | |
| GEA WESTFALIA SEPARATOR, INC.; and DOES 1 - 20, INCLUSIVE | JURY TRIAL DEMANDED |
| Defendant. | |

RECEIVED
OCT 1 3 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, GS CleanTech Corporation, for its Complaint against Defendants, GEA

Westfalia Separator, Inc. and DOES 1 - 20 (collectively "Defendants"), alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This is a claim for patent infringement and arises under the patents laws of the

United States, Title 35 of the United States Code.  This Court has original jurisdiction over the

subject matter of this claim under 28 U.S.C. §§ 1331 and 1338(a).

2.      GS CleanTech Corporation (hereinafter "GS CleanTech") is a Delaware

corporation having its principal place of business at 1 Penn Plaza, Suite 1612, New York, New

York 10119.  GS CleanTech is a wholly-owned subsidiary of GreenShift Corporation

(hereinafter "GreenShift"), a Delaware corporation having its principal place of business at 1

Penn Plaza, Suite 1612, New York, New York 10119.

3.      GS CleanTech is the owner by assignment of United States Patent No. 7,601,858,

entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," issued on

October 13, 2009 (the " '858 patent").  The '858 patent issued from a patent application

originally filed on May 5, 2005 as Serial No. 11/122,859 (the " '859 application") and published

on February 23, 2006 as U.S. Patent Application Publication 2006/0041152. Both the '858

patent and the '859 application claim priority to GS CleanTech's first patent application related

to its novel corn oil extraction methods and systems, which was filed in August of 2004 as a

provisional application (Serial No. 60/602,050) (the "'050 provisional application"). The patent

and patent application are generally directed to the recovery of corn oil from the byproducts

produced during the manufacture of ethanol from corn.

4.      GS CleanTech has standing to sue for infringement of the '858 patent because it

owns all right, title and interest in and to the '858 patent, including the right to collect for past

and future damages. GS CleanTech has suffered injury from the Defendants' acts of patent

infringement.

5.      Upon information and belief, GEA Westfalia Separator, Inc. (hereinafter

"Westfalia") is a New York corporation having its principal place of business at 100 Fairway

Court, Northvale, New Jersey 07647.

6.      The true names and capacities of Defendants DOES 1-20 inclusive are unknown

to GS CleanTech, who therefore sues them by such fictitious names. GS CleanTech will seek

leave to amend this Complaint to allege their true names and capacities when they have been

ascertained. GS CleanTech is informed and believes and thereon alleges that each of the

fictitiously named Defendants infringe and will continue to infringe the '858 patent.

7.      Upon information and belief, Westfalia has sold products to the Defendants

DOES 1-20 inclusive that contributorily infringe at least the claims of the '858 patent. Westfalia

has also actively induced DOES 1-20 inclusive to infringe the claims of the '858 patent.

8.      In a separate lawsuit filed in this Court, No. 09-cv-7686 (LMM) (the "Westfalia Suit"), Westfalia has alleged that it has suffered injuries as a result of GreenShift's notification to potential infringers of GS CleanTech's then-pending patent applications.

9.      The Court has personal jurisdiction over Defendants because, among other things, they reside in and/or transact business in this District, at least by offering to sell, selling, purchasing, and/or advertising the infringing products and/or placing them into the stream of commerce in such a way as to reach customers in this judicial District, and because they have sufficient minimum contacts with this judicial District.  New York's long-arm statute, N.Y. CPLR § 302(a), also permits personal jurisdiction over Defendants because the claims arise from their transaction of business within the state or its contracts to supply goods or services in the state.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).

## BACKGROUND FACTS

11.     GS CleanTech has invented a novel patented process to extract corn oil from the byproducts created during the manufacture of ethyl alcohol.  This process is claimed in GS CleanTech's '858 patent and pending patent applications.

12.     Recently, significant attention has been given to the production of ethyl alcohol, or "ethanol," for use as an alternative fuel.  Ethanol not only burns cleaner than fossil fuels, but also can be produced using grains such as corn, which are abundant and renewable domestic resources.

13.     In the United States, ethanol is typically produced from corn.  Corn contains significant amounts of sugar and starch, which are fermented to produce ethanol.

14.     A popular method of producing ethanol is known as "dry milling," whereby the starch in the corn is used to produce ethanol through fermentation.  In a typical dry milling method, the process starts by grinding each kernel of corn into meal, which is then slurried with water into mash.  Enzymes are added to the mash to convert the starch to sugar.  Yeast is then added in fermentors to convert the sugar to ethanol and carbon dioxide.  After fermentation, the mixture is transferred to distillation columns where the ethanol is evaporated and recovered as product, leaving an intermediate product called "whole stillage."  The whole stillage contains the corn oil and the parts of each kernel of corn that were not fermented into ethanol.

15.     Despite containing valuable corn oil, the whole stillage has traditionally been treated as a byproduct of the dry milling fermentation process and used primarily to supplement animal feed mostly in the form of a product called "dried distillers grains with solubles" ("DDGS").

16.     Prior to GS CleanTech's invention, efforts to recover the valuable corn oil from the whole stillage had not been successful in terms of efficiency or economy.  A need therefore existed for a more efficient and economical manner of recovering corn oil.  GS CleanTech has filled that need with its novel and inventive process.

17.     The inventors of the novel process, David Cantrell and David Winsness, completed feasibility testing with an early-stage corn oil extraction prototype in 2004 and demonstrated, for the first time, that efficient extraction of the corn oil trapped in the dry milling byproducts was economically feasible.

18.     In August of 2004, the inventors filed the '050 provisional application directed to their novel corn oil extraction methods and systems.  The '858 patent claims priority back to the '050 provisional application.

4

19.     In one embodiment, GS CleanTech's patented method comprises initially processing the whole stillage by mechanically separating (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, and then introducing the thin stillage into an evaporator to form a concentrated byproduct or "syrup." Prior to recombining the now concentrated syrup with the distillers wet grains, the syrup is introduced into a second mechanical separator, such as a second centrifuge, which is different from the centrifuge that mechanically separated the whole stillage into distillers wet grains and thin stillage. This second centrifuge separates corn oil from the syrup thereby allowing for the recovery of usable corn oil. The syrup that exits the centrifuge is then recombined with the distillers wet grain and dried in a dryer to form the DDGS. The corn oil that is extracted from the syrup can be used for various purposes such as feedstock for producing biodiesel.

20.     After filing the '050 provisional application in 2004, the inventors of GS CleanTech's novel corn oil extraction method began to engage the ethanol manufacturing industry to explain and market the corn oil extraction method itself and the benefits to be had by ethanol manufacturers if they were to install these systems in their facilities. In fact, in 2005, the inventors invited ethanol manufacturers to a symposium to hear about the advantages of this method and about 30 percent of the industry attended.

21.     In its Complaint ("Westfalia Complaint") in the Westfalia Suit, Westfalia admits that its customers directly infringe the claims of the '858 patent. Westfalia further admits that, at a minimum, it indirectly infringes the '858 patent. In fact, Westfalia seems to boast about this infringement by admitting that, as of the date it filed its Complaint, it "sold twenty-nine centrifuges designed for corn oil recovery to twenty different ethanol plants across the country" which has resulted in "*over $15 million* in total sales for Westfalia."

5

22.     Westfalia asserts that, in 1998, some six years prior to the filing of the '050 provisional application, Westfalia began to market its centrifuges to the ethanol industry. However, at that time, Westfalia was not marketing centrifuges for the purpose of extracting corn oil from dry milling byproducts because the corn oil extraction process had not yet been invented.  Instead, Westfalia marketed its centrifuges to be used to mechanically separate the whole stillage into distillers wet grains and thin stillage.

23.     Interestingly, by Westfalia's own admission, and surely not by coincidence, it was not until 2005 - after the inventors of the corn oil extraction technology began marketing these new corn oil extraction methods and systems to the ethanol industry - that Westfalia started to market its centrifuges to those same ethanol manufacturers for purposes of extracting corn oil by the methods taught in the '858 patent.

24.     Westfalia admits that the centrifuges that it has supplied to its customers for purposes of corn oil extraction are designed for that specific purpose.  Westfalia also specifies the process that its customers employ to extract corn oil from the condensed thin stillage (i.e., syrup) using Westfalia's centrifuges.

25.     The process used by the Defendants DOES 1-20 inclusive, as described by Westfalia in its Complaint, infringes the claims of GS CleanTech's patent applications as published and as issued in the '858 patent.

26.     GS CleanTech is entitled to provisional rights under 35 U.S.C. § 154(d) because the Defendants DOES 1-20 inclusive make, use, offer for sale, or sell in the United States the invention as claimed in the published '859 application; the Defendants DOES 1-20 inclusive had actual notice of the published '859 application; and the issued claims in the '858 patent are substantially identical to the originally published claims in the '859 application.

## COUNT I

### (Infringement of U.S. Patent No. 7,601,858)

27.     GS CleanTech repeats and realleges paragraphs 1-26, above, as though fully set forth herein.

28.     Defendants infringe and will continue to infringe one or more of the claims of the '858 patent, by, among other activities, practicing the claimed methods and/or processes, and/or by knowingly and actively inducing others to infringe, and/or by contributing to the infringement of others.

29.     Defendants' infringement, contributory infringement and/or inducement to infringe has injured GS CleanTech, and GS CleanTech is entitled to recover damages adequate to compensate it for such infringement.

30.     Defendants' infringement, contributory infringement and/or inducement to infringe has been willful, deliberate, and objectively reckless.

31.     Defendants' infringing activities have injured and will continue to injure GS CleanTech, unless and until this Court enters an injunction prohibiting further infringement and, specifically, enjoining further manufacture, use, sale, importation, and/or offer for sale of products or practice of any methods and/or processes that come within the scope of the claims of the '858 patent.

### PRAYER FOR RELIEF

WHEREFORE, GS CleanTech respectfully asks this Court to enter judgment against Defendants and against their respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants and employees, and all persons in active concert or participation with them, granting the following relief:

7

A.   The entry of judgment in favor of GS CleanTech and against Defendants;

B.   A preliminary injunction prohibiting further infringement, inducement, and/or contributory infringement of the '858 patent;

C.   A permanent injunction prohibiting further infringement, inducement, and/or contributory infringement of the '858 patent;

D.   An award of damages adequate to compensate GS CleanTech for the infringement that has occurred, together with prejudgment interest from the date the infringement began;

E.   An award to GS CleanTech of all remedies available under 35 U.S.C. § 284;

F.   An award to GS CleanTech of all remedies available under 35 U.S.C. § 285;

G.   An award to GS CleanTech of all remedies available under 35 U.S.C. § 154(d); and

H.   Such other relief to which GS CleanTech is entitled under law, and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

GS CleanTech demands a trial by jury on all issues so triable.

Done this 13th day of October, 2009.

Respectfully submitted,
CANTOR COLBURN, LLP

_____

Michael J. Rye (MR0305)
mrye@cantorcolburn.com
Charlie F. O'Brien
cobrien@cantorcolburn.com
20 Church Street, 22 Floor
Hartford, CT  06103
Tel: 860-286-2929
Fax: 860-286-0115
ATTORNEYS FOR THE PLAINTIFF

8

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GS CLEANTECH CORPORATION <br><br> Plaintiff, <br><br> v. <br><br> GEA WESTFALIA SEPARATOR, INC.; ACE ETHANOL, LLC; ICM, INC.; LIFELINE FOODS LLC; and DOES 1 - 30, INCLUSIVE <br><br> Defendant. | Civil Action No. 09-cv-08642-SAS <br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, GS CleanTech Corporation, for its First Amended Complaint against Defendants, GEA Westfalia Separator, Inc., Ace Ethanol, LLC, ICM, Inc., Lifeline Foods LLC, and DOES 1 - 30 (collectively "Defendants"), alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This is a claim for patent infringement and arises under the patents laws of the United States, Title 35 of the United States Code.  This Court has original jurisdiction over the subject matter of this claim under 28 U.S.C. §§ 1331 and 1338(a).

2.      GS CleanTech Corporation (hereinafter "GS CleanTech") is a Delaware corporation having its principal place of business at 1 Penn Plaza, Suite 1612, New York, New York 10119.  GS CleanTech is a wholly-owned subsidiary of GreenShift Corporation (hereinafter "GreenShift"), a Delaware corporation having its principal place of business at 1 Penn Plaza, Suite 1612, New York, New York 10119.

3.     GS CleanTech is the owner by assignment of United States Patent No. 7,601,858, entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," issued on October 13, 2009 (the " '858 patent").  The '858 patent issued from a patent application originally filed on May 5, 2005 as Serial No. 11/122,859 (the " '859 application") and published on February 23, 2006 as U.S. Patent Application Publication 2006/0041152.  Both the '858 patent and the '859 application claim priority to GS CleanTech's first patent application related to its novel corn oil extraction methods and systems, which was filed in August of 2004 as a provisional application (Serial No. 60/602,050) (the "'050 provisional application").  The patent and patent application are generally directed to the recovery of corn oil from the byproducts produced during the manufacture of ethanol from corn.

4.     GS CleanTech has standing to sue for infringement of the '858 patent because it owns all right, title and interest in and to the '858 patent, including the right to collect for past and future damages.  GS CleanTech has suffered injury from the Defendants' acts of patent infringement.

5.     Upon information and belief, GEA Westfalia Separator, Inc. (hereinafter "Westfalia") is a New York corporation having its principal place of business at 100 Fairway Court, Northvale, New Jersey 07647.

6.     Upon information and belief, Ace Ethanol, LLC (hereinafter "Ace Ethanol") is a Wisconsin limited liability company having a place of business in Stanley, Wisconsin.

7.     Upon information and belief, Ace Ethanol is one of Westfalia's customers.  Ace Ethanol uses Westfalia's product to infringe, and will continue to infringe, one or more of the claims of the '858 patent.

8.      Upon information and belief, ICM, Inc. (hereinafter "ICM") is a Kansas corporation having a place of business at 310 North First Street, Colwich, Kansas.

9.      Upon information and belief, Lifeline Foods LLC (hereinafter "Lifeline Foods") is a Missouri limited liability company having a place of business at 2811 S 11th Street, Saint Joseph, Missouri.

10.     Upon information and belief, Lifeline Foods is one of ICM's customers and is forth-nine percent (49%) owned by ICM.  Lifeline Foods uses ICM's product to infringe, and will continue to infringe, one or more of the claims of the '858 patent.

11.     The true names and capacities of the Defendants DOES 1-30 inclusive are unknown to GS CleanTech, who therefore sues them by such fictitious names.  GS CleanTech will seek leave to amend this Complaint to allege their true names and capacities when they have been ascertained.  GS CleanTech is informed and believes and thereon alleges that each of the fictitiously named Defendants infringe and will continue to infringe the '858 patent.

12.     Upon information and belief, Westfalia has sold products to Ace Ethanol and one or more of the Defendants DOES 1-30 inclusive that contributorily infringe one or more of the claims of the '858 patent.  Westfalia has also actively induced Ace Ethanol and one or more of the Defendants DOES 1-30 inclusive to infringe one or more of the claims of the '858 patent.

13.     Upon information and belief, ICM has sold products to Lifeline Foods and one or more of the Defendants DOES 1-30 inclusive that contributorily infringe one or more of the claims of the '858 patent.  ICM has also actively induced Lifeline Foods and one or more of the Defendants DOES 1-30 inclusive to infringe one or more of the claims of the '858 patent.

14.     In a separate lawsuit filed in this Court, No. 09-cv-7686 (LMM) (the "Westfalia/Ace Ethanol Suit"), Westfalia and Ace Ethanol filed a First Amended Complaint ("Westfalia/Ace Ethanol First Amended Complaint") for declaratory judgment of non-infringement and invalidity and have alleged that they have suffered injuries as a result of GreenShift's notification of GS CleanTech's then-pending patent applications.

15.     In a separate lawsuit filed in U.S. District Court for the District of Kansas, No. 09-cv-01315-WEB-KMH (the "ICM Suit"), ICM filed a complaint ("ICM Complaint") for declaratory judgment of non-infringement and invalidity of the '858 patent and has also alleged unfair competition under Kansas state law against GS CleanTech and GreenShift.  However, that Court has no jurisdiction over either GS CleanTech or GreenShift.

16.     The Court has personal jurisdiction over Defendants because, among other things, they reside in and/or transact business in this District, at least by offering to sell, selling, purchasing, and/or advertising the infringing products and/or placing them into the stream of commerce in such a way as to reach customers in this judicial District, and/or because they have sufficient minimum contacts with this judicial District.  New York's long-arm statute, N.Y. CPLR § 302(a), also permits personal jurisdiction over Defendants because the claims arise from their transaction of business within the state or its contracts to supply goods or services in the state.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).

## BACKGROUND FACTS

18.     GS CleanTech has invented a novel patented process to extract corn oil from the byproducts created during the manufacture of ethyl alcohol.  This process is claimed in GS CleanTech's '858 patent and pending patent applications.

19.  Recently, significant attention has been given to the production of ethyl alcohol, or "ethanol," for use as an alternative fuel.  Ethanol not only burns cleaner than fossil fuels, but also can be produced using grains such as corn, which are abundant and renewable domestic resources.

20.  In the United States, ethanol is typically produced from corn.  Corn contains significant amounts of sugar and starch, which are fermented to produce ethanol.

21.  A popular method of producing ethanol is known as "dry milling," whereby the starch in the corn is used to produce ethanol through fermentation.  In a typical dry milling method, the process starts by grinding each kernel of corn into meal, which is then slurried with water into mash.  Enzymes are added to the mash to convert the starch to sugar.  Yeast is then added in fermentors to convert the sugar to ethanol and carbon dioxide.  After fermentation, the mixture is transferred to distillation columns where the ethanol is evaporated and recovered as product, leaving an intermediate product called "whole stillage."  The whole stillage contains the corn oil and the parts of each kernel of corn that were not fermented into ethanol.

22.  Despite containing valuable corn oil, the whole stillage has traditionally been treated as a byproduct of the dry milling fermentation process and used primarily to supplement animal feed mostly in the form of a product called "dried distillers grains with solubles" ("DDGS").

23.  Prior to GS CleanTech's invention, efforts to recover the valuable corn oil from the whole stillage had not been successful in terms of efficiency or economy.  A need therefore existed for a more efficient and economical manner of recovering corn oil.  GS CleanTech has filled that need with its novel and inventive process.

24.     The inventors of the novel process, David Cantrell and David Winsness, completed feasibility testing with an early-stage corn oil extraction prototype in 2004 and demonstrated, for the first time, that efficient extraction of the corn oil trapped in the dry milling byproducts was economically feasible.

25.     In August of 2004, the inventors filed the '050 provisional application directed to their novel corn oil extraction methods and systems.  The '858 patent claims priority back to the '050 provisional application.

26.     In one embodiment, GS CleanTech's patented method comprises initially processing the whole stillage by mechanically separating (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, and then introducing the thin stillage into an evaporator to form a concentrated byproduct or "syrup."  Prior to recombining the now concentrated syrup with the distillers wet grains, the syrup is introduced into a second mechanical separator, such as a second centrifuge, which is different from the centrifuge that mechanically separated the whole stillage into distillers wet grains and thin stillage.  This second centrifuge separates corn oil from the syrup thereby allowing for the recovery of usable corn oil.  The syrup that exits the centrifuge is then recombined with the distillers wet grain and dried in a dryer to form the DDGS.  The corn oil that is extracted from the syrup can be used for various purposes such as feedstock for producing biodiesel.

27.     After filing the '050 provisional application in 2004, the inventors of GS CleanTech's novel corn oil extraction method began to engage the ethanol manufacturing industry to explain and market the corn oil extraction method itself and the benefits to be had by ethanol manufacturers if they were to install these systems in their facilities.  In fact, in 2005, the inventors invited ethanol manufacturers to a symposium to hear about the advantages of this method and about 30 percent of the industry attended.

28.     In the Westfalia/Ace Ethanol First Amended Complaint in the Westfalia/Ace Ethanol Suit, Westfalia admits that its customers directly infringe the claims of the '858 patent. Westfalia further admits that, at a minimum, it indirectly infringes the '858 patent.  In fact, Westfalia seems to boast about this infringement by admitting that, as of the date the Westfalia/Ace Ethanol First Amended Complaint was filed, it "sold twenty-nine centrifuges designed for corn oil recovery to twenty different ethanol plants across the country" which has resulted in "*over $15 million* in total sales for Westfalia."  Westfalia further seems to boast that it "is negotiating the sale of more than twenty additional machines" at the time of the filing of the Westfalia/Ace Ethanol First Amended Complaint.

29.     Westfalia asserts that, in 1998, some six years prior to the filing of the '050 provisional application, Westfalia began to market its centrifuges to the ethanol industry. However, at that time, Westfalia was not marketing centrifuges for the purpose of extracting corn oil from dry milling byproducts because the corn oil extraction process had not yet been invented.  Instead, Westfalia marketed its centrifuges to be used to mechanically separate the whole stillage into distillers wet grains and thin stillage.

30.     Interestingly, by Westfalia's own admission, and surely not by coincidence, it was not until 2005 - after the inventors of the corn oil extraction technology began marketing these new corn oil extraction methods and systems to the ethanol industry - that Westfalia started to market its centrifuges to those same ethanol manufacturers for purposes of extracting corn oil by the methods taught in the '858 patent.

31.     Westfalia admits that the centrifuges that it has supplied to its customers for purposes of corn oil extraction are designed for that specific purpose.  Westfalia also specifies the process that its customers employ to extract corn oil from the condensed thin stillage (i.e., syrup) using Westfalia's centrifuges.

32.     In the Westfalia/Ace Ethanol First Amended Complaint, Ace Ethanol admits that it is one of Westfalia's customers, and that since August 2008, it has employed "a Westfalia centrifuge to separate corn oil from condensed thin stillage."  Ace Ethanol further admits that it directly infringes the claims of the '858 patent.

33.     In the ICM Complaint in the ICM Suit, ICM admits that it "designs and builds ethanol production plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn byproducts."  ICM further admits that it "sell[s] and/or use[s] equipment to practice corn oil recovery methods that are in part the subject of the claims of the '858 Patent."

34.     The process used by Ace Ethanol and the Defendants DOES 1-30 inclusive, as described by Westfalia and Ace Ethanol in the Westfalia/Ace Ethanol First Amended Complaint, and the process used by Lifeline Foods and the Defendants DOES 1-30 inclusive, as described by ICM in the ICM Complaint, infringe the claims of GS CleanTech's patent applications as published and as issued in the '858 patent.

8

35.     GS CleanTech is entitled to provisional rights under 35 U.S.C. § 154(d) because Ace Ethanol, Lifeline Foods, and the Defendants DOES 1-30 inclusive make, use, offer for sale, or sell in the United States the invention as claimed in the published '859 application; Ace Ethanol, Lifeline Foods, and the Defendants DOES 1-30 inclusive had actual notice of the published '859 application; and the issued claims in the '858 patent are substantially identical to the originally published claims in the '859 application.

36.     In the Westfalia/Ace Ethanol First Amended Complaint, Westfalia and Ace Ethanol admit that they "have separated corn oil through evaporation followed by centrifugation and intend to continue to do so."  Westfalia further admits that it "has previously sold and intends to continue to sell centrifuges to customers like Ace Ethanol that will be used in the corn oil recovery process."

## COUNT I

### (Infringement of U.S. Patent No. 7,601,858)

37.     GS CleanTech repeats and realleges paragraphs 1-36, above, as though fully set forth herein.

38.     Defendants infringe and will continue to infringe one or more of the claims of the '858 patent, by, among other activities, practicing the claimed methods and/or processes, and/or by knowingly and actively inducing others to infringe, and/or by contributing to the infringement of others.

39.     Defendants' infringement, contributory infringement and/or inducement to infringe has injured GS CleanTech, and GS CleanTech is entitled to recover damages adequate to compensate it for such infringement.

40.     Defendants' infringement, contributory infringement and/or inducement to infringe has been willful, deliberate, and objectively reckless.

41.     Defendants' infringing activities have injured and will continue to injure GS CleanTech, unless and until this Court enters an injunction prohibiting further infringement and, specifically, enjoining further manufacture, use, sale, importation, and/or offer for sale of products or practice of any methods and/or processes that come within the scope of the claims of the '858 patent.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, GS CleanTech respectfully asks this Court to enter judgment against Defendants and against their respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants and employees, and all persons in active concert or participation with them, granting the following relief:

A.     The entry of judgment in favor of GS CleanTech and against Defendants;

B.     A preliminary injunction prohibiting further infringement, inducement, and/or contributory infringement of the '858 patent;

C.     A permanent injunction prohibiting further infringement, inducement, and/or contributory infringement of the '858 patent;

D.     An award of damages adequate to compensate GS CleanTech for the infringement that has occurred, together with prejudgment interest from the date the infringement began;

E.     An award to GS CleanTech of all remedies available under 35 U.S.C. § 284;

F.     An award to GS CleanTech of all remedies available under 35 U.S.C. § 285;

G.    An award to GS CleanTech of all remedies available under 35 U.S.C. § 154(d); and

H.    Such other relief to which GS CleanTech is entitled under law, and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

GS CleanTech demands a trial by jury on all issues so triable.

Done this 15th day of October, 2009.

Respectfully submitted,
CANTOR COLBURN, LLP


/s/ Michael J. Rye
Michael J. Rye (MR0305)
mrye@cantorcolburn.com
Charlie F. O'Brien
cobrien@cantorcolburn.com
20 Church Street, 22nd Floor
Hartford, CT 06103
Tel: 860-286-2929
Fax: 860-286-0115
ATTORNEYS FOR THE PLAINTIFF

**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

_____
                                        )
                                        )
ICM, INC.,                              )
                                        )        **Civil Action No. 09-1315-WEB-KMH**
            **Plaintiff,**              )
                                        )
    **v.**                              )
                                        )        **PLAINTIFF'S MEMORANDUM**
**GS CLEANTECH CORPORATION**            )        **OF LAW IN SUPPORT OF**
**GREENSHIFT CORPORATION,**             )        **MOTION TO ENJOIN DEFENDANT'S**
                                        )        **PROSECUTION OF A SECOND-FILED**
            **Defendants.**             )        **ACTION AGAINST DEFENDANT**
_____)

### INTRODUCTION

Ten days after Plaintiff ICM, Inc. ("ICM") initiated the instant action, Defendant GS CleanTech Corporation ("GS CleanTech") initiated an action involving identical issues against ICM in the U.S. District Court for the Southern District of New York (the "SDNY action"). Because ICM's first-filed action conferred jurisdiction to this Court over issues and parties identical to the SDNY action and no circumstances warrant deviating from the first to file rule, the Court should enjoin GS CleanTech from prosecuting the SDNY action against plaintiff.

### BACKGROUND

At least in part, Defendant Greenshift Corporation ("Greenshift") is in the business of selling equipment to ethanol production plants for recovering oil from corn byproducts produced in the ethanol production process. Defendant Greenshift formerly operated and was known as GS CleanTech Corporation and before that Veridium Corporation. (Weyrauch Dec. Exhibit A, pg. 14). On February 11, 2008, GS CleanTech Corporation amended its Certificate of Incorporation to change its name to Greenshift Corporation. (Weyrauch Dec. Exhibit B, pg. 2).

- 1 -

Subsequently, the name GS CleanTech Corporation was transferred to a related company GS Ethanol Technologies, Inc. by a name change amendment to the articles of incorporation of GS Ethanol Technologies, Inc. (Weyrauch Dec. Exhibits C and D).  Greenshift asserts it is a holding company, claiming 100 percent ownership of several subsidiaries, including GS CleanTech. (Weyrauch Dec. Exhibit A, pg. 14-15).  Greenshift's Chief Executive Officer and Chairman, Kevin Kreisler, is also the Chief Executive Officer and Chairman of GS CleanTech.  (Weyrauch Dec. Exhibit E, pg. 5).  Greenshift's Chief Technology Officer, David Winsness, was also the Chief Technology Officer of GS Ethanol Technologies, Inc. and remains an officer of GS CleanTech.  (Weyrauch Dec. Exhibit F).  Greenshift and GS CleanTech share the same business address.  (Weyrauch Dec. Exhibit E, pg. 10).  David Winsness has transacted business in Kansas, has traveled to Kansas and has communicated with persons in Kansas in his capacity as an officer of Greenshift, GS CleanTech and the related predecessors in interest.  (Farrish Affidavit; McMillan Affidavit; Jevers Affidavit).

Plaintiff ICM designs and builds ethanol production plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn byproducts.  In July 2009, certain customers of ICM received a letter from counsel for Defendant Greenshift (the "July Greenshift letters") asserting that Greenshift was the owner of certain patent applications for which the customers were liable to Greenshift for pre-patent grant royalties.[1]  (Weyrauch Dec. Exhibits G, H, I, J).  Specifically, the letters from Greenshift's

---

[1] 35 U.S.C. § 154(d) sets forth the conditions upon which a patentee may obtain royalties for acts that occur prior to the grant of a patent as follow:

(d) PROVISIONAL RIGHTS.-

(1) IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during

counsel asserted that Greenshift owned U.S. Patent Application Serial No. 11/122,859 (the "'859

patent application") and U.S. Patent Application Serial No. 11/241,231 (the "'231 patent

application"), both of which relate to corn oil recovery processes.  (*Id.*).  Copies of the published

form of the '859 and '231 patent applications accompanied the letters.[2]  (*Id.*).  The July

Greenshift letters cited portions section 154(d) of the patent statutes, but did not include sub-

---

the period beginning on the date of publication of the application for such patent under section 122(b) …, and ending on the date the patent is issued-

(A) (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; or

(ii) if the invention as claimed in the published patent application is a process, uses, offers for sale, or sells in the United States or imports into the United States products made by that process as claimed in the published patent application; and

(B) had actual notice of the published patent application and, in a case in which the right arising under this paragraph is based upon an international application designating the United States that is published in a language other than English, had a translation of the international application into the English language.

(2) RIGHT BASED ON SUBSTANTIALLY IDENTICAL INVENTIONS.- The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

35 U.S.C. § 154(d).

[2] Greenshift's counsel who wrote the letters to ICM customers is also the patent attorney who was prosecuting the '859 and '231 patent applications.  On May 15, 2009, an assignment of the '859 patent application in favor of Defendant GS CleanTech Corporation was recorded with the U.S. Patent and Trademark Office.  (Weyrauch Dec. Exhibit K).  Prior to the May 15, 2009 assignment, the '859 patent application was owned by GS Ethanol Technologies, Inc.  (*Id.*).  At no time during the pendency of the '859 and '231 patent applications was Defendant Greenshift an owner of the '859 and/or '231 patent applications.  Nonetheless, throughout at least most of 2009, Greenshift publicly asserted in its SEC filings and press releases it was the owner of U.S. patent applications pertaining to a corn oil recovery process.  (Weyrauch Dec. Exhibits L and M, pg. 21).

section (2), which excludes liability when the claims of the issued patent are not substantially identical to the claims that appear in the application as it is published. (*Id.*).

On or about August 6, 2009, Plaintiff ICM's counsel wrote a letter to Greenshift's counsel to address the letters ICM's customers received (the "August 6 letter"). (Weyrauch Dec. Exhibit N). The August 6 letter took issue with the assertion of liability under 35 U.S.C. Section 154(d), noting that Greenshift failed to include mention of the limitations set forth in sub-section (2). The August 6 letter then identified in detail how the claims in the '859 and '231 patent applications had been materially amended since each of the applications had been published, and that the Greenshift letters were therefore apparently sent with the intent to improperly interfere with ICM's business relationships. ICM's August 6 letter asserted that ICM was prepared to take such steps as would be necessary to prevent any further customer interference. (*Id.*). ICM did not receive a response to the August 6 letter from Greenshift.

In early October, Greenshift sent additional letters to customers of ICM asserting that the '859 and '231 patent applications were owned by Greenshift and that the customers were liable for royalties under 35 U.S.C. Section 154(d) (the "October Greenshift letters"). (Weyrauch Dec. Exhibits O, P, Q). The October Greenshift letters further indicated that the '859 patent application had been allowed by the U.S. Patent and Trademark Office and would issue in the near future. (*Id.*). Upon examination of the U.S. Patent and Trademark Office records for the '859 patent application, ICM learned that the '859 patent would issue as U.S. Patent No. 7,601,858 (the "'858 patent") on October 13, 2009. One of the October Greenshift letters was sent to Lifeline Foods, LLC in St. Joseph, Missouri. (Weyrauch Dec. Exhibit Q). Lifeline Foods is owned in part by Plaintiff ICM, and ICM owns and operates centrifuge equipment in Lifeline Foods' facilities for the purpose of recovering corn oil. (Amended Complaint ¶ 12). To halt

further harmful communications from Greenshift to ICM's customers, and to resolve the issue of ICM's freedom to practice corn oil recovery processes with ICM's centrifuge equipment, ICM initiated the present action on October 13, 2009.

On October 13, 2009, Defendant GS CleanTech Corporation initiated an action in the U.S. District Court for the Southern District of New York against GEA Westfalia Separator, Inc. and DOES 1-20, whose true names and capacities were stated to be unknown to GS CleanTech, for infringement of U.S. Patent No. 7,601,858.  (Weyrauch Dec. Exhibit R).  On October 23, 2009, GS CleanTech filed an Amended Complaint in that action naming Plaintiff ICM and its customer Lifeline Foods, LLC as defendants.  (Weyrauch Dec. Exhibit S).

## ARGUMENT

### GS CleanTech Should Be Enjoined From Prosecuting Its Second-filed Action.

Defendant GS CleanTech Corporation should be enjoined from maintaining its second-filed action against Plaintiff ICM in the Southern District of New York concerning identical issues presented in ICM's Kansas action.  According to the first to file rule adopted by the Tenth Circuit, the first federal district court which obtains jurisdiction of parties and issues should have priority.  *Cessna Aircraft Co. v. Brown,* 348 F.2d 689, 692 (10th Cir. 1965); *Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1163 (10th Cir. 1982).  When two actions involving the same issues are brought in two different federal district courts, the first court has power to enjoin the prosecution of the second action, and should exercise such power in its sound discretion in order to avoid the possibility of inconsistent results and the duplication of judicial effort.  *The Horn & Hardart Co. v. Burger King Corporation,* 476 F.Supp. 1058, 1059 (S.D.N.Y. 1979).  *See also Chicago Pneumatic Tool Co. v. Hughes Tool Co.,* 180 F.2d 97 (10th Cir. 1950); *The Scott & Fetzer Co. v. McCarty,* 450 F.Supp. 274 (N.D. Ohio 1977).  Where jurisdiction of a federal

district court has first attached, that right cannot be arrested or taken away by proceedings in another federal district court. *O'Hare International Bank v. Lambert,* 459 F.2d 328 (10th Cir. 1972). The first suit filed has priority, unless there are circumstances which justify giving priority to the later-filed action. *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir. 1978), *cert. denied,* 440 U.S. 908 (1979).

    1.    <u>ICM's action was filed first.</u>

Jurisdiction over Defendants Greenshift and GS CleanTech with respect to the issue of ICM's freedom to practice corn oil recovery processes vis a vis the '858 patent attached first in Kansas. ICM's Kansas action for declaratory judgment of noninfringement and invalidity of the '858 patent was filed on October 13, 2009. While Defendant GS CleanTech initiated an action against GEA Westfalia Separator, Inc. and DOES 1-20 in the U.S. District Court for the Southern District of New York on that same date for infringement of the '858 patent, ICM was not a named party to that action. GS CleanTech's inclusion of DOES 1-20 in the action was expressly due to the lack of knowledge GS CleanTech had of the names of the alleged infringers. ICM was a known entity to GS CleanTech and its parent Greenshift at least because ICM's August 6 letter to Greenshift's attorney addressed the propriety of Greenshift/GS CleanTech asserting patent rights against ICM's customers. GS CleanTech did not amend its Complaint to add ICM until October 23, 2009, ten days after ICM's Kansas action was filed. Accordingly, there is no question that ICM's action was the first filed action.

    2.    <u>Defendants' contacts with Kansas support the Court's jurisdiction over the defendants.</u>

Greenshift and GS CleanTech have transacted business in Kansas and otherwise have had ample contact with Kansas for the Court to have personal jurisdiction. Kansas' long-arm statute permits jurisdiction to be asserted over a person to the full extent permitted by the constitutions

of the United States and Kansas.[3]   The Affidavit testimony presented by ICM establishes that

Greenshift and GS CleanTech have transacted business in Kansas.   According to the Affidavit of

Burt Farrish, David Winsness negotiated and signed an agreement with Everton Energy, a

Kansas company, for the sale and installation of a corn oil extraction system.   At the time of the

agreement, David Winsness was an officer of GS Ethanol Technologies, Inc., a company that

later changed its name to GS CleanTech.   (Farrish Affidavit).   On numerous occasions from

2006 to 2008, representatives of Greenshift and GS CleanTech, including David Winsness,

traveled to and communicated with Western Plains Energy, LLC, an ethanol manufacturing plant

located in Oakley, Kansas, in an effort to market corn oil extraction equipment.   (McMillan

Affidavit and Exhibit A).   David Winsness has also been in regular e-mail contact with and has

traveled to Kansas to meet with Jeremy Javers, an employee of ICM.   (Javers Affidavit and

Exhibit A).   Greenshift and GS CleanTech have had sufficient contacts in this jurisdiction to

reasonably anticipate being haled into court in Kansas.

      3.     <u>No circumstances exist to deviate from the first to file rule.</u>

ICM's first filed action was proper and does not warrant deviating from the first to file

rule.   ICM's action was not hastily initiated.   When ICM learned in July 2009 that its customers

---

[3] Kansas Statute 60-308(b) states as follows:

    (b) *Submitting to jurisdiction.*   (1) Any person, whether or not a citizen or
resident of this state, who in person or through an agent or instrumentality does
any of the acts hereinafter enumerated, thereby submits the person … to the
jurisdiction of the courts of this state as to any cause of action arising from the
doing of any of these acts:

    (2)   A person may be considered to have submitted to the jurisdiction of the courts
of this state for a cause of action which did not arise in this state if substantial,
continuous and systematic contact with this state is established that would support
jurisdiction consistent with the constitutions of the United States and of this state.

had received letters from Greenshift asserting rights in then-pending U.S. patent applications, ICM wrote the August 6 letter to Greenshift's counsel detailing the reasons such letters were inappropriate and notifying Greenshift of the harm such letters were calculated to cause to ICM's business relationships. Rather than respond to ICM's August 6 letter and debate the propriety of Greenshift's legal claims, Greenshift chose to engage ICM's customers with additional threatening letters in October 2009. ICM gave notice to Greenshift in the August 6 letter that ICM would take whatever action was necessary to prevent Greenshift from interfering with ICM's business relationships. ICM's action against Greenshift was necessitated to halt the ongoing negative letter writing campaign that Greenshift was apparently waging against customers of ICM's centrifuge systems to the competitive detriment of ICM.

Greenshift's October letters escalated the threat to ICM's customers by asserting that claims in the then-pending '859 patent application, for which pre-patent grant liability was claimed under 35 U.S.C. § 154(d), had been allowed and would soon issue. Such a notice was tantamount to an allegation of patent infringement. Such a threat, while not directly made to ICM, was nonetheless a threat against ICM since the activity asserted by Greenshift to fall within the scope of the patent rights was, in the case of Lifeline Foods, LLC, activity that ICM was conducting. Thus, at the time ICM initiated its action, ICM was not anticipating a suit against ICM involving the '858 patent. ICM recognized, however, that an action against Greenshift for interference with ICM's business relationships would make it inevitable that the patent issues involving the '858 patent would need to be addressed, and ICM chose to address them sooner in its Kansas action than at some later indefinite time of Greenshift's choosing.

ICM's action seeks a declaration of the Court that ICM is not infringing the '858 patent and that the '858 patent is invalid, which is identical to the GS CleanTech's second filed action

for infringement of the '858 patent.  The Court can and should maintain and resolve the claims in

ICM's Amended Complaint, which will resolve all issues presented in GS CleanTech's action.

Because there are no circumstances to warrant deviation from the first to file rule, it is

respectfully requested that the Court enjoin Defendant GS CleanTech from prosecuting the

action against ICM in the Southern District of New York.

### CONCLUSION

ICM's first filed action was proper and will resolve all issues presented in GS

CleanTech's second filed action in the Southern District of New York.  Because jurisdiction over

the parties and issues attached first in ICM's Kansas action, GS CleanTech's action is

duplicative.  ICM respectfully requests that the Court enjoin GS CleanTech from prosecuting the

SDNY action against plaintiff.

Dated:    November 5, 2009

Respectfully submitted,

DICKE, BILLIG & CZAJA, PLLC
John M. Weyrauch (221,879) (*pro hac vice*)
Michael A. Bondi (237,309) (*pro hac vice*)
100 South Fifth Street, Suite 2250
Minneapolis, MN 55402
Telephone: (612) 767-2512
Facsimile: (612) 573-2005


By:    s/Charles E. Millsap
Charles E. Millsap (# 9692)
Fleeson, Gooing, Coulson & Kitch, L.L.C.
1900 EPIC Center
301 N. Main
Wichita, KS 67202
Tel:  (316) 267-7361
E-mail:  **cmillsap@fleeson.com**

ATTORNEYS FOR PLAINTIFF

**<u>Certificate of Service</u>**

I hereby certify that on November 5, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Ken M. Peterson
Will B. Wohlford
Kristen Wheeler Maloney
MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHTD.
300 N. Mead, Suite 200
Wichita, KS 67202
Tel:  (316) 262-2671
Fax:  (316) 262-5991
E-mail:  **kpeterson@morrislaing.com**
E-mail:  **wwohlford@morrislaing.com**
E-mail:  **kwheeler@morrislaing.com**
*Attorneys for Defendants*

      By:    <u>s/Charles E. Millsap</u>
           Charles E. Millsap (# 9692)
           Fleeson, Gooing, Coulson & Kitch, L.L.C.
           1900 EPIC Center
           301 N. Main
           Wichita, KS 67202
           Tel:  (316) 267-7361
           E-mail:  **cmillsap@fleeson.com**

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ICM, INC.,

        Plaintiff,

v.

GS CLEANTECH CORPORATION
GREENSHIFT CORPORATION,

        Defendants.

Case No. 09-cv-01315-WEB-KMH

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(B)(1), 12(B)(2), 12(B)(3), AND 12(B)(6)
OR, ALTERNATIVELY, MOTION TO TRANSFER**

## TABLE OF CONTENTS

I.     NATURE OF THE CASE..................................................................1

    A. Forum Shopping and Procedural Background..................................4

II.    STATEMENT OF FACTS.........................................................5

III.  QUESTIONS PRESENTED.......................................................8

IV.  ICM'S CLAIMS SHOULD BE DISMISSED UNDER
       FED. R. CIV. P. 12(B)(2) FOR LACK OF PERSONAL
       JURISDICTION OVER THE DEFENDANTS..............................9

    A. Personal Jurisdiction Is Not Established In Kansas.........................10

         i.     ICM Cannot Establish General Jurisdiction Over
               Either Defendant..................................................11

         ii.    ICM Cannot Establish Specific Jurisdiction Over
               Either Defendant..................................................12

         iii.   GreenShift's Letter to Lifeline Does Not Create
               Jurisdiction in Kansas..........................................13

V.    ICM'S KANSAS STATE LAW CLAIMS (COUNT I) SHOULD
      BE DISMISSED UNDER RULE 12(B)(6)..................................15

    A. Rule 12(b)(6) Standard...............................................15

    B. ICM Fails To Meet The Elements Of Any Cause of Action.................16

         i.     GreenShift's Statements Are Not False............................16

         ii.    Unfair Competition..............................................18

         iii.   Interference With Existing And Prospective Business
               And Contractual Relationship....................................19

         iv.   Deceptive Trade Practices Under KCPA § 50-626 And
               KCPA Claim Under § 50-623 *et seq*..............................21

             a.     Failure to State a KCPA Claim............................21

              b.     Lack of Standing To Assert KCPA Claim...................22

VI.     **ICM'S DECLARATORY JUDGMENT CLAIMS (COUNT II)
        SHOULD BE DISMISSED**............................................................................22

        A.  ICM's Claim For Declaratory Judgment Should Be Dismissed
            For Lack of Standing..................................................................................23

        B.  In Its Discretion, This Court Should Decline To Exercise
            Jurisdiction To Hear ICM's Declaratory Judgment Claims......................24

VII.    **VENUE IS IMPROPER IN KANSAS, ALTERNATIVELY,
        ICM'S DECLARATORY JUDGMENT CLAIMS SHOULD
        BE TRANSFERRED TO THE SOUTHERN DISTRICT
        OF NEW YORK**........................................................................................28

VIII.   **CONCLUSION**..........................................................................................29

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Accessible Technologies, Inc. v. Paxton Automotive Corp.,*
    Case No. 01-2407, 2002 WL 31256227 (D. Kan. Aug. 28, 2002)......................18, 19

*Akro Corp. v. Luker,*
    45 F.3d 1541 (Fed. Cir. 1995)..................................................................................9

*Altrutech, Inc. v. Hooper Holmes, Inc.,*
    Case No. 96-2091, 1998 WL 398231 (D. Kan. Jan. 26, 1998)..............................18

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)........................................................................................15

*Aurora Corp. of America v. Fellowes, Inc.,*
    Case No. 07-8306, 2008 WL 709198 (C.D. Cal. Feb. 27, 2008)...........................26

*Autogenomics, Inc. v. Oxford Gene Technology Ltd.,*
    566 F.3d 1012 (Fed. Cir. 2009)...............................................11, 12, 13, 14

*Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.,*
    552 F.3d 1324 (Fed. Cir. 2008).................................................9, 10, 13, 14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).......................................................................15, 16

*Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories,* Inc.,
    444 F.3d 1356 (Fed. Cir. 2006)................................................9, 12, 13, 14

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985).........................................................................11

*Burton v. R.J. Reynolds Tobacco Co.,*
    884 F.Supp. 1515, (D. Kan. 1995)..........................................................21

*Campbell Pet Co. v. Miale,*
    542 F.3d 879 (Fed. Cir. 2008)...............................................................12

*Cingular Wireless LLC, v. Freedom Wireless, Inc.,*
    Case No. 06-1935, 2007 WL 1876377 (D. Ariz. June 27, 2007)...........................27

*CQGT, LLC v. Trading Technologies Intern., Inc.,*
    Case No. 05-1584, 2006 WL 2711770 (D. Colo. Sept. 21, 2006)..........................27

*Electronics for Imaging, Inc. v. Coyle,*
    394 F.3d 1341 (Fed. Cir. 2005)…………………………………………………..25

*Federal Deposit Ins. Corp. v. Oaklawn Apartments,*
    959 F.2d 170 (10th Cir. 1992)……………………………………………………10

*Felix v. American Honda Motor Co., Inc.,*
    Case No. 05-2525, 2008 WL 199817 (D. Kan. Jan. 23, 2008)…………..……………10

*Genentech, Inc. v. Eli Lilly & Co.,*
    998 F.2d 931 (Fed. Cir. 1993)……………………………………………….23, 25

*Gonzalez v. Pepsico, Inc.,*
    489 F.Supp.2d 1233 (D. Kan. 2007)……………………………………………..21

*Helicopteros Nacionales de Columbia, S.A. v. Hall,*
    466 U.S. 408 (1984)……………………………………………………...11

*Hildebrand v. Steck Mfg. Company, Inc.,*
    279 F.3d 1351 (Fed. Cir. 2002)…………………………………………………..14

*Hodgdon Powder Co., Inc. v. Clean Shot Tech., Inc.,*
    92 F.Supp.2d 1170 (D. Kan. 2000)………………………………………………10

*Inamed Corp. v. Kuzmak,*
    249 F.3d 1356 (Fed. Cir. 2001)…………………………………………………10

*Kahn v. General Motors Corp.,*
    889 F.2d 1078 (Fed. Cir. 1989)…………………………………………………26

*Kestrel Holdings I, L.L.C. v. Learjet Inc.,*
    316 F.Supp.2d 1071 (D. Kan. 2004)……………………………………………..22

*LSI Industries Inc. v. Hubbell Lighting, Inc.,*
    232 F.3d 1369 (Fed. Cir. 2000)…………………………………………………11

*McHenry v. Colgate-Palmolive Co., Inc.,*
    Case No. 08-2622, 2009 WL 3414833 (D. Kan. October 19, 2009)…………………16

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118  (2007)……………………………………………………….23

*Micron Technology, Inc. v. Mosaid Technologies, Inc.,*
    518 F.3d 897 (Fed. Cir. 2008)……………………………………………23, 24, 25

*Morrison Co., Inc. v. WCCO Belting, Inc.,*
   35 F.Supp.2d 1293 (D. Kan. 1999)..................................................................9, 10

*Nacogdoches Oil & Gas, L.L.C. v. Leading Solutions, Inc.,*
   Case No. 06-2551, 2007 WL 2402723 (D. Kan. Aug. 17, 2007).......................25, 26

*Panduit Corp. v. All States Plastic Mfg. Co.,*
   744 F.2d 1564 (Fed. Cir. 1984).......................................................................10

*Paradigm Alliance, Inc. v. Celeritas Technologies, LLC,*
   ---F.Supp.2d----, 2009 WL 3045464 (D. Kan. Sept. 22, 2009)........................19, 20

*Prasco, LLC v. Medicis Pharmaceutical Corp.,*
   537 F.3d 1329 (Fed. Cir. 2008).......................................................................24

*Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.,*
   148 F.3d 1355 (Fed. Cir. 1998).......................................................................14

*Richardson-Merrell, Inc. v. Koller,*
   472 U.S. 424 (1985).....................................................................................10

*Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.,*
   26 Kan.App.2d 104, 979 P.2d 144 (Kan.App. Apr. 30, 1999)............................19

*Serco Services Co., L.P. v. Kelley Co., Inc.,*
   51 F.3d 1037 (Fed. Cir. 1995).....................................................................23, 26

*Silent Drive, Inc. v. Strong Industries, Inc.,*
   326 F.3d 1194 (Fed. Cir. 2003)....................................................................9, 11

*Sprint Corp. v. Aerotel, Ltd.,*
   Case No. 99-2547, 2000 WL 382031 (D. Kan. Mar. 17, 2000)...........................24

*Snyder v. American Kennel Club,*
   ---F.Supp.2d----, 2009 WL 3242114 (D. Kan. Oct. 6, 2009)...........................19, 20

*Stephens v. Tech Intern., Inc.,*
   393 F.3d 1269 (Fed. Cir. 2004).....................................................................17, 18

*Wayman v. Amoco Oil Co.,*
   923 F.Supp. 1322 (D. Kan. 1996)....................................................................22

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995)...................................................................................23, 24

**Rules and Statutes**

28 U.S.C. § 2201(a)……………………………………………………………………...22, 23, 24

28 U.S.C. § 1391(b)…………………………………………………………………..……...28

28 U.S.C. § 1391(c)…………………………………………………………………..……...28

28 U.S.C. § 1406(a)…………………………………………………………………..……...29

35 U.S.C. § 154(d)……………………………………………………………2, 4, 8, 9, 17, 20, 21

Fed. R. Civ. P. 9(b)…………………………………………………………………………...21

Fed. R. Civ. P. 12(b)(1)……………………………………………1, 4, 15, 21, 22, 23, 24, 29

Fed. R. Civ. P. 12(b)(2)…………………………………………………………………...1, 9, 29

Fed. R. Civ. P. 12(b)(3)…………………………………………………………………...1, 4, 9

Fed. R. Civ. P. 12(b)(6)……………………………………………………1, 4, 15, 17, 21, 29

KCPA § 50-623…………………………………………………………………………...21

KCPA § 50-626…………………………………………………………………………... 21

KCPA § 50-634…………………………………………………………………………...15, 21

Defendants GS CleanTech Corporation ("GS CleanTech") and GreenShift Corporation ("GreenShift") (collectively, "Defendants") hereby submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff ICM, Inc.'s ("ICM") Complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) or, alternatively, Motion to Transfer this action (declaratory judgment claims only if the Kansas state law claims are dismissed) to the Southern District of New York.

## I.     NATURE OF THE CASE

Employees of GS CleanTech, which is a wholly-owned subsidiary of GreenShift, have invented and recently patented novel methods to extract corn oil from the by-products formed during ethanol production. By ICM's own admission, ICM and its customers have been employing these novel methods using ICM supplied equipment while GS CleanTech's patent applications have been pending at the United States Patent and Trademark Office ("PTO").

Over the past thirty years, and even more so recently, significant attention has been given to the production of ethyl alcohol, or "ethanol," for use as an alternative fuel. A popular method of producing ethanol is known as "dry milling" which in the United States is typically practiced using corn. For example, in 2008 alone, approximately 170 dry milling plants in the United States produced approximately 10 billion gallons of ethanol. This is expected to increase to 15 billion gallons per year as the industry grows to meet federally mandated volumes.

The dry milling process utilizes the starch in the corn to produce the ethanol through fermentation, and creates a waste stream comprised of byproducts termed "whole stillage." The whole stillage may be further separated into products known as "distillers wet grains" and "thin stillage".

Despite containing valuable corn oil, this whole stillage has for the most part been treated as waste and used primarily to supplement animal feed in the form of distillers dried grains with

1

solubles ("DDGS"). The DDGS is created by mechanically separating (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, evaporating the thin stillage to form a concentrate or syrup, recombining the resulting concentrate or syrup with the distillers wet grains, and drying the product to create the DDGS.

Prior to GS CleanTech's invention, efforts to recover the valuable corn oil from the whole stillage had not been successful in terms of efficiency or economy. A need therefore existed for a more efficient and economical manner of recovering corn oil from a byproduct containing it, such as thin stillage created during the dry milling process used to produce ethanol. GS CleanTech has filled that need with its novel and inventive process.

GS CleanTech's invention comprises, without limitation[1], initially processing the whole stillage in the manner described above, that is, mechanically separating (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, and then introducing the thin stillage into an evaporator to form a concentrate or syrup. In GS CleanTech's method, prior to recombining the syrup with the distillers wet grains, the syrup is introduced into a mechanical processor such as a second centrifuge. The second centrifuge separates corn oil from the syrup thereby allowing for the recovery of usable corn oil. The syrup that exits the centrifuge is then recombined with the distillers wet grains and dried to form the DDGS. The corn oil that is extracted from the syrup can be sold for various purposes such as feed stock for producing biodiesel.

After publication of the pending patent application, pursuant to 35 U.S.C. § 154(d), GreenShift sent letters to third parties, some of which were coincidentally ICM's customers. The letters placed each third party on actual notice of GS CleanTech's patent applications; that in

---

[1] While GS CleanTech describes an embodiment of its novel corn oil extraction method and system in this Memorandum, GS CleanTech does not intend that its invention is in any way limited to that embodiment and any statements in this Memorandum should not be construed as such.

2

GreenShift's opinion, the processes employed by each third party falls within the scope of the published claims; that each third party should carefully consider the published applications in its immediate and future business plans; and that GreenShift is willing to resolve the matter in a mutually beneficial manner. GreenShift was perfectly within its rights to send this type of letter and, as will be discussed below, is statutorily required to send such letters to protect its ability to obtain certain patent related damages.

In an obvious attempt to appease its customers and to ensure jurisdiction in a patent infringement case, ICM filed this civil action against the Defendants in the District of Kansas alleging: (1) that GreenShift's statements about GS CleanTech's patent applications constitute unfair methods of competition, interference with ICM's existing and prospective business and contractual relationships, and unfair and deceptive acts and practices possibly under the Kansas Consumer Protection Act ("KCPA"); and (2) for declaratory judgment of non-infringement and invalidity of GS CleanTech's United States Patent No. 7,601,858, entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," and issued on October 13, 2009 (the "'858 patent").

In its First Amended Complaint, ICM essentially admits that both it and its customers infringe GS CleanTech's patent claims not only as published and amended during prosecution[2] but also as issued in the '858 patent. Nonetheless, and quite surprisingly given its admissions, ICM claims that GreenShift has violated Kansas state law by communicating with those very same infringing customers.

---

[2]  To be clear, throughout this Memorandum, when the Defendants allege that ICM and its customers have "infringed" the claims in the pending patent applications as published and amended during prosecution, Defendants are not attempting to extend the term of any issued patent to include a time period prior to its issuance, but rather are referring to a third party's liability for a pre-issuance reasonable royalty under 35 U.S.C. § 154(d) for "infringing" the published patent application claims.

ICM's claims must fail as a matter of law.  First, ICM cannot maintain this action against the Defendants in the District of Kansas because the Court lacks personal jurisdiction over them.  Second, ICM's Kansas state law claims should be dismissed because GreenShift's statements are not false and ICM fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  Further, ICM lacks standing to bring a Kansas Consumer Protection Act ("KCPA") claim pursuant to Rule 12(b)(1).  Third, ICM's declaratory judgment claims related to the '858 patent should be dismissed because ICM lacks standing to assert them.  Alternatively, if this Court determines it has jurisdiction, then it should decline to hear these claims because the question of the '858 patent's validity is already pending in the Southern District of New York in another lawsuit.  Finally, this action should be dismissed or transferred because venue is improper pursuant to Rule 12(b)(3).

A. <u>Forum Shopping and Procedural Background</u>

In its First Amended Complaint, ICM is trying to claim that, while ICM and its customers admittedly infringe the '858 patent's claims, GreenShift should not have preserved its ability to obtain pre-issuance patent damages by sending notice letters, as required by 35 U.S.C. § 154(d), to potential third party.  This inconsistency is surprising to say the least and shines a light on ICM's true reason for filing this lawsuit, which is to appease its customers and to forum shop for the purpose of establishing jurisdiction for an impending patent infringement suit.

ICM filed its Complaint For Declaratory Judgment on October 13, 2009, which is the same day the '858 patent issued, the same day that GS CleanTech filed its complaint for patent infringement against GEA Westfalia Separator, Inc. ("Westfalia") and DOES 1 – 20 inclusive in the Southern District of New York ("NY Patent Infringement Case")[3], and the same day that

---

[3] The NY Patent Infringement Case was originally assigned to Judge Shira A. Scheindlin and pending as Case No. 09-cv-08642-SAS.

Westfalia amended its previously filed complaint against GreenShift to add claims for declaratory judgment of non-infringement and invalidity of the '858 patent in the Southern District of New York ("NY Declaratory Judgment Case").[4]  One of Westfalia's customers, Ace Ethanol, LLC ("Ace Ethanol"), who received letters from GreenShift, also joined in Westfalia's First Amended Complaint as party-plaintiff in New York.

On October 14, 2009, ICM filed its First Amended Complaint For Declaratory Judgment against the Defendants alleging additional facts.  (Docket Entry No. 4).  On October 15, 2009, GS CleanTech amended its complaint in the NY Patent Infringement Case to add as additional party defendants Ace Ethanol, ICM, Lifeline Foods LLC ("Lifeline Foods"), which is an ICM customer, and ten (10) additional DOES.

On October 21, 2009, the Court in the NY Patent Infringement Case issued a Notice of Case Reassignment and reassigned the case to the calendar of Judge Lawrence M. McKenna, who is the judge presiding over the NY Declaratory Judgment Case.  (NY Patent Infringement Case, Docket Entry No. 4).[5]  On the same day, the Court issued another notice that the NY Patent Infringement Case is accepted as related to the NY Declaratory Judgment Case.

## II.   STATEMENT OF FACTS

GS CleanTech is a Delaware corporation having its principal place of business at 1 Penn Plaza, Suite 1612, New York, New York.  Declaration of David J. Winsness, (Winsness Decl. at ¶ 7, attached as Exhibit 1).  GS CleanTech is the owner by assignment of the '858 patent and the patent applications at issue in this case.[6]  Id. at ¶ 8.  GreenShift is a Delaware corporation having

---

[4]  Westfalia's original complaint against GreenShift was filed on September 3, 2009, alleges that GreenShift violated the Lanham Act and New York state statutes for false advertising, and common law unfair competition for GreenShift's statements made in letter to Westfalia's customers regarding the patent applications pursuant to 35 U.S.C. § 154(d), and is pending as Case No. 09-cv-07686-LMM.

[5]  The NY Patent Infringement Case is now pending as Case No. 09-cv-08642-LMM.

[6]  The patent applications were originally filed by the inventors and have since been assigned to GS CleanTech and thus for purposes of simplicity, GS CleanTech is referred to as the owner throughout this Memorandum.

its principal place of business at 1 Penn Plaza, Suite 1612, New York, New York. *Id.* at ¶ 9. GS CleanTech is a wholly-owned subsidiary of GreenShift. *Id.* at ¶ 10.

Neither GS CleanTech nor GreenShift maintains an office in Kansas, holds company meetings in Kansas, has any employees in Kansas, or has recruited any employees from Kansas. *Id.* at ¶ 11. Neither Defendant has any bank accounts or other tangible property (real or personal) in Kansas. *Id.* at ¶ 12. Neither Defendant is registered to do business in Kansas, nor does either have a registered agent for service of process in Kansas. *Id.* at ¶ 13.

Neither Defendant has any current business relationships with any Kansas entity. *Id.* at 11. Neither Defendant has placed any advertising in Kansas. *Id.* at ¶ 15. Defendants do advertise in an ethanol producer magazine, which is published in Canada and distributed in all states. *Id.* at ¶ 16. Defendants maintain a website at **www.greenshift.com**. *Id.* at ¶ 17. However, this is a passive website, and a visitor to this website cannot purchase a product or service or enter into a contract or license agreement over the website. *Id.* at ¶ 18.

During the past several years, Defendants have traveled to Kansas for less than ten (10) sporadic visits for business purposes, but no business resulted from these visits. *Id.* at ¶ 19. Neither Defendant has ever been paid for any business in Kansas, nor has either ever received any payments from any Kansas entity. *Id.* at ¶ 20.

GS CleanTech's predecessor, Veridium Industrial Design Corporation ("Veridium"), and GS CleanTech have each entered into confidentiality agreements with ICM. *Id.* at ¶ 21. On May 30, 2006, Veridium entered into a Mutual Confidentiality Agreement with ICM to protect confidential information not involving the patented process of the '858 patent. *Id.* at ¶ 22. Veridium did travel to Kansas to discuss this unrelated technology with ICM, but no contract or licensing agreement resulted from this discussion. *Id.* at ¶ 23.

6

On April 23, 2007, GS CleanTech entered into a Mutual Confidentiality Agreement with ICM to protect confidential information relating to an order for computer control work and programming. (Winsness Decl. at ¶ 24, attached as Exhibit 1). Neither GS CleanTech nor GreenShift traveled to Kansas to discuss this technology with ICM. *Id.* In addition, neither GS CleanTech nor GreenShift entered into any contracts or licensing agreements as a result of any discussions with ICM related to this technology. *Id.*

In May of 2005, GS CleanTech filed a non-provisional patent application (Serial No. 11/122,859) (the " '859 application"), entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," which published as U.S. Patent Application Publication No. 2006/0041152 on February 23, 2006. (See **Exhibit A** to Winsness Decl., attached at Exhibit 1). On October 13, 2009, the '859 application issued as the '858 patent. (Docket Entry No. 4-1). In September of 2005, GS CleanTech filed a continuation of the '859 application (Serial No. 11/241,231) (the " '231 application"), which published as U.S. Patent Application Publication No. 2006/0041153 on February 23, 2006. (ICM's First Amended Complaint ("FAC") at ¶ 2 (Docket Entry No. 4)). In September of 2009, GS CleanTech filed a continuation of the '859 application (Serial No.12/559,136) (the " '136 application") (Winsness Decl. at ¶ 26, attached at Exhibit 1).

ICM admits that it "designs and builds ethanol production plants for customers and promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn byproducts." (FAC at ¶ 9). ICM also admits it "sell[s] and/or use[s] equipment to practice corn oil recovery methods that are in part the subject of the claims of the '858 Patent." (FAC at ¶ 8).

As a result, in July of 2009, GreenShift sent letters, pursuant to 35 U.S.C. § 154(d), to specific ethanol manufacturers who, on information and belief, are practicing GS CleanTech's corn oil extraction method (collectively the "July Letters"). (FAC at ¶ 10). The July Letters

provided third parties with actual notice of GS CleanTech's published patent applications and of

GreenShift's belief that the method of extracting corn oil employed by each third party falls

within the scope of the published claims. *Id.*

On or about October 7, 2009, GreenShift sent additional letters, pursuant to 35 U.S.C. §

154(d), to specific ethanol manufacturers who, on information and belief, are practicing GS

CleanTech's corn oil extraction method (collectively the "October Letters"). (FAC at ¶ 12). The

October Letters provided third parties with actual notice of GS CleanTech's published patent

applications and of GreenShift's belief that the method of extracting corn oil employed by each

third party falls within the scope of the published claims. *Id.*

GreenShift did not send ICM either the July or October Letter. (FAC at ¶¶ 10 & 12).

GreenShift sent one of ICM's customers, Lifeline Foods, an October Letter. *Id.* at ¶ 12. The

October Letter GreenShift sent to Lifeline Foods, which is a Missouri limited liability company,

was addressed to Lifeline Foods, with attention to Bill Becker as President and CEO, and sent to

its principal place of business at 2811 S 11th Street, Saint Joseph, Missouri 64503 by Federal

Express. (See **Exhibit B** to Winsness Decl., attached at Exhibit 1).

## III.   QUESTIONS PRESENTED

(1)   Does the Court lack personal jurisdiction over GS CleanTech and GreenShift?

(2)   Should the Kansas state law claims be dismissed because GreenShift's statements

are not false, ICM fails to state a claim upon which relief can be granted, and ICM

lacks standing to bring a KCPA claim?

(3)   Should the declaratory judgment claims related to the '858 patent be dismissed

because ICM lacks standing and fails to state a claim upon which relief can be

granted, or should this Court, in its discretion, decline to hear these claims

8

because the invalidity claim is already pending in the Southern District of New York?

(4)     Is venue improper under Rule 12(b)(3), and should the Court transfer the action (the declaratory judgment claims only after the Kansas state law claims are dismissed) to the Southern District of New York?

## IV.   ICM'S CLAIMS SHOULD BE DISMISSED UNDER FED. R. CIV. P. 12(B)(2) FOR LACK OF PERSONAL JURISDICTION OVER THE DEFENDANTS

ICM's claims should be dismissed under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction over the Defendants.  Federal Circuit law governs "because the jurisdictional issue is 'intimately involved with the substance of the patent laws.'"  *Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.,* 552 F.3d 1324, 1328 (Fed. Cir. 2008) (*quoting Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed. Cir. 1995); *Silent Drive, Inc. v. Strong Industries, Inc.,* 326 F.3d 1194, 1201 (Fed. Cir. 2003) ("[b]ecause the issue of personal jurisdiction in a declaratory action for patent invalidity and non-infringement is intimately related to patent law, personal jurisdiction…is governed by the law of [the Federal] [C]ircuit"); *see also Morrison Co., Inc. v. WCCO Belting, Inc.,* 35 F.Supp.2d 1293, 1294 (D. Kan. 1999).  Further, Federal Circuit law is applied "to all of the claims where 'the question of infringement is a critical factor in determining liability under the non-patent claims.'"  *Avocent,* 552 F.3d at 1328 (*quoting Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories,* Inc., 444 F.3d 1356, 1362 (Fed. Cir. 2006).

"With regard to procedural matters that are unrelated to patent law, the Federal Circuit generally follows the guidance of the regional court of appeals." *Morrison Co.,* 35 F.Supp.2d at 1294; *see Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1575 (Fed. Cir. 1984), *overruled on other grounds by Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424, 432 (1985).

According to Tenth Circuit precedent, "[a] plaintiff bears the burden of establishing personal jurisdiction over a defendant." *Felix v. American Honda Motor Co., Inc.,* No. 05-2525, 2008 WL 199817, at *1 (D. Kan. Jan. 23, 2008); *see Federal Deposit Ins. Corp. v. Oaklawn Apartments,* 959 F.2d 170, 174 (10th Cir. 1992). "Prior to trial, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing." *Hodgdon Powder Co., Inc. v. Clean Shot Tech., Inc.,* 92 F.Supp.2d 1170, 1172 (D. Kan. 2000).

ICM cannot make such showing, and, therefore, cannot meet its burden of establishing personal jurisdiction because neither GS CleanTech nor GreenShift have sufficient minimum contacts with the District of Kansas and the exercise of personal jurisdiction over either Defendant is inconsistent with due process.

A. Personal Jurisdiction Is Not Established In Kansas

Personal jurisdiction over GS CleanTech and GreenShift is not proper in Kansas. "'Determining whether personal jurisdiction exists over an out-of-state defendant involves two inquiries: whether a forum state's long-arm statute permits service of process, and whether the assertion of personal jurisdiction would violate due process.'" *Avocent,* 552 F.3d at 1329 (*quoting Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1359 (Fed. Cir. 2001). "Thus, [the] jurisdictional analysis collapses into a single determination of whether the exercise of personal jurisdiction comports with due process." *Avocent,* 552 F.3d at 1329. "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (internal quotations and citations omitted).

Personal jurisdiction over Defendants can be satisfied by either general or specific

jurisdiction. "General jurisdiction, on one hand, 'requires that the defendant have continuous and systematic contacts with the forum state and confers personal jurisdiction even when the cause of action has no relationship with those contacts.'" *Autogenomics, Inc. v. Oxford Gene Technology Ltd.,* 566 F.3d 1012, 1017 (Fed. Cir. 2009) (*quoting Silent Drive,* 326 F.3d at 1200; *see also Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416 (1984). "Specific jurisdiction, on the other hand, must be based on activities that arise out of or relate to the cause of action, and can exist even if the defendant's contacts are not continuous and systematic." *Id.* (*citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1985). ICM can satisfy neither basis to support personal jurisdiction over GS CleanTech or GreenShift.

     i.   ICM Cannot Establish General Jurisdiction
        Over Either Defendant

ICM cannot satisfy general jurisdiction requirements for either GS CleanTech or GreenShift. Neither have contacts with the District of Kansas that qualify as "continuous and systematic general business contacts." *Helicopteros,* 466 U.S. at 416; *see LSI Industries Inc. v. Hubbell Lighting, Inc.,* 232 F.3d 1369, 1375 (Fed. Cir. 2000) (general jurisdiction found based on millions in sales of non-infringing products over past several years and broad distributorship network).

Both GS CleanTech and GreenShift are Delaware corporations having principal places of business in New York. (Winsness Decl. at ¶¶ 7 & 9, attached at Exhibit 1). Neither GS CleanTech nor GreenShift maintains an office in Kansas, holds company meetings in Kansas, has any employees in Kansas, or has recruited any employees from Kansas. *Id.* at ¶ 11. Neither Defendant has any bank accounts or other tangible property (real or personal) in Kansas. *Id.* at ¶ 12. Further, neither Defendant is registered to do business in Kansas, nor does either have a registered agent for service of process in Kansas. *Id.* at ¶ 13. During the past several years,

Defendants have traveled to Kansas for less than ten (10) sporadic visits for business purposes, but no business resulted from these visits. *Id.* at ¶ 19. While there are sporadic contacts with the state, they are certainly not continuous and systematic contacts.

In its First Amended Complaint, ICM alleges that "[t]his Court has personal jurisdiction over Defendants because they transact business in this jurisdiction." (FAC at ¶ 6). However, neither GS CleanTech nor GreenShift does any business in Kansas. Neither Defendant has any current business relationships with any Kansas entity. (Winsness Decl. at ¶ 14, attached at Exhibit 1). Neither Defendant has ever been paid for any business in Kansas, nor has either ever received any payments from any Kansas entity. *Id.* at ¶ 20; *see Campbell Pet Co. v. Miale,* 542 F.3d 879, 882 & 884 (Fed. Cir. 2008) (no general jurisdiction found where defendant made 12 sales over 8 years for $14,000 in gross revenue (approximately 2% of total sales) and attended convention in forum, but no office or sales representative, not registered, and did not pay taxes in forum).

     ii.  ICM Cannot Establish Specific Jurisdiction
            Over Either Defendant

ICM cannot satisfy specific jurisdiction requirements over either GS CleanTech or GreenShift. The Federal Circuit employs a three-prong test to determine whether the exercise of specific personal jurisdiction over a defendant satisfies the requirements of due process: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair." *Autogenomics,* 566 F.3d at 1018 (*quoting Breckenridge,* 444 F.3d at 1363. "The first two factors correspond with the minimum contacts prong of the *International Shoe* analysis, and the third factor corresponds with the fair play and substantial justice prong of the analysis." *Autogenomics,* 566 F.3d at 1018 (internal quotations and citations omitted).

A declaratory judgment action arises out of or relates to the activities of the defendant patentee in enforcing the patent or patents. "The relevant inquiry for specific personal jurisdiction purposes then becomes to what extent has the defendant patentee 'purposefully directed [such enforcement activities] at residents of the forum,' and the extent to which the declaratory judgment claim 'arises out of or relates to those activities.'" *Avocent,* 552 F.3d at 1332-33 (*quoting Breckenridge,* 444 F.3d at 1363). In its First Amended Complaint, ICM details the actions undertaken by GreenShift in sending the July Letters and October Letters to ICM's customers and, specifically, to Lifeline Foods. (FAC at ¶¶ 10-14). However, GreenShift sent the July and October Letters to ethanol manufacturers, not to ICM. GreenShift did not specifically direct the letters to ICM's customers. According to ICM, some of these ethanol manufacturers happen to be ICM's customers. However, other than Lifeline (which is based in Missouri), ICM fails to provide the number, identity, or any details regarding its other customers that received the letters.

ICM fails to allege that GreenShift sent letters to ICM or any entity in Kansas because GreenShift did not purposefully direct any enforcement activities at residents of the District of Kansas. Further, the letter that GreenShift sent to Lifeline Foods was addressed and sent to Lifeline Foods to its place of business in Missouri. (See **Exhibit B** to Winness Decl., attached as Exhibit 1).

### iii. GreenShift's Letter to Lifeline Does Not Create Jurisdiction in Kansas

If ICM is claiming that the July and October Letters are somehow directed at ICM and Kansas, and therefore should serve as a basis for specific jurisdiction in the District of Kansas, ICM's claim is misplaced. "[B]ased on policy considerations unique to the patent context, letters threatening suit for patent infringement sent to the alleged infringer by themselves do not suffice

to create personal jurisdiction." *Avocent,* 552 F.3d at 1333 (internal quotations and citations

omitted); *see Breckenridge,* 444 F.3d at 1363 ("personal jurisdiction may not be exercised

constitutionally when the defendant's contact with the forum state is limited to cease and desist

letters, 'without more'") (*quoting Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148

F.3d 1355, 1360 (Fed. Cir. 1998)).

"This is because to exercise jurisdiction in such a situation would not comport with fair

play and substantial justice." *Avocent,* 552 F.3d at 1333 (internal quotations and citations

omitted). The Federal Circuit explained:

> Principles of fair play and substantial justice afford a patentee sufficient latitude to
> inform others of its patent rights without subjecting itself to jurisdiction in a foreign
> forum. A patentee should not subject itself to personal jurisdiction in a forum solely by
> informing a party who happens to be located there of suspected infringement. Grounding
> personal jurisdiction on such contacts alone would not comport with principles of
> fairness.

*Autogenomics,* 566 F.3d at 1020 (*quoting Red Wing Shoe,* 148 F.3d at 1360-61). Even when

there is additional activity by the defendant patentee in the forum state, the Federal Circuit has

found no personal jurisdiction. *See Hildebrand v. Steck Mfg. Company, Inc.*, 279 F.3d 1351,

1356 (Fed. Cir. 2002) (additional activity includes unsuccessful attempts to license the patent in

the forum state); *see also Red Wing Shoe*, 148 F.3d at 1357-58 (defendant successfully licensed

the patent in the forum state, even to multiple nonexclusive licensees, but does not exercise

control over the licensees' sales activities and has no dealings with those licensees beyond the

receipt of royalty income).

In the present case, as described above, there is no such additional activity, and, therefore

ICM cannot show that the District of Kansas has personal jurisdiction over either Defendant.

## V.   ICM'S KANSAS STATE LAW CLAIMS (COUNT I)
    SHOULD BE DISMISSED UNDER RULE 12(B)(6)

ICM's state law claims should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted because GreenShift's statements in the July and October Letters are not false and ICM fails to make a showing that its pleadings meet the elements of the any the various state law claims. Further, under Fed. R. Civ. P. 12(b)(1), ICM lacks standing to assert a KCPA claim. Therefore, Count I should be dismissed.

In Count I of its First Amended Complaint, ICM attempts to identify at least five (5) different causes of action. However, based on the deficient pleadings, it is unclear the precise causes of action ICM is attempting to assert against GreenShift. Count I is styled "Unfair Competition/Interference With Existing And Prospective Business And Contractual Relationship/Deceptive Trade Practices." (FAC, p. 4). ICM alleges that "GreenShift's acts constitute unfair methods of competition, interference with ICM's existing and prospective business and contractual relationships and unfair or deceptive acts or practices" and alleges it is entitled to remedies "under Kansas Stat. § 50-634," which is the remedy provision for KCPA claims. (FAC at ¶¶ 16 and 18).

Each of the five (5) causes of action that ICM may possibly be asserting in Count I of its First Amended Complaint fails to state a claim under Rule 12(b)(6).

A. Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

15

short of the line between possibility and plausibility of entitlement to relief." *Id.* (*quoting*

*Twombly*, 550 U.S. at 557) (internal quotations omitted).

"Plaintiff bears the burden to frame her complaint with enough factual matter to suggest

that she is entitled to relief; it is not enough for her to make threadbare recitals of a cause of

action accompanied by mere conclusory statements." *McHenry v. Colgate-Palmolive Co., Inc.,*

Case No. 08-2622, 2009 WL 3414833, at *2 (D. Kan. Oct. 19, 2009). "A pleading which offers

labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked

assertions devoid of further factual enhancement will not stand." *Id.*

B. ICM Fails To Meet The Elements Of Any Cause of Action

In its First Amended Complaint, ICM does not plead sufficient facts to support the

elements of any of these causes of action, set forth the appropriate elements of the claims, or

even attempt to make a showing that its pleadings meet the elements of the claims. As described

in Sections i-iv, below, ICM simply offers "labels and conclusions," "naked assertions devoid of

factual enhancement," and does not even give a "formulaic recitation of the elements" in its First

Amended Complaint. Therefore, ICM's Count I should be dismissed.

i. GreenShift's Statements Are Not False

Each of the five (5) possible causes of action asserted by ICM in Count I are premised on

the falsity of GreenShift's statements. However, GreenShift's statements in the July and October

Letters are not false. ICM claims that GreenShift "falsely and materially misrepresented

liability" and "knowingly and intentionally misrepresented that ICM's customers had liability."

(FAC at ¶¶ 11 & 14). But these naked assertions by ICM are simply not accurate. Not only is

ICM unable to show that GreenShift's statements are false, but ICM also admits that they are not

false. (FAC at ¶ 8). Pursuant to Rule 12(b)(6), ICM's Count I should be dismissed because ICM

cannot state a claim that is plausible on its face for any of the Kansas state law claims.

16

As already detailed above, ICM admits that it and its customers infringe one or more claims both in the published patent applications as well as the amended claims that have now issued the '858 patent. (FAC at ¶¶ 8-9). In addition, there are pending claims in the '136 application, which is a continuation of the '859 application, that are identical to the published claims. (Winsness Decl. at ¶ 26, attached at Exhibit 1). To argue that GreenShift should have unilaterally given up any right to pursue substantial pre-issuance royalties available to it under 35 U.S.C. Section 154(d) by refraining from sending out the July Letters and October Letters while - at the same time - admitting that GreenShift's statements were in fact true, is unsupportable. GreenShift has the right - and the obligation under § 154(d) - to inform others they are infringing the claims in the published patent applications in order to obtain pre-issuance reasonable royalties.

GreenShift was both adhering to and operating within its rights under §154(d) in sending out the July Letters and October Letters. The fact that the some of the pending claims had been amended is not determinative of whether §154 damages are ultimately recoverable. In *Stephens v. Tech Intern., Inc.*, 393 F.3d 1269 (Fed. Cir. 2004), the Federal Circuit addressed the issue of amendments made to claims during prosecution, and held:

> Second, [plaintiff] did not harass [defendant] by sending the section 154 notice while the [patent] application was being amended. The application was actually amended after the section 154 notice was sent to [defendant]. ***Further, [plaintiff] was not required to withdraw its section 154 notice; it believed [defendant] still infringed the amended claims, and had a right to await possible patent issuance to see if its infringement allegations were correct***.

*Id.* at 1276 (emphasis added).

17

The fact that the plaintiff in *Stephens* sent the letters before the claims were amended does not distinguish *Stephens*. Providing the plaintiff with the "the right to await possible patent issuance to see if its infringement allegations were correct" rather than requiring withdrawal of the letters is no different than GreenShift sending the July Letters or October Letters after the amendment and filing of the '136 continuation application with the belief that the recipients infringe the claims as published and as amended and waiting to see if its allegations are correct. In fact, the circumstances of the instant case are even more compelling than those in *Stephens*. In this case not only does GreenShift believe that the recipients of the July Letters and October Letters infringe the published patent claims, the claims now issued in the '858 patent, and the claims pending in the '136 application, which is a continuation of the '859 application, that are identical to the published claims, but ICM actually admits this. There was no such admission by the defendant in *Stephens*. Thus, as did the plaintiff in *Stephens*, GreenShift had the right to send the July Letters and October Letters to await patent issuance to see if its infringement allegations were correct. It turns out GreenShift was correct.

ii.  Unfair Competition

ICM's allegations that GreenShift's alleged false and misleading advertising relating to ICM's goods, services, or commercial activities fails to state a claim for unfair competition under Kansas state law. *See Accessible Technologies, Inc. v. Paxton Automotive Corp.,* Case No. 01-2407, 2002 WL 31256227, at *3 (D. Kan. Aug. 28, 2002) ("[t]he court is not willing at this juncture to predict that the Kansas Supreme Court would interpret the *Restatement (Third)* as providing a cause of action not expressly stated therein, where a plaintiff complains about a defendant's deceptive advertising relating to that plaintiff's goods, services, or commercial activities"); *see also Altrutech, Inc. v. Hooper Holmes, Inc.,* Case No. 96-2091, 1998 WL 398231, at *1-3 (D. Kan. Jan. 26, 1998) (court dismissed count for unfair competition based on

18

published falsehoods to plaintiff's employees, contractors, and clients that plaintiff "was about to go out of business and likely would be unable to promptly and properly service paramedical business").

However, "[a]s a general rule, Kansas unfair competition law provides a cause of action for the misuse of trademark or other intellectual property." *Accessible Technologies,* 2002 WL 31256227, at *2; *see Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.,* 26 Kan.App.2d 104, 105, 979 P.2d 144, 147 (Kan.App. Apr. 30, 1999). Although there appear to be no Kansas cases addressing Kansas unfair competition law based on false advertising and the alleged misuse of a patent and/or patent application, to the extent that such a cause of action is recognized under Kansas law, Defendants submit that ICM fails to set forth any elements of such a claim or state a claim upon which relief can be granted for any such claim. Therefore, ICM's common law unfair competition claim should be dismissed.

### iii. Interference With Existing And Prospective Business And Contractual Relationship

ICM fails to state a claim upon which relief can be granted for interference with either an existing or prospective business or contractual relationship. "Under Kansas law, for a plaintiff to recover on a tortuous interference with contracts claim, he must show: (1) a contract; (2) the wrongdoer's knowledge thereof; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages resulting therefrom." *Paradigm Alliance, Inc. v. Celeritas Technologies, LLC,* --- F.Supp.2d ----, 2009 WL 3045464, at *20 (D. Kan. Sept. 22, 2009); *see also Snyder v. American Kennel Club,* --- F.Supp.2d ----, 2009 WL 3242114, at *13 (D. Kan. Oct. 6, 2009).

Alternatively, "[t]o prove tortious inference with a business expectation under Kansas law, a party must prove: (1) the existence of a business relationship or expectancy with the

19

probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or

expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was

reasonably certain to have continued the relationship or realized the expectancy; (4) intentional

misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of

defendant's misconduct." *Paradigm Alliance,* 2009 WL 3045464, at \*20; *see also Snyder,* 2009

WL 3242114, at \*13.  "In addition, the claimant must demonstrate that the defendant acted with

malice, which the Kansas Supreme Court has defined as acting with actual evil-mindedness or

specific intent to injure." *Id.* (internal quotations, citations, and footnotes omitted).

Although ICM has failed to satisfy any of the above-described elements of either tort, for

the purposes of simplicity, GreenShift will focus on the contract and business relationship,

intentional procurement of its breach and intentional misconduct by defendant, absence of

justification, and damages.  ICM alleges GreenShift sent the July and October Letters to ICM's

customers, but ICM does not identify any contract, any specific customers (other than Lifeline),

or any specific prospective business relationship necessary to satisfy the elements of the torts.

In a conclusory fashion, ICM alleges that GreenShift made knowing and intentional

misrepresentations in the July and October Letters.  However, ICM fails to allege GreenShift's

intentional procurement of a breach of any contract, fails to describe GreenShift's intentional

misconduct, and fails to address any absence of justification of the July and October Letters.  As

set forth in Section IV(B)(i) above, GreenShift has the right and obligation to send 35 U.S.C. §

154(d) letters, and GreenShift's statements in the letters were not false.  Finally, ICM wholly and

utterly fails to allege damages and any nexus to GreenShift's alleged misconduct.

Thus, ICM fails to state a claim upon which relief can be granted for interference with either an existing or prospective business or contractual relationship and the claim should be dismissed under Rule 12(b)(6).

<div align="center">

iv.  Deceptive Trade Practices Under KCPA § 50-626 And KCPA Claim Under § 50-623 *et seq.*

</div>

If Count I is intended to state a claim under KCPA § 50-623 *et seq.,* it should be dismissed under both Rule 12(b)(6) and 12(b)(1).[7]

<div align="center">

a.    Failure to State a KCPA Claim

</div>

ICM fails to state a claim for either Deceptive Trade Practices claim under KCPA § 50-626 or any KCPA claim under § 50-623 *et seq.* because it fails to plead the elements of a KCPA claims and fails to plead with particularity.  "The elements of an action under the KCPA are identical to fraud actions except for the intent requirement." *Burton v. R.J. Reynolds Tobacco Co.* 884 F.Supp. 1515, 1524 (D. Kan. 1995).  "Allegations of unfair trade practices under the KCPA must be pleaded with particularity in accordance with Rule 9(b)." *Gonzalez v. Pepsico, Inc.,* 489 F.Supp.2d 1233, 1247 (D. Kan. 2007); *see* Fed. R. Civ. P. 9(b).

"For purposes of Rule 9(b), particularity includes the time, place and content of the alleged wrongful conduct, as well as the identities of the wrongdoers and the harm caused by plaintiffs' reliance on any false representation." *Id.*  ICM fails to plead any elements of a KPCA claim and, therefore, fails to plead with any particularity.  Thus, any alleged KPCA claim is deficient and ICM fails to state a claim upon which relief can be granted under KCPA.

---

[7] ICM alleges it is entitled to remedies "under Kansas Stat. § 50-634," which is the remedy statute for KCPA claims.  (FAC at ¶ 18).

<div align="center">

21

</div>

b.   Lack of Standing To Assert KCPA Claim

ICM does not have standing to bring any KCPA claim, and, therefore, ICM's KCPA

claim should be dismissed under Fed. R. Civ. P. 12(b)(1).  "'[A] corporation or similar entity that

has suffered an injury as a result of a 'deceptive' or 'unconscionable' act or practice cannot

assert a claim under the KCPA.'"  *Kestrel Holdings I, L.L.C. v. Learjet Inc.,* 316 F.Supp.2d

1071, 1076-77 (D. Kan. 2004) ("the court finds that the KCPA claim belongs to the corporation,

which does not have standing to sue under the KCPA because it is not a consumer") (*quoting*

*Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1363 (D. Kan. 1996).  "Rather, the individual or

sole proprietor must have suffered the injury and must make the claim. *Id.*

## VI.   ICM'S DECLARATORY JUDGMENT CLAIMS (COUNT II) SHOULD BE DISMISSED

ICM's declaratory judgment claims should be dismissed because there was no

controversy between ICM and Defendants when ICM filed suit and this defect cannot be

corrected.  GreenShift did not send either the July or October Letter to ICM.  FAC at ¶ 12.

Therefore, there is no controversy between the Plaintiff and Defendants.  Even if ICM can

somehow establish subject matter and personal jurisdiction, this Court has the discretion to

decline jurisdiction based on a number of factors discussed below.

The Declaratory Judgment Act provides, in pertinent part, "[i]n a case of actual

controversy within its jurisdiction ... any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.

§2201(a). Therefore, this Court must consider both jurisdiction and the prudence of maintaining the action in Kansas, while a similar action is pending in the State of New York.[8]

A. ICM's Claim For Declaratory Judgment Should Be
   Dismissed For Lack of Standing

ICM's claim for declaratory judgment should also be dismissed under Fed. R. Civ. P. 12(b)(1) because ICM lacked standing when suit was filed.  For this Court to have jurisdiction over the declaratory judgment claims, "the dispute [must] be definite and concrete, touching the legal relations having adverse legal interests and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Micron Technology, Inc. v. Mosaid Technologies, Inc.,* 518 F.3d 897, 901 (Fed. Cir. 2008) (internal quotations and citations omitted).  "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (internal quotations and citations omitted).

No controversy between ICM and Defendants existed when ICM filed suit.  The October Letter cited by ICM as the basis for the dispute between it and Defendants was not sent to ICM; rather, it was sent to ICM's customer, Lifeline.  Therefore, no controversy existed between ICM and Defendants.

---

[8] "The proper relationship between an action under this act for a declaration of patent rights and a later-filed infringement suit triggers [the Federal Circuit's] special responsibility to foster national uniformity in patent practice; [the Federal Circuit does] not defer to the procedural rules of other circuits." *Serco Services Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1038 (Fed. Cir. 1995); *see Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed. Cir. 1993), *overruled on other grounds by Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995).

GS CleanTech's filing of the NY Patent Infringement Case against ICM does not correct the subject matter jurisdictional defect in this case because the issue must be evaluated as of the time the case was filed, not today. *See Prasco, LLC v. Medicis Pharmaceutical Corp.,* 537 F.3d 1329, 1337 (Fed. Cir. 2008) ("while later events may not create jurisdiction where none existed at the time of filing, the proper focus in determining jurisdiction are the facts existing at the time the complaint under consideration was filed") (internal quotations and citations omitted).

Prior to filing of suit in New York, the GreenShift Defendants made no overtures towards ICM. Jurisdiction cannot arise simply because ICM perceived that the '858 patent posed some risk to it or its customers that received letters. *See Prasco,* 537 F.3d at 1339 ("jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee") (internal quotations and citations omitted).

ICM's declaratory judgments claims should, therefore, be dismissed under Rule 12(b)(1).

B.  In Its Discretion, This Court Should Decline To Exercise
    Jurisdiction To Hear ICM's Declaratory Judgment Claims

"Even when jurisdiction is present [in a declaratory judgment action], district courts retain some measure of discretion to decline to hear the case." *Micron Technology,* 518 F.3d at 902; *see Wilton,* 515 U.S. at 289; *see also Sprint Corp. v. Aerotel, Ltd.,* Case No. 99-2547, 2000 WL 382031, at *2 (D. Kan. Mar. 17, 2000). "The word 'may' within the language of the Declaratory Judgment Act means that a court has discretion to accept a declaratory judgment action in the first place: 'In a case of actual controversy within its jurisdiction ... any court ... *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Micron Technology,* 518 F.3d at 903 (*quoting* 28 U.S.C. § 2201(a).

24

The Federal Circuit provides the following guidance for district courts when considering

a declaratory judgment action filed to anticipate a latter filed mirror patent infringement

complaint in another forum:

> The general rule favors the forum of the first-filed action, whether or not it is a
> declaratory judgment action. The trial courts have discretion to make exceptions to this
> general rule in the interest of justice or expediency, as in any issue of choice of forum.
> These exceptions are not rare. A district court may consider a party's intention to
> preempt another's infringement suit when ruling on the dismissal of a declaratory action,
> but that consideration is merely one factor in the analysis. Other factors include the
> convenience and availability of witnesses, the absence of jurisdiction over all necessary
> or desirable parties, and the possibility of consolidation with related litigation.

*Micron Technology,* 518 F.3d at 904 (internal quotations and citations omitted) ("trial court must

weigh the factors used in a transfer analysis as for any other transfer motion"); *see Genentech*,

998 F.2d at 937-38; *see also Electronics for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1348 (Fed.

Cir. 2005). "Eventually, robust consideration of these factors will reduce the incentives for a

race to the courthouse because both parties will realize that the case will be heard or transferred

to the most convenient or suitable forum." *Micron Technology,* 518 F.3d at 905.

This Court should decline to exercise jurisdiction over ICM's declaratory judgment

claims because it would be unjust and inefficient to allow ICM's anticipatory suit to proceed.

First, ICM's filing of a declaratory judgment action against the Defendants immediately after the

'858 patent issued was a "preemptive strike" against Defendants to secure a preferable forum. It

would be unjust to allow ICM suit to proceed in the District of Kansas, particularly where ICM's

jurisdictional claim is based on a letter to a third party. *See Nacogdoches Oil & Gas, L.L.C. v.*

*Leading Solutions, Inc.,* Case No. 06-2551, 2007 WL 2402723, at *2-*3 (D. Kan. Aug. 17, 2007)

(noting exception to first-filed rule when first-filed declaratory judgment suit is merely a

"preemptive strike" that mirrors an anticipated adversary filing another jurisdiction).

"Though it is an acknowledged risk of the rule, the first-filed rule is not intended to create

a race to the courthouse." *Aurora Corp. of America v. Fellowes, Inc.,* Case No. 07-8306, 2008 WL 709198, at * 1 (C.D. Cal. Feb. 27, 2008). "Application of the first-filed rule here, where the parties filed nearly simultaneous actions in competing jurisdictions the first day that courts were open after the [patent-in-dispute] was issued, would invoke none of the merits of the first-filed rule, while promoting the sort of race to the courthouse that is the worst feature of the rule." *Id.* "[I]n other contexts,…the first-filed rule is of no utility where competing cases are filed within a short interval of one another." *Id.; see Nacogdoches,* 2007 WL 2402723, at *3 ("when competing actions are filed within a short time of each other (seven (7) weeks), courts may disregard the first-filed rule").

GS CleanTech amended its patent infringement case to bring claims against ICM in the Southern District of New York only two days after ICM filed its declaratory judgment action in Kansas. *See Serco Services,* 51 F.3d at 1039 (affirming district court's dismissal of declaratory judgment action to allow mirror patent infringement action filed three days later to proceed).

Defendants submit that forum shopping alone motivated ICM to file this action in the District of Kansas on the day the '858 patent issued, premised entirely on a letter sent to a third party in another state. *See Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081 (Fed. Cir. 1989) (an exception to the first-to-file rule is "where forum shopping alone motivated the choice of sites for the first suit").

Second, it would be unjust to allow this case to proceed in Kansas because of the lack of jurisdiction over the necessary and/or desirable parties. See Section IV, above.

Third, it would be inefficient, and could potentially result in inconsistent rulings, if ICM's action is permitted to proceed in the District of Kansas while earlier filed related litigation is pending in the Southern District of New York against multiple third parties, ICM and Lifeline.

See *CQGT, LLC v. Trading Technologies Intern., Inc.,* Case No. 05-1584, 2006 WL 2711770, at

*1-*2 (D. Colo. Sept. 21, 2006) (declaratory judgment action transferred to district where patent

infringement case pending along with seven other cases involving the same patents and all

assigned to the same judge); *see also Cingular Wireless LLC, v. Freedom Wireless, Inc.,* Case

No. 06-1935, 2007 WL 1876377, at *6 (D. Ariz. June 27, 2007) (declaratory judgment action

dismissed in part because four pending cases before same judge in another district "all predicated

upon alleged infringement of the patents-in-suit").

The question of the '858 patent's validity is pending in the NY Declaratory Judgment

Case, which was filed prior to the present action (although amended by GEA Westfalia

Separator, Inc to add the declaratory judgment claims on the same day). The New York case is

assigned to the same judge who will hear GS CleanTech's patent infringement claims against

ICM. Further, GS CleanTech has named 30 DOES and intends to bring in additional patent

infringement defendants as they are identified. Even if this Court determines it has jurisdiction,

it should decline to hear the declaratory judgment claims because the question of validity of the

'858 patent should not be determined concurrently in two different federal courts. Separate

lawsuits are an unnecessary waste of judicial resources, duplicative, overly costly for

Defendants, and could produce inconsistent results.

Fourth, the convenience and availability of witnesses appears to be at best a neutral factor

and does not favor ICM or the Defendants. ICM and the Defendants will have to travel to

engage in discovery regardless of the location of the trial court. However, should this Court

allow this case to proceed in Kansas, the inconvenience and duplicative litigation costs to the

Defendants in Kansas and New York will be immense.

Based on the above factors, this Court should decline to hear the declaratory judgment claims. The fact that ICM filed its declaratory judgment two days prior to GS CleanTech filing its patent infringement claims against ICM does not dictate a result under the First-to-File Rule. Further, ICM's declaratory judgment action will not settle the controversy, nor will it clarify the legal relations at issue because the same controversy is pending in New York, along with claims of patent infringement against ICM.

## VII.   VENUE IS IMPROPER IN KANSAS, ALTERNATIVELY, ICM'S DECLARATORY JUDGMENT CLAIMS SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF NEW YORK

If this Court is not inclined to dismiss all of ICM's claims, then Defendants seek transfer of the declaratory judgment claims to the Southern District of New York where the NY Patent Infringement Case is pending and other parties have alleged invalidity of the '858 patent. Moreover, as set forth above, this Court does not have personal jurisdiction over GS CleanTech or GreenShift. Therefore, venue is also improper in this district pursuant to 28 U.S.C. § 1391(b), which provides:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may...be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). A defendant corporation "shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction..." 28 U.S.C. § 1391(c). GS CleanTech nor GreenShift reside in the District of Kansas, and the events giving rise to ICM's claim did not occur in Kansas.

When venue is improper, 28 U.S.C. § 1406(a) provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).  The District of Kansas is improper under the venue statute, thus warranting transfer under Section 1406(a).  If the Court is not inclined to dismiss this action, Defendants, in the alternative, request that the Court transfer this action (declaratory judgment claim only after the Kansas state law claims are dismissed) to the United States District Court for the Southern District of New York, a Court of proper venue and jurisdiction.

## VIII.   CONCLUSION

This action must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because the Court lacks personal jurisdiction over the Defendants.  ICM's state law claims should be dismissed because GreenShift's statements are nor false, ICM fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), and, further, ICM lacks standing to bring a KCPA claim pursuant to Rule 12(b)(1).  ICM's declaratory judgment claims related to the '858 patent should be dismissed because ICM lacks standing to assert them pursuant to Rule 12(b)(1) and, therefore, this Court does not have jurisdiction.  If this Court determines it has jurisdiction, then it should, in its discretion, decline to hear these claims because the question of the '858 patent's validity is already pending in the Southern District of New York.  Alternatively, this Court should transfer the action to the Southern District of New York.

Dated: November 5, 2009                Respectfully submitted,

                                       s/Ken M. Peterson
                                       Ken M. Peterson, SC #07499
                                       Will B. Wohlford, SC #21773
                                       Kristen Wheeler Maloney, SC #22600
                                       MORRIS, LAING, EVANS, BROCK
                                       & KENNEDY, CHTD.
                                       300 N. Mead, Suite 200
                                       Wichita, KS 67202
                                       Telephone: 316-262-2671
                                       Facsimile: 316-262-5991
                                       kpeterson@morrislaing.com

                                       and

                                       Michael J. Rye, Esq.
                                       CANTOR COLBURN LLP
                                       20 Church Street, 22d Floor
                                       Hartford, CT 06103
                                       Telephone: (860) 286-2929
                                       Facsimile: (860) 286-0115
                                       mrye@cantorcolburn.com
                                       cobrien@cantorcolburn.com

                                       *Counsel for Defendants*
                                       *GS CleanTech and GreenShift*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2009, I caused to be filed a true and correct copy of the above pleading with the Clerk of the Court using the CM/ECF System, and served a copy of the same via U.S. Mail on the following:

John M. Weyrauch
Michael A. Bondi
100 S. Fifth Street, Suite 2250
Minneapolis, MN  55402
Telephone:  (612) 767-2512
Facsimile:  (612) 573-2005

and

Charles Millsap
Fleeson, Gooing, Coulson & Kitch, L.L.C.
1900 EPIC Center
301 N. Main
Wichita, KS  67202
Telephone:  (316) 267-7361
cmillsap@fleeson.com

***Counsel for Plaintiff***

s/Ken M. Peterson
Ken M. Peterson, S.C. No. 07499

31

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

_____
                                        )
                                        )
ICM, INC.,                              )
                                        )        Civil Action No. 09-1315-WEB-KMH
        Plaintiff,                      )
                                        )
        v.                              )        ORDER AMENDING
                                        )        THE JURISDICTIONAL
GS CLEANTECH CORPORATION                )        DISCOVERY AND MOTION
GREENSHIFT CORPORATION,                 )        BRIEFING SCHEDULES
                                        )
        Defendants.                     )
_____ )


        On the parties' joint motion, the Court's jurisdictional discovery and motion briefing

scheduled, entered on December 2, 2009 (Doc. 26), is amended as follows:

        1.  Jurisdictional discovery shall be completed by February 24, 2010;

        2.  Briefs in opposition to the respective parties' initial memorandum of law filed and

served by March 8, 2010; and

        3.  Reply briefs filed and served by March 22, with a consolidated hearing on the pending

motions.

        Dated:  February 22, 2010


                                        s/ Wesley E. Brown
                                        Wesley E. Brown
                                        U.S. District Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **GS CLEANTECH CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 09-08642-(LMM)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GEA WESTFALIA SEPARATOR, INC.;** | ) | |
| **ACE ETHANOL, LLC; ICM, INC.;** | ) | |
| **LIFELINE FOODS LLC; and DOES 1-30,** | ) | |
| **INCLUSIVE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ICM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO STAY ICM INC.'S RESPONSE TO PLAINTIFF'S AMENDED COMPLAINT

**COZEN O'CONNOR**
**Jennifer F. Beltrami**
**250 Park Avenue**
**New York, NY 10177**
**Tel: (212) 883-4955**
**Fax: (866) 832-7197**
**jbeltrami@cozen.com**

- and -

**John M. Weyrauch,** *pro hac vice*
**Paul P. Kempf,** *pro hac vice*
**Michael A. Bondi,** *pro hac vice*
**DICKE, BILLIG & CZAJA, PLLC**
**100 South Fifth Street, Suite 2250**
**Minneapolis, MN 55402**
**jmweyrauch@dbclaw.com**
**pkempf@dbclaw.com**
**mbondi@dbclaw.com**

December 14, 2009

## **INTRODUCTION**

ICM, Inc. ("ICM") filed an action against Plaintiff GS CleanTech Corporation ("CleanTech") in the District of Kansas prior to CleanTech's addition of ICM as a defendant in the instant action. The issues in both cases are identical. ICM has moved the Kansas District Court for an order enjoining CleanTech from prosecuting the instant action against ICM (the "Kansas Motion"). Until the Kansas Motion is resolved, ICM should not be obligated to respond to CleanTech's Amended Complaint. CleanTech is unwilling to stipulate to a stay of ICM's response time pending a resolution of the Kansas Motion. ICM therefore respectfully requests that the Court extend the time within which ICM must respond to the Amended Complaint until the Kansas District Court has resolved the propriety of the instant action against ICM and any appeals of such decision have been resolved.

## BACKGROUND

CleanTech is a wholly-owned subsidiary of Greenshift Corporation ("Greenshift"). CleanTech is the owner by assignment of U.S. Patent No. 7,601,858 (the "'858 patent").[1] In July 2009, Greenshift began sending letters to various companies in the ethanol production industry asserting that Greenshift was the owner of certain patent applications for which the customers were liable to Greenshift for pre-patent grant royalties (the "July Greenshift letters").[2] Weyrauch

---

[1]    See Declaration of John Weyrauch dated December 14, 2009 ("Weyrauch Decl.") Ex. A. The '858 patent issued from U.S. Patent Application Serial No. 11/122,859 (the "'859 patent application"). On May 15, 2009, an assignment of the '859 patent application in favor of CleanTech was recorded with the U.S. Patent and Trademark Office. Weyrauch Decl. Ex. A. Prior to the May 15, 2009 assignment, the '859 patent application was owned by GS Ethanol Technologies, Inc. *Id.* At no time during the pendency of the '859 and '231 patent applications was Greenshift an owner of the '859 and/or '231 patent applications. Nonetheless, throughout at least most of 2009, Greenshift publicly asserted in its SEC filings and press releases it was the owner of U.S. patent applications pertaining to a corn oil recovery process. Weyrauch Decl. Exs. F, G.

[2]    35 U.S.C. § 154(d) sets forth the conditions upon which a patentee may obtain royalties for acts that occur prior to the grant of a patent as follow:

(d) PROVISIONAL RIGHTS.-

(1) IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent under section 122(b) …, and ending on the date the patent is issued-

(A) (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; or

(ii) if the invention as claimed in the published patent application is a process, uses, offers for sale, or sells in the United States or imports into the United States products made by that process as claimed in the published patent application; and

(B) had actual notice of the published patent application and, in a case in which the right arising under this paragraph is based upon an international application

Decl. Exs. B, C, D, E.  Specifically, the letters from Greenshift's counsel asserted that Greenshift owned the '859 patent application and U.S. Patent Application Serial No. 11/241,231 (the "'231 patent application"), both of which relate to corn oil recovery processes.[3]  *Id.*  Copies of the published form of the '859 and '231 patent applications accompanied the letters.  *Id.*

On or about August 6, 2009, ICM's counsel wrote a letter to Greenshift's counsel to address the letters ICM's customers received (the "August 6 letter").  Weyrauch Decl. Ex. H. The August 6 letter addressed the assertion of liability under 35 U.S.C. § 154(d), noting that the July Greenshift letters failed to include mention of the limitations set forth in sub-section (2) of Section 154(d).  The August 6 letter then identified in detail how the claims in the '859 and '231 patent applications had been materially amended since each of the applications had been published, and that the Greenshift letters were therefore apparently sent with the intent to improperly interfere with ICM's business relationships.  ICM's August 6 letter asserted that ICM was prepared to take such steps as would be necessary to prevent any further customer interference.  *Id.*  ICM did not receive a response from Greenshift to the August 6 letter.

In early October 2009, Greenshift sent additional letters to customers of ICM asserting that the '859 and '231 patent applications were owned by Greenshift and that the customers were liable for royalties under 35 U.S.C. § 154(d) (the "October Greenshift letters.").  Weyrauch Decl.

---

designating the United States that is published in a language other than English, had a translation of the international application into the English language.

(2) RIGHT BASED ON SUBSTANTIALLY IDENTICAL INVENTIONS.- The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

35 U.S.C. § 154(d).

[3]      In general, all claims of the '858 patent are directed to a method of recovering oil from thin stillage.

Exs. I, J, K.  The October Greenshift letters further indicated that the '859 patent application had been allowed by the U.S. Patent and Trademark Office and would issue in the near future.  *Id.* Upon examination of the U.S. Patent and Trademark Office records for the '859 patent application, ICM learned that the '859 patent would issue as U.S. Patent No. 7,601,858 (the "'858 patent") on October 13, 2009.

One of the October Greenshift letters was sent to Lifeline Foods, LLC ("Lifeline Foods"), a company located in St. Joseph, Missouri that produces ethanol and other products from corn. Weyrauch Decl. Ex. K.  Lifeline Foods is 49% owned by ICM, and ICM owns and operates centrifuge equipment in Lifeline Foods' facilities for the purpose of recovering corn oil. Weyrauch Decl. Ex. L at ¶ 12.  To halt further harmful communications from Greenshift to ICM's customers, and to resolve the issue of ICM's freedom to practice corn oil recovery processes with ICM's centrifuge equipment, ICM initiated an action against Greenshift and CleanTech in the U.S. District Court for the District of Kansas on October 13, 2009 (the "Kansas action").  The Kansas action asserts claims for unfair competition, interference with existing and prospective business and contractual relationships, deceptive trade practices and for declaratory judgment of non-infringement and patent invalidity regarding the '858 Patent.  *Id.*

On October 13, 2009, CleanTech initiated the instant action against GEA Westfalia Separator, Inc. and DOES 1-20, whose true names and capacities were stated to be unknown to CleanTech, for infringement of U.S. Patent No. 7,601,858.  Although, as demonstrated by the above facts, CleanTech was well aware of ICM, the initial complaint did not name ICM.  On October 23, 2009, CleanTech amended its complaint in this action to name Plaintiff ICM and its

customer Lifeline Foods as defendants.[4]  The Amended Complaint in this action acknowledges ICM's first-filed Kansas action, but alleges that the Kansas Court lacked jurisdiction over CleanTech and Greenshift.  Amended Complaint ¶ 15.  Other factual allegations in the Amended Complaint concerning ICM are taken from ICM's Complaint in the Kansas action.  Weyrauch Decl. Ex. L.

On November 5, 2009, ICM filed a motion in the Kansas action to enjoin CleanTech's prosecution of this action against ICM.[5]  Weyrauch Decl. Ex. M.  By stipulation of the parties, briefing on the pending motions in the Kansas action is scheduled to be complete by March 12, 2010, with a hearing to follow.  ICM requested that CleanTech stipulate to a stay of ICM's involvement in this action pending resolution of the motions pending in the Kansas action, but that request was denied.  Weyrauch Decl. ¶ 15.

## ARGUMENT

ICM should not be required to defend itself in a second action regarding identical issues that are pending in the first-filed Kansas action.  CleanTech's filing of an Amended Complaint to add ICM as a defendant after it received notice of ICM's Kansas action was clearly retaliatory and calculated to duplicate ICM's costs and effort in resolving this patent dispute.  As is demonstrated by the above pre-litigation facts, CleanTech was well aware of ICM at the time it filed suit in New York, yet it chose not to name ICM as a defendant until after ICM brought suit in Kansas.

---

[4]     On October 15, 2009, CleanTech filed a "Notice of Filing of Amended Complaint," but it did not file the Amended Complaint until October 23, 2009.

[5]     CleanTech and Greenshift have also moved to dismiss ICM's Complaint under Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6), or alternatively to transfer venue to the Southern District of New York.

When two actions involving the same issues are brought in two different federal district courts, the first court has power to enjoin the prosecution of the second action, and should exercise such power in its sound discretion in order to avoid the possibility of inconsistent results and the duplication of judicial effort. *The Horn & Hardart Co. v. Burger King Corporation,* 476 F.Supp. 1058, 1059 (S.D.N.Y. 1979). *See also Chicago Pneumatic Tool Co. v. Hughes Tool Co.,* 180 F.2d 97 (10th Cir. 1950); *The Scott & Fetzer Co. v. McCarty,* 450 F.Supp. 274 (N.D. Ohio 1977). Accordingly, ICM has moved the Kansas District Court to enjoin CleanTech from prosecuting this action against ICM. By refusing to stipulate to an extension of time for ICM to respond to the Amended Complaint, CleanTech is attempting to usurp the authority of the Kansas District Court to determine the propriety of this second-filed action, and to force ICM to participate prematurely in an action that CleanTech may be enjoined from prosecuting. ICM therefore seeks an order of this Court to temporarily stay ICM's response to the Amended Complaint until such time as the Kansas District Court has ruled on the pending motion before it to enjoin this action.

## **CONCLUSION**

For the foregoing reasons, ICM's motion should be granted.

Dated: New York, New York
December 14, 2009

COZEN O'CONNOR

By: _____
     Jennifer F. Beltrami
250 Park Avenue
New York, NY 10177
Tel: (212) 883-4955
Fax: (866) 832-7197
jbeltrami@cozen.com

  - and -

John M. Weyrauch, *pro hac vice*
Paul P. Kempf, *pro hac vice*
Michael A. Bondi, *pro hac vice*
DICKE, BILLIG & CZAJA, PLLC
100 South Fifth Street, Suite 2250
Minneapolis, MN 55402
jmweyrauch@dbclaw.com
pkempf@dbclaw.com
mbondi@dbclaw.com

ATTORNEYS FOR DEFENDANT ICM, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

GS GLEANTECH CORPORATION,             :

                    Plaintiff,        :      09 Civ. 8642 (LMM)

          - v -                       :      MEMORANDUM AND ORDER

GEA WESTFALIA SEPARATOR, INC.;        :
ACE ETHANOL, LLC; ICM, INC.;
LIFELINE FOODS LLC; and DOES 1-30, :
INCLUSIVE,
                                      :
                    Defendants.
                                      :
----------------------------------x

McKENNA, D.J.,

          Defendant ICM, Inc. ("ICM") moves, pursuant to Fed. R.

Civ. P. 6(b), for an order staying the running of ICM's time to

answer or otherwise respond to plaintiff's amended complaint until

such time as the United States District Court for the District of

Kansas enters a decision in an action pending in that court, ICM,

Inc. v. GS Cleantech Corporation (09 Civ. 1315), resolving ICM's

pending motion to enjoin plaintiff's prosecution of the present

action, and any appeals from such order have been finally resolved.

          The present action was commenced in this district by the

filing of the original complaint, which did not name ICM as a

defendant, on October 13, 2009.  The District of Kansas action was

filed in that district on October 13, 2009.  (See Pl. Mem. at 1

n.1; Def. Mem. at 4.)  On October 15, 2009, plaintiff filed a

notice of filing a first amended complaint, and on October 23, 2009

filed the first amended complaint, which does name ICM as a defendant.

On November 5, 2009, ICM filed a motion in the District of Kansas action for an order enjoining plaintiff's prosecution of the present action in this district.[1]  "By stipulation of the parties, briefing on the pending motions in the Kansas action is scheduled to be complete by March 12, 2010, with a hearing to follow." (Def. Mem. at 5.)  The plaintiff in the present action in this district has declined to stay ICM's involvement in this action pending resolution of the motions in the District of Kansas action. (Id.)

There is little question that not only is the District of Kansas action related to the present action, but that it would also be convenient to the parties to the present action other than ICM to have the issues in the District of Kansas action litigated in this district.  But there are other considerations.

As far as ICM is concerned, its District of Kansas action is the first filed action, plaintiff having added ICM as a defendant in the present action only after ICM filed its action. Further, ICM is, according to its District of Kansas complaint, a Kansas corporation with its principal place of business in Kansas (Weyrauch Decl., Ex. L, ¶ 1) (an allegation not disputed by

---

[1] The plaintiff in the present case has moved in the District of Kansas action for dismissal of the District of Kansas complaint or, in the alternative, transfer to this district.  (Pl. Mem. at 5 n.5.)

2

plaintiff on the present motion), so that ICM's choice of a Kansas venue cannot be dismissed as impermissible forum shopping.

Perhaps most important is the fact that the issue as to where ICM is to proceed is now before a district judge of the District of Kansas. It is most appropriate to await that judge's determination in the normal course of the question where ICM is to proceed without subjecting ICM to litigation in New York to which the District of Kansas may, in the end, find that ICM should not, in the circumstances, be subject. Nor has plaintiff shown any compelling need to involve ICM in the litigation in this district prior to a decision by the District of Kansas.

*          *          *

ICM's motion is granted, with the exception that, should the District of Kansas deny ICM's motion, the stay granted shall not continue pending appeal, to which extent the motion is denied.

SO ORDERED.

Dated: January 6, 2010

Lawrence M. McKenna
U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| _____ ) | |
| **IN RE: METHOD FOR** ) | |
| **PROCESSING ETHANOL** ) | **1:10-ml-02181 LJM-DML** |
| **BYPRODUCTS AND RELATED** ) | |
| **SUBSYSTEMS ('858) PATENT** ) | |
| **LITIGATION,** ) | |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | |
| **1:10-cv-0180-LJM-DML** ) | |
| **1:10-cv-8000-LJM-DML** ) | |
| **1:10-cv-8007-LJM-DML** ) | |
| **1:10-cv-8008-LJM-DML** ) | |
| **1:10-cv-8009-LJM-DML** ) | |
| _____ ) | |

**CASE SUMMARY ON BEHALF OF DEFENDANTS ICM, INC., CARDINAL
ETHANOL, LLC, BIG RIVER RESOURCES GALVA, LLC, BIG RIVER RESOURCES
WEST BURLINGTON, LLC AND LINCOLNLAND AGRI-ENERGY, LLC**

    1.    <u>Synopsis of factual allegations and issues in this case.</u>

    ICM, Inc. ("ICM") designs and builds ethanol production plants for customers and promotes, sells and installs a tricanter centrifuge to such customers for recovering oil from corn byproducts called "thin stillage." In July and October 2009, certain customers of ICM received letters from counsel for Greenshift asserting that Greenshift was the owner of certain patent applications, including the patent application that subsequently issued on October 13, 2009 as U.S. Patent No. 7,601,858 (the "'858 patent"), for which the customers were liable to Greenshift for pre-patent grant royalties. To address the allegations against ICM's customers, on October 13, 2009, ICM initiated an action in U.S. District Court in Kansas against Greenshift and its subsidiary GS CleanTech Corporation, the actual owner of the '858 patent. ICM's complaint included claims for declaratory judgment of noninfringement, invalidity and unenforceability of the '858 patent as well as Federal and Kansas State law claims for unfair competition, interference with existing and prospective business and contractual relationship and deceptive

trade practices.  GS CleanTech reacted to ICM's Kansas action by filing a separate action for patent infringement against ICM and one of ICM's customers in the Southern District of New York (the "SDNY action"), and then filing a motion to dismiss ICM's Kansas action.  ICM moved the Kansas Court to enjoin CleanTech from prosecuting the SDNY action, and requested and obtained a stay of the SDNY action pending the outcome of the cross-motions in Kansas. The cross-motions in the Kansas action have been fully briefed but remain unresolved.

In early 2010, GS CleanTech began a separate campaign directly against ICM's customers by initiating patent infringement actions against Cardinal Ethanol, Big River Resources Galva, Big River Resources West Burlington and Lincolnland Agri-Energy (the "ICM customer actions").  CleanTech also filed preliminary injunction motions against Cardinal Ethanol and the Big River Resources defendants.  Motions to stay the ICM customer actions and to transfer venue of those actions to be consolidated with the ICM action were granted.  No responsive pleadings have been filed in any of the ICM customer actions.

2.     Summary of legal issues.

Defendants contend the '858 patent is not infringed and is invalid and/or unenforceable. ICM also contends Greenshift has committed unfair competition and interference with existing and prospective business and contractual relationship.

3.     Discovery.

No discovery on any substantive legal issue has been taken.

4.     Status of pending motions.

ICM moved the Kansas Court to enjoin CleanTech's second filed patent infringement action against ICM in the Southern District of New York under the first to file rule.  Greenshift and CleanTech cross-moved the Kansas Court to dismiss ICM's Complaint pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure contending ICM lacked

standing to assert a claim under the Kansas Consumer Protection Act and to bring a declaratory judgment claim relative to the '858 patent, and that ICM failed to state a claim for relief for unfair competiton and interference with existing and prospective business and contractual relationship. Following jurisdictional discovery, Greenshift and CleanTech withdrew their jurisdictional challenge under Rule 12(b)(2). ICM has withdrawn its claim under the Kansas Consumer Protection Act (KCPA), obviating one basis for the Rule 12(b)(1) motion. Briefing on these cross-motions has been complete since March 22, 2010. In a May 11, 2010 joint submission to the Kansas Court regarding management of that case, ICM requested that the Kansas Court resolve the pending cross-motions. Greenshift and CleanTech recommended that the motions be left for the MDL transferee court to resolve. The cross-motions in the Kansas action require resolution, which will allow the ICM customer actions to be consolidated with the ICM action for trial purposes and will simplify the pretrial docket in this MDL matter.

      6.     Other matters.

Assuming ICM's Kansas motion is granted, ICM will seek leave of the Court to amend its Complaint to assert additional grounds for noninfringement and invalidity of the '858. The effect of recent tag-along cases on scheduling should be discussed. For efficiency, discovery should be bifurcated and/or limited to liability issues alone.

Dated: October 20, 2010                s/John M. Weyrauch
                                John M. Weyrauch (MN221,879)
                                Paul P. Kempf (MN239,215)
                                DICKE, BILLIG & CZAJA, PLLC
                                100 South Fifth Street, Suite 2250
                                Minneapolis, MN 55402
                                Telephone: (612) 767-2511
                                Facsimile: (612) 573-2005
                                jmweyrauch@dbclaw.com
                                pkempf@dbclaw.com

                                ATTORNEY FOR DEFENANTS ICM et al.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 20, 2010, a copy of the foregoing CASE SUMMARY ON BEHALF OF DEFENDANTS ICM, INC., CARDINAL ETHANOL, LLC, BIG RIVER RESOURCES GALVA, LLC, BIG RIVER RESOURCES WEST BURLINGTON, LLC AND LINCOLNLAND AGRI-ENERGY, LLC was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

J. Donald Best
John Scheller
Matthew D. Brown
MICHAEL BEST & FRIEDRICH
jdbest@michaelbest.com
jcscheller@michaelbest.com
mdbrown@michaelbest.com

Charles F. O'Brien
Michael Joseph Rye
CANTOR COLBURN LLP
mrye@cantorcolburn.com
cobrien@cantorcolburn.com

Daniel J. Lueders
Spiro Bereveskos
WOODARD EMHARDT MORIARTY
MCNETT & HENRY
dlueders@uspatent.com
judy@uspatent.com

John J. Brogan
Jonathan C. Miesen
STOEL RIVES LLP
jjbrogan@stoel.com
jcmiesen@stoel.com

Glenn J. Johnson
Sarah J. Gayer
NEYMASTER, GOODE, WEST, HANSELL
& O'BRIEN
gjohnson@nyemaster
sjgayer@nyemaster

Donald T. Campbell
LEONARD STREET & DEINARD
donald.campbell@leonard.com

Michael F. Buchanan
Edward Richard Tempesta
Sean Reeves Marshall
Gregory L. Diskant
Brian Lasky
PATTERSON BELKNAP WEBB &TYLER
mfbuchanan@pbwt.com
ertempesta@pbwt.com
smarshall@pbwt.com
gldiskant@pbwt.com
bnlasky@pbwt.com

Camille L. Urban
Michael A. Dee
Haley R. Van Loon
BROWN WINICK GRAVES GROSS
BASKERVILLE & SCHOENEBAUM
urban@brownwinick.com
dee@brownwinick.com
vanloon@brownwinick.com

Ken M. Peterson
Will B. Wohlford
Kristen Diane Wheeler Maloney
MORRIS LAING EVANS BROCK

James P. Strenski
Kelly R. Eskew
CANTRELL, STRENSKI & MEHRINGER
jstrenski@csmlawfirm.com
kewkew@csmlawfirm.com

& KENNEDY
kpeterson@morrislaing.com
wwohlford@morrislaing.com
kmaloney@morrislaing.com


s/John M. Weyrauch

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| _____ ) | |
| IN RE: METHOD OF PROCESSING )  | Master Case No.: 1:10-ml-02181-LJM-DML |
| ETHANOL BYPRODUCTS AND )  | Associated Case No. 1:10-cv-08000-LJM-DML |
| RELATED SUBSYSTEMS ('858 )  | |
| PATENT LITIGATION )  | |
| _____ ) | |

**DEFENDANTS GS CLEANTECH CORPORATION AND GREENSHIFT CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF, ICM INC.'S FIFTH AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) OR, ALTERNATIVELY, TO TRANSFER**

# <u>TABLE OF CONTENTS</u>

**I.**    **NATURE OF THE CASE**………………………………………………………1

**II.**   **STATEMENT OF FACTS**……………………………….………………...5

**III.**  **ARGUMENT** ………………………………………….………………...6

   A.    ICM's Causes of Action in Count I Should Be Dismissed …………………..6

      1.    ICM Fails To Meet The Elements Of Any Asserted Cause of
            Action Under Count I …………………………………………..7

         i.    GreenShift's Statements Are Not False  ………………….8

         ii.   ICM Fails to State a Lanham Act Claim Upon
               Which Relief Can Be Granted Under Count I …………………10

         iii.  ICM Fails to State a Claim for Unfair Competition
               Upon Which Relief Can Be Granted Under Count I ……..…....12

         iv.   ICM Fails to State a Claim for Interference With Existing
               And Prospective Business and Contractual Relationship
               Upon Which Relief Can Be Granted Under Count I ……..…….13

         v.    ICM Fails to State a Claim for Deceptive Trade Practices
               Under KCPA Upon Which Relief Can Be Granted and ICM
               Lacks Standing to Assert Such a Claim Under Count I ..……….15

   B.    ICM'S Declaratory Judgment Causes of Action Under Count II
         Should Be Dismissed ………………………………………………..16

      1.    ICM's Declaratory Judgment Cause of Action for Inequitable
            Conduct Under Count II Should Be Dismissed Under Rule 12(b)(6)
            for Failure to Plead with Particularity Under Rule 9(b) ………..……16

      2.    ICM's Declaratory Judgment Causes of Action Under Count II
            Should Be Dismissed For Lack of Standing Under Rule 12(B)(1) ……19

      3.    In Its Discretion, This Court Should Decline To Exercise
            Jurisdiction To Hear ICM's Declaratory Judgment
            Claims Under Count II …………………………………………21

C.    Alternatively, ICM's Claims Should be Transferred to
the Southern District of New York …..……………………………..…24

**IV.   CONCLUSION** …………………………………………………………….……24

# TABLE OF AUTHORITIES

*Accessible Technologies, Inc. v. Paxton Automotive Corp.*,
 Case No. 01-2407, 2002 WL 31256227, at *3 (D. Kan. Aug. 28, 2002)...............12, 13

*Altrutech, Inc. v. Hooper Holmes, Inc.*,
 Case No. 96-2091, 1998 WL 398231, at *1-3 (D. Kan. Jan. 26, 1998).....................12

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009)......................................................................................6

*Aurora Corp. of America v. Fellowes, Inc.*,
 Case No. 07-8306, 2008 WL 709198, at * 1 (C.D. Cal. Feb. 27, 2008)....................22

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007).........................................................................................6

*Burton v. R.J. Reynolds Tobacco Co.*
 884 F.Supp. 1515 (D. Kan. 1995)......................................................................15

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*,
 524 F.3d 1254 (Fed. Cir. 2008).........................................................................11

*Electronics for Imaging, Inc. v. Coyle*,
 394 F.3d 1341 (Fed. Cir. 2005).........................................................................21

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
 575 F.3d 1312 (Fed. Cir. 2009)....................................................................17, 18

*Genentech, Inc. v. Eli Lilly & Co.*,
 998 F.2d 931 (Fed. Cir. 1993).....................................................................19, 21

*Gonzalez v. Pepsico, Inc.*,
 489 F.Supp.2d 1233 (D. Kan. 2007)..................................................................15

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
 153 F.3d 1318 (Fed. Cir. 1998).........................................................................11

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
 348 F. Supp. 2d 165, 177 (S.D.N.Y. 2004)..........................................................10

*Kahn v. General Motors Corp.*,
 889 F.2d 1078 (Fed. Cir. 1989).........................................................................23

*Kestrel Holdings I, L.L.C. v. Learjet Inc.*,
 316 F.Supp.2d 1071, 1076-77 (D. Kan. 2004).....................................................15

*McHenry v. Colgate-Palmolive Co., Inc.,*
    Case No. 08-2622, 2009 WL 3414833, at *2 (D. Kan. Oct. 19, 2009)…………………..6

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118, 127 (2007)…………………………………………………………..20

*Medtronic Navigation, Inc. v. BrianLAB Medizinische Computersystems GMBH,*
    2005 WL 1661081, *2 (D.Colo. 2005)……………………………………………10, 11

*Micron Technology, Inc. v. Mosaid Technologies, Inc.,*
    518 F.3d 897, 901 (Fed. Cir. 2008)……………………………………………19, 21, 22

*Monsanto Co. v. Bayer BioScience N.V.,*
    363 F.3d 1235, 239 (Fed. Cir. 2004)…………………………………………………..17

*Nacogdoches Oil & Gas, L.L.C. v. Leading Solutions, Inc.,*
    Case No. 06-2551, 2007 WL 2402723, at *2-*3 (D. Kan. Aug. 17, 2007)……………...22

*Pandora Jewelry,*
    2008 WL 3307156, at *10 (D.Md. Aug. 8, 2008)……………………………………12

*Paradigm Alliance, Inc. v. Celeritas Technologies, LLC,*
    2009 WL 3045464, at *20 (D. Kan. Sept. 22, 2009)………………………………...13, 14

*Plasmart v. Wincell International,*
    442 F. Supp. 2d 53, 57 (S.D.N.Y 2006)……………………………………………11

*Prasco, LLC v. Medicis Pharmaceutical Corp.,*
    537 F.3d 1329, 1337 (Fed. Cir. 2008)……………………………………………20

*Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.,*
    26 Kan.App.2d 104, 105, 979 P.2d 144, 147 (Kan.App. Apr. 30, 1999)……………...13

*Serco Services Co., L.P. v. Kelley Co., Inc.,*
    51 F.3d 1037 (Fed. Cir. 1995)……………………………………………………..19, 23

*Snyder v. American Kennel Club,*
    2009 WL 3242114, at *13 (D. Kan. Oct. 6, 2009)………………………………...13, 14

*Sprint Corp. v. Aerotel, Ltd.,*
    Case No. 99-2547, 2000 WL 382031, at *2 (D. Kan. Mar. 17, 2000)…………………...21

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
    537 F.3d 1357 (Fed. Cir. 2008)……………………………………………………16, 17

*Stephens v. Tech Intern., Inc.,*
    393 F.3d 1269 (Fed. Cir. 2004)…………………………………………………8, 9, 12

*Wayman v. Amoco Oil Co.,*
    923 F.Supp. 1322 (D. Kan. 1996)………………………………………………16

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995)……………………………………………………………19, 21

*Zenith Electronics Corp. v. Exzec, Inc.,*
    182 F.3d 1340 (Fed. Cir. 1999)………………………………………....10, 11

## OTHER AUTHORITIES

15 U.S.C. § 1125………………………………………………………………………..7

15 U.S.C. § 1125(a)(1)(B)…………………………………………………………10

28 U.S.C. § 1406(a)………………………………………………………………...24

28 U.S.C. 2201(a)…………………………………………………………………19, 21

35 U.S.C. § 102(b)………………………………………………………….........17

35 U.S.C. § 154(d)……………………………………………………2, 3, 4, 5, 8, 9, 14

Fed. R. Civ. P. 12(b)(1)……………………………………………...6, 15, 19, 20, 24

Fed. R. Civ. P. 12(b)(6)…………………………………..…6, 7, 8, 12, 13, 14, 15, 16, 18, 24

Fed. R. Civ. P. 9(b)…………………………………………………15, 16, 17, 18, 24

37 C.F.R. § 1.56…………………………………………………………………16

5 McCarthy on Trademarks and Unfair Competition, § 27:24 (4th ed.)………………………...10

# I.    NATURE OF THE CASE

Employees of GS CleanTech Corporation ("GS CleanTech"), which is a wholly-owned subsidiary of GreenShift Corporation ("GreenShift" and collectively with GS CleanTech, "Defendants"), have invented and recently patented novel methods to extract corn oil from the by-products formed during ethanol production.  By ICM's own admission, ICM and its customers have been employing these novel methods using ICM supplied equipment while GS CleanTech's patent applications have been pending at the United States Patent and Trademark Office ("PTO").

Over the past thirty years, and even more so recently, significant attention has been given to the production of ethyl alcohol, or "ethanol," for use as an alternative fuel.  A popular method of producing ethanol is known as "dry milling" which in the United States is typically practiced using corn.  For example, in 2008 alone, approximately 170 dry milling plants in the United States produced approximately 10 billion gallons of ethanol.  This is expected to increase to 15 billion gallons per year as the industry grows to meet federally mandated volumes.

The dry milling process utilizes the starch in the corn to produce the ethanol through fermentation, and creates a waste stream comprised of byproducts termed "whole stillage." The whole stillage may be further separated into products known as "distillers wet grains" and "thin stillage".  Despite containing valuable corn oil, this whole stillage has for the most part been treated as waste and used primarily to supplement animal feed in the form of distillers dried grains with solubles ("DDGS").  The DDGS is created by mechanically separating  (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, evaporating the thin stillage to form a concentrate or syrup, recombining the resulting concentrate or syrup with the distillers wet grains, and drying the product to create the DDGS.

Prior to GS CleanTech's invention, efforts to recover the valuable corn oil from the whole stillage had not been successful in terms of efficiency or economy. A need therefore existed for a more efficient and economical manner of recovering corn oil from a byproduct containing it, such as thin stillage created during the dry milling process used to produce ethanol. GS CleanTech has filled that need with its novel and inventive process.

GS CleanTech's invention comprises, without limitation[1], initially processing the whole stillage in the manner described above, that is, mechanically separating (such as by using a centrifugal decanter) the whole stillage into distillers wet grains and thin stillage, and then introducing the thin stillage into an evaporator to form a concentrate or syrup. In GS CleanTech's method, prior to recombining the syrup with the distillers wet grains, the syrup is introduced into a mechanical processor such as a second centrifuge. The second centrifuge separates corn oil from the syrup thereby allowing for the recovery of usable corn oil. The syrup that exits the centrifuge is then recombined with the distillers wet grains and dried to form the DDGS. The corn oil that is extracted from the syrup can be sold for various purposes such as feedstock for producing biodiesel.

After publication of the pending patent application, pursuant to 35 U.S.C. § 154(d), GreenShift sent letters to third parties, some of which were coincidentally ICM's customers. The letters placed each third party on actual notice of GS CleanTech's patent applications; that in GreenShift's opinion, the processes employed by each third party falls within the scope of the published claims; that each third party should carefully consider the published applications in its immediate and future business plans; and that GreenShift is willing to resolve the matter in a

---

[1] While GS CleanTech describes an embodiment of its novel corn oil extraction method and system in this Memorandum, GS CleanTech does not intend that its invention is in any way limited to that embodiment and any statements in this Memorandum should not be construed as such.

mutually beneficial manner. GreenShift was perfectly within its rights to send this type of letter and, as will be discussed below, is statutorily required to send such letters to protect its ability to obtain certain patent related damages.

In an obvious attempt to appease its customers and to ensure jurisdiction in a patent infringement case, ICM filed this civil action against the Defendants: (1) alleging that GreenShift's statements about GS CleanTech's patent applications constitute unfair methods of competition under the Lanham Act and interference with ICM's existing and prospective business and contractual relationships (including possibly allegations of unfair and deceptive acts and practices under the Kansas Consumer Protection Act ("KCPA"); and (2) seeking declaratory judgments of non-infringement, invalidity and unenforceability of GS CleanTech's United States Patent No. 7,601,858, entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," and issued on October 13, 2009 (the "'858 patent") and United States Patent Nos. 8,008,516 and 8,008,517, both entitled "Method Of Processing Ethanol Byproducts And Related Subsystems," and issued on August 30, 2011 (the "'516 patent" and " '517 patent") (collectively "the patents in suit").

In its Fifth Amended Complaint (Dkt. No. 421), ICM essentially admits that both it and its customers infringe GS CleanTech's patent claims not only as published and amended during prosecution[2] but also as issued in the patents-in-suit. Nonetheless, and quite surprisingly given its admissions, ICM claims that GreenShift has violated the Lanham Act and Kansas state law by communicating with those very same infringing customers.

---

[2] To be clear, throughout this Memorandum, when the Defendants allege that ICM and its customers have "infringed" the claims in the pending patent applications as published and amended during prosecution, Defendants are not attempting to extend the term of any issued patent to include a time period prior to its issuance, but rather are referring to a third party's liability for a pre-issuance reasonable royalty under 35 U.S.C. § 154(d) for "infringing" the published patent application claims.

3

In its Fifth Amended Complaint, ICM is trying to claim that, while ICM and its customers admittedly infringe the patents-in-suit' claims, GreenShift should not have preserved its ability to obtain pre-issuance patent damages by sending notice letters, as required by 35 U.S.C. § 154(d), to potential third party. This inconsistency is surprising to say the least and shines a light on ICM's true reason for filing this lawsuit, which is to appease its customers and to forum shop for the purpose of establishing jurisdiction for an impending patent infringement suit.

ICM filed its initial Complaint For Declaratory Judgment on October 13, 2009, which is the same day the '858 patent issued, the same day that GS CleanTech filed its complaint for patent infringement against GEA Westfalia Separator, Inc. ("Westfalia") and DOES 1 – 20 inclusive in the Southern District of New York ("NY Patent Infringement Case")[3], and the same day that Westfalia amended its previously filed complaint against GreenShift to add claims for declaratory judgment of non-infringement and invalidity of the patents-in-suit in the Southern District of New York ("NY Declaratory Judgment Case").[4] One of Westfalia's customers, Ace Ethanol, LLC ("Ace Ethanol"), who received letters from GreenShift, also joined in Westfalia's First Amended Complaint as party-plaintiff in New York.

On July 30, 2012, ICM filed its Fifth Amended Complaint For Declaratory Judgment ("FAC") against the Defendants, which now additionally seeks under Count II, a declaration that

---

[3] The NY Patent Infringement Case is pending in the MDL Action as Civil Action Number 1:10-cv-08007-LJM-DML.

[4] Westfalia's original complaint against GreenShift was filed on September 3, 2009, alleges that GreenShift violated the Lanham Act and New York state statutes for false advertising, and common law unfair competition for GreenShift's statements made in letter to Westfalia's customers regarding the patent applications pursuant to 35 U.S.C. § 154(d), and is pending in the MDL Action as Civil Action Number 1:10-CV-08006-LJM-DML.

the patents-in-suit are unenforceable.  As set out below, ICM fails to plead with particularity to

support its request for a declaration that the patents-in-suit are unenforceable.

## II.    STATEMENT OF FACTS

ICM admits that it "designs and builds ethanol production plants for customers and

promotes, sells and installs centrifuge equipment to such customers for recovering oil from corn

byproducts."  Fifth Amended Complaint ("FAC") at ¶ 9.  ICM also admits it "sell[s] and/or

use[s] equipment to practice corn oil recovery methods that are in part the subject of the claims

of the '858 Patent and the '516 Patent."  FAC at ¶ 8.

In July of 2009, GreenShift sent letters, pursuant to 35 U.S.C. § 154(d), to specific

ethanol manufacturers who, on information and belief, are practicing GS CleanTech's corn oil

extraction method (collectively the "July Letters").  FAC at ¶ 10.  The July Letters provided third

parties with actual notice of GS CleanTech's published patent applications and of GreenShift's

belief that the method of extracting corn oil employed by each third party falls within the scope

of the published claims.  *Id.*

On or about October 7, 2009, GreenShift sent additional letters, pursuant to 35 U.S.C. §

154(d), to specific ethanol manufacturers who, on information and belief, are practicing GS

CleanTech's corn oil extraction method (collectively the "October Letters").  FAC at ¶ 12.  The

October Letters provided third parties with actual notice of GS CleanTech's published patent

applications and of GreenShift's belief that the method of extracting corn oil employed by each

third party falls within the scope of the published claims.  *Id.*

GreenShift did not send ICM either the July or October Letter.   GreenShift sent one of

ICM's customers, Lifeline Foods, an October Letter.  *Id.* at ¶ 12.  The October Letter GreenShift

sent to Lifeline Foods, which is a Missouri limited liability company, was addressed to Lifeline

Foods, with attention to Bill Becker as President and CEO, and sent to its principal place of
business at 2811 S 11th Street, Saint Joseph, Missouri 64503 by Federal Express.

### III. ARGUMENT

#### A. ICM's Causes of Action Under Count I Should Be Dismissed

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient
factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell
Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).
"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops
short of the line between possibility and plausibility of entitlement to relief." *Id.* (*quoting
Twombly*, 550 U.S. at 557) (internal quotations omitted).

"Plaintiff bears the burden to frame her complaint with enough factual matter to suggest
that she is entitled to relief; it is not enough for her to make threadbare recitals of a cause of
action accompanied by mere conclusory statements." *McHenry v. Colgate-Palmolive Co., Inc.,*
Case No. 08-2622, 2009 WL 3414833, at *2 (D. Kan. Oct. 19, 2009). "A pleading which offers
labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked
assertions devoid of further factual enhancement will not stand." *Id.*

ICM's Lanham Act and state law claims under Count I should be dismissed under Fed. R.
Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted because
GreenShift's statements in the July and October Letters are not false and ICM fails to make a
showing that its pleadings meet the elements of the Lanham Act or the various state law claims.

Further, under Fed. R. Civ. P. 12(b)(1), ICM lacks standing to assert a KCPA claim. Therefore, Count I should be dismissed.

In Count I of its Fifth Amended Complaint, ICM confusingly attempts to identify more than one cause of action. Based on the deficient pleadings, it is unclear the precise causes of action ICM is attempting to assert against Defendants. Count I is styled "Unfair Competition Under the Lanham Act (15 U.S.C. § 1125) and Kansas Common Law and Tortious Interference Contractual and Business Relationships." FAC, p. 4. ICM vaguely then alleges that "GreenShift's false and material misrepresentations to ICM's customers constitute unfair methods of competition under the Lanham Act, (sic) interference with ICM's existing and prospective business and contractual relationships." FAC at ¶ 16.[5]

Although Count I appears to include at least two causes of action, each cause of action that ICM may possibly be asserting in Count I of its Fifth Amended Complaint fails to state a claim under Rule 12(b)(6).

       1.     <u>ICM Fails To Meet The Elements of Any<br>Asserted Cause of Action Under Count I</u>

In its Fifth Amended Complaint, ICM does not (1) plead sufficient facts to support the elements of any of the causes of action contained therein, (2) set forth the appropriate elements of the claims, or (3) even attempt to make a showing that its pleadings meet the elements of the claims. As described below, ICM simply offers "labels and conclusions," "naked assertions devoid of factual enhancement," and does not even give a "formulaic recitation of the elements" in its Fifth Amended Complaint. Therefore, ICM's Count I should be dismissed.

---

[5] In the initial Complaint as well as in the First Amended Complaint, ICM included the additional allegation that it is entitled to remedies "under Kansas Stat. § 50-634," which is the remedy provision for claims under the Kansas Consumer Protection Act ("KCPA"). ICM removed the reference to the KCPA in the Fifth Amended Complaint but it is still nonetheless unclear to Defendants whether ICM intends Count I to include such claims related to the KCPA and therefore this Memorandum addresses potential KPCA claims.

i  GreenShift's Statements Are Not False

Each of the possible causes of action asserted by ICM in Count I are premised on the falsity of GreenShift's statements. However, GreenShift's statements in the July and October Letters are not false. ICM claims that GreenShift "falsely and materially misrepresented liability" and "knowingly and/or intentionally misrepresented that ICM's customers had liability." FAC at ¶¶ 11 & 14. But these naked assertions by ICM are simply not accurate. Not only is ICM unable to show that GreenShift's statements are false, but ICM also admits that they are not false. FAC at ¶ 8. Pursuant to Rule 12(b)(6), ICM's Count I should be dismissed because ICM cannot state a claim that is plausible on its face for the Lanham Act claim or any Kansas state law claims.

As already detailed above, ICM admits that it and its customers infringe one or more claims both in the published patent applications as well as the claims that have now issued in the patents-in-suit. FAC at ¶¶ 8-9. To argue that GreenShift should have unilaterally given up any right to pursue substantial pre-issuance royalties available to it under 35 U.S.C. § 154(d) by refraining from sending out the July Letters and October Letters while - at the same time - admitting that GreenShift's statements were in fact true, is unsupportable. GreenShift has the right - and the obligation under § 154(d) - to inform others they are infringing the claims in the published patent applications in order to obtain pre-issuance reasonable royalties.

GreenShift was both adhering to and operating within its rights under §154(d) in sending out the July Letters and October Letters. The fact that the some of the pending claims had been amended is not determinative of whether § 154 damages are ultimately recoverable. In *Stephens v. Tech Intern., Inc.,* 393 F.3d 1269 (Fed. Cir. 2004), the Federal Circuit addressed the issue of amendments made to claims during prosecution, and held:

8

> Second, [plaintiff] did not harass [defendant] by sending the section
> 154 notice while the [patent] application was being amended.  The
> application was actually amended after the section 154 notice was sent
> to [defendant].  ***Further, [plaintiff] was not required to withdraw its
> section 154 notice; it believed [defendant] still infringed the amended
> claims, and had a right to await possible patent issuance to see if its
> infringement allegations were correct***.

*Id.* at 1276 (emphasis added).

The fact that the plaintiff in *Stephens* sent the letters before the claims were amended does

not distinguish *Stephens*.  Providing the plaintiff with the "the right to await possible patent

issuance to see if its infringement allegations were correct" rather than requiring withdrawal of

the letters is no different than GreenShift sending the July Letters or October Letters after the

amendment and filing of the applications with the belief that the recipients infringe the claims as

published and as amended and waiting to see if its allegations are correct.  In fact, the

circumstances of the instant case are even more compelling than those in *Stephens*.  In this case

not only does GreenShift believe that the recipients of the July Letters and October Letters

infringe the published patent claims, the claims now issued in the '858 patent and the '516 patent

(which is a continuation of the application that issued as the '858 patent) that are identical to the

claims published during the prosecution of the applications that issued as the patents-in-suit, but

ICM actually admits this.  There was no such admission by the defendant in *Stephens*.  Thus, as

did the plaintiff in *Stephens*, GreenShift had the right to send the July Letters and October Letters

to await patent issuance to see if its infringement allegations were correct.  It turns out

GreenShift was correct.

        **ii.**  <u>ICM Fails to State a Lanham Act Claim Upon</u>
              <u>Which Relief Can Be Granted Under Count I</u>

To establish false advertising under § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), ICM must prove all of the following elements: (1) in connection with its services, GreenShift made a false or misleading description or representation of fact, which in commercial advertising or promotion misrepresents the nature, characteristic, qualities, or geographic origin of GreenShift's services or commercial activities; (2) GreenShift's statements actually deceive or are likely to deceive a substantial segment of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant caused the statement to enter interstate commerce; (5) the statement results in actual or probable injury to the plaintiffs; and (6) GreenShift's statements were made in bad faith. 15 U.S.C. § 1125(a)(1)(B); *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1360 (Fed. Cir. 1999); *Medtronic Navigation, Inc. v. BrianLAB Medizinische Computersystems GMBH*, 2005 WL 1661081, *2 (D.Colo. 2005); *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 177-78 (S.D.N.Y. 2004); see also 5 McCarthy on Trademarks and Unfair Competition, § 27:24 (4th ed.).

      First, as set forth above, GreenShift's statements in the July and October Letters were not false. Secondly, ICM fails to allege that the statements resulted in actual or probable injury to it. ICM's damage claim is not causally connected to the statements about which it complains. Rather, the alleged damage results from the infringement of the patent claims that were allowed by the PTO before the letters were sent (and which have now matured into issued patent claims). Simply stated, ICM's customers are upset that they infringe an issued patent, not because they were told supposedly inaccurate information about a pending application.

ICM has also failed to satisfy the bad faith element. "Federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (quoting *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed. Cir. 1998)); see also *Medtronic Navigation*, 2005 WL 1661081, *2. The prerequisite of bad faith "is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith." *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). A showing of bad faith cannot be made "in the absence of a showing that the claims asserted were objectively baseless." *Dominant*, 524 F.3d at 1260. Moreover, "[e]ven if a defendant's contention that its patents are being infringed eventually proves inaccurate statements asserting infringement are protected unless a plaintiff can prove by clear and convincing evidence that the infringement allegations are objectively false, and that the patentee made them in bad faith, viz, with knowledge of their incorrectness or falsity, or disregard for either." *Plasmart v. Wincell International*, 442 F. Supp. 2d 53, 57 (S.D.N.Y 2006).

ICM fails to even allege bad faith in its Lanham Act claim, and as such its Lanham Act claim fails on its face. See *Dominant*, 524 F.3d at 1260 ("[b]ad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim."). Further, even taken as true, there are no facts that would plausibly support a claim that GreenShift's statements were objectively baseless and therefore it would be futile to allow ICM to amend its Lanham Act claim. The crux of ICM's claim is that the published patent applications are not "substantially identical" to the claims as amended. ICM appears to assert a per se rule that any amendment to a claim in a patent application necessarily is a "substantive change" to the claim.

11

However, there is no such per se rule. *Pandora Jewelry*, 2008 WL 3307156, at *10 (D.Md. Aug. 8, 2008) ("[T]here is no per se rule that an amendment to a claim in order to overcome a PTO rejection based on prior art precludes finding valid provisional rights."). As addressed above, at a minimum, based upon *Stephens v. Tech Intern., Inc.,* 393 F.3d 1269 (Fed. Cir. 2004), GreenShift did not act in bad faith by sending out the July and October Letters.

Thus, ICM fails to state a claim upon which relief can be granted for any Lanham Act violations and the claim should be dismissed under Rule 12(b)(6).

iii. <u>ICM Fails to State a Claim for Unfair Competition Upon Which Relief Can Be Granted Under Count I</u>

ICM's allegations that GreenShift's alleged false and misleading advertising relating to ICM's goods, services, or commercial activities fails to state a claim for unfair competition under Kansas state law. *See Accessible Technologies, Inc. v. Paxton Automotive Corp.,* Case No. 01-2407, 2002 WL 31256227, at *3 (D. Kan. Aug. 28, 2002) ("[t]he court is not willing at this juncture to predict that the Kansas Supreme Court would interpret the *Restatement (Third)* as providing a cause of action not expressly stated therein, where a plaintiff complains about a defendant's deceptive advertising relating to that plaintiff's goods, services, or commercial activities"); *see also Altrutech, Inc. v. Hooper Holmes, Inc.,* Case No. 96-2091, 1998 WL 398231, at *1-3 (D. Kan. Jan. 26, 1998) (court dismissed count for unfair competition based on published falsehoods to plaintiff's employees, contractors, and clients that plaintiff "was about to go out of business and likely would be unable to promptly and properly service paramedical business").

However, "[a]s a general rule, Kansas unfair competition law provides a cause of action for the misuse of trademark or other intellectual property." *Accessible Technologies,* 2002 WL

31256227, at *2; *see Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.,* 26 Kan.App.2d 104, 105, 979 P.2d 144, 147 (Kan.App. Apr. 30, 1999).  Although there appear to be no Kansas cases addressing Kansas unfair competition law based on false advertising and the alleged misuse of a patent and/or patent application, to the extent that such a cause of action is recognized under Kansas law, Defendants submit that ICM fails to set forth any elements of such a claim or state a claim upon which relief can be granted for any such claim.

Thus, ICM fails to state a claim upon which relief can be granted for unfair competition and the claim should be dismissed under Rule 12(b)(6).

iv.  ICM Fails to State a Claim for Interference With Existing And Prospective Business And Contractual Relationship Upon Which Relief Can Be Granted Under Count I

ICM fails to state a claim upon which relief can be granted for interference with either an existing or prospective business or contractual relationship.  "Under Kansas law, for a plaintiff to recover on a tortious interference with contracts claim, he must show: (1) a contract; (2) the wrongdoer's knowledge thereof; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages resulting therefrom."  *Paradigm Alliance, Inc. v. Celeritas Technologies, LLC,* 2009 WL 3045464, at *20 (D. Kan. Sept. 22, 2009); *see also Snyder v. American Kennel Club,* 2009 WL 3242114, at *13 (D. Kan. Oct. 6, 2009).

Alternatively, "[t]o prove tortious inference with a business expectation under Kansas law, a party must prove: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional

13

misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Paradigm Alliance,* 2009 WL 3045464, at \*20; *see also Snyder,* 2009 WL 3242114, at \*13. "In addition, the claimant must demonstrate that the defendant acted with malice, which the Kansas Supreme Court has defined as acting with actual evil-mindedness or specific intent to injure." *Id.* (internal quotations, citations, and footnotes omitted).

Although ICM has failed to satisfy any of the above-described elements of either tort, for the purposes of simplicity, GreenShift will focus on the contract and business relationship, intentional procurement of its breach and intentional misconduct by defendant, absence of justification, and damages. ICM alleges GreenShift sent the July and October Letters to ICM's customers, but ICM does not identify any contract, any specific customers (other than Lifeline), or any specific prospective business relationship necessary to satisfy the elements of the torts.

In a conclusory fashion, ICM alleges that GreenShift made knowing and intentional misrepresentations in the July and October Letters. However, ICM fails to allege GreenShift's intentional procurement of a breach of any contract, fails to describe GreenShift's intentional misconduct, and fails to address any absence of justification of the July and October Letters. As set forth above, GreenShift has the right and obligation to send 35 U.S.C. § 154(d) letters, and GreenShift's statements in the letters were not false. Finally, ICM wholly and utterly fails to allege damages and any nexus to GreenShift's alleged misconduct.

Thus, ICM fails to state a claim upon which relief can be granted for interference with either an existing or prospective business or contractual relationship and the claim should be dismissed under Rule 12(b)(6).

          v.   <u>ICM Fails to State a Claim for Deceptive Trade</u>
                 <u>Practices Under KCPA Upon Which Relief Can</u>
                 <u>Be Granted and ICM Lacks Standing to Assert</u>
                 <u>Such a Claim Under Count I</u>

If Count I is intended to state a claim under KCPA § 50-623 *et seq.,* it should be dismissed under both Rule 12(b)(6) and 12(b)(1).  ICM fails to state a claim for either Deceptive Trade Practices claim under KCPA § 50-626 or any KCPA claim under § 50-623 *et seq.* because it fails to plead the elements of a KCPA claims and fails to plead with particularity.  "The elements of an action under the KCPA are identical to fraud actions except for the intent requirement." *Burton v. R.J. Reynolds Tobacco Co.* 884 F.Supp. 1515, 1524 (D. Kan. 1995).  "Allegations of unfair trade practices under the KCPA must be pleaded with particularity in accordance with Rule 9(b)." *Gonzalez v. Pepsico, Inc.,* 489 F.Supp.2d 1233, 1247 (D. Kan. 2007); *see* Fed. R. Civ. P. 9(b).

"For purposes of Rule 9(b), particularity includes the time, place and content of the alleged wrongful conduct, as well as the identities of the wrongdoers and the harm caused by plaintiffs' reliance on any false representation." *Id.*  ICM fails to plead any elements of a KPCA claim and, therefore, fails to plead with any particularity.  Thus, any alleged KPCA claim is deficient and ICM fails to state a claim upon which relief can be granted under KCPA.

Moreover, ICM does not have standing to bring any KCPA claim, and, therefore, ICM's KCPA claim should be dismissed under Fed. R. Civ. P. 12(b)(1).  "'[A] corporation or similar entity that has suffered an injury as a result of a 'deceptive' or 'unconscionable' act or practice cannot assert a claim under the KCPA.'" *Kestrel Holdings I, L.L.C. v. Learjet Inc.,* 316 F.Supp.2d 1071, 1076-77 (D. Kan. 2004) ("the court finds that the KCPA claim belongs to the corporation, which does not have standing to sue under the KCPA because it is not a consumer")

(*quoting Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1363 (D. Kan. 1996). "Rather, the

individual or sole proprietor must have suffered the injury and must make the claim. *Id.*

   B.   ICM's Declaratory Judgment Causes of Action Under Count II
        Should be Dismissed

        1.   ICM's Declaratory Judgment Cause of Action for Inequitable
             Conduct Under Count II Should Be Dismissed Under Rule 12(b)(6)
             for Failure to Plead with Particularity Under Rule 9(b)

Count II of the Fifth Amended Complaint should be dismissed to the extent it seeks a

declaration that the patents-in-suit are unenforceable by virtue of alleged inequitable conduct.

Count II fails to meet the strict standard for pleading inequitable conduct with particularity, as

required by Rule 9(b), and therefore fails to state a claim against GreenShift upon which relief

could be granted, as required by Rule 12(b)(6).

"Inequitable conduct" in patent cases refers to an intentional violation of the duty that

individuals associated with the filing and prosecution of a patent application owe to the United

States Patent and Trademark Office ("PTO"). The duty includes disclosing information that is

material to the examination, or "prosecution," of their patent applications and is noncumulative

of information already before the examiners. 37 C.F.R. § 1.56. There are two substantive

elements to a claim of inequitable conduct: (1) "an affirmative misrepresentation of a material

fact, fail[ure] to disclose material information, or submi[ssion] of false material information" by

the individual ("materiality"); and (2) that such was done with a specific intent to deceive the

PTO ("deceptive intent"). *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co*., 537 F.3d 1357,

1365 (Fed. Cir. 2008).

The intent motivating the alleged inequitable conduct must be an intent specifically to

deceive the PTO, not simply an intent to withhold information. *Id*. at 1366. No meaningful

16

inequitable conduct inquiry can take place without addressing the accused individual's specific

intent to deceive. *Id*. ("we have emphasized that materiality does not presume intent, which is a

separate and essential component of inequitable conduct.") (citations and internal quotation

marks omitted). Further, even if both materiality and intent are proved, "the district court must

still balance the equities to determine whether the applicant's conduct before the PTO was

egregious enough to warrant holding the entire patent unenforceable." *Id*. at 1365, *citing*

*Monsanto Co. v. Bayer BioScience N.V*., 363 F.3d 1235, 239 (Fed. Cir. 2004).

Under the pleading standard articulated in *Exergen Corp. v. Wal-Mart Stores, Inc*., 575

F.3d 1312 (Fed. Cir. 2009), ICM's declaration for inequitable conduct in Count II is deficient

under Rule 9(b) and should be dismissed. The Federal Circuit in *Exergen* summarized the

pleading standard as follows:

> In sum, to plead the "circumstances" of inequitable conduct with the
> requisite "particularity" under Rule 9(b), the pleading must identify the
> specific who, what, when, where, and how of the material
> misrepresentation or omission committed before the PTO. Moreover,
> although "knowledge" and "intent" may be averred generally, a pleading
> of inequitable conduct under Rule 9(b) must include sufficient allegations
> of underlying facts from which a court may reasonably infer that a specific
> individual (1) knew of the withheld material information or of the falsity
> of the material misrepresentation, and (2) withheld or misrepresented this
> information with a specific intent to deceive the PTO.

*Id*. at 1328-29.

ICM's declaratory judgment action for inequitable conduct is based solely upon an

alleged offer to sell. (FAC ¶¶ 26-32) A person is not entitled to a patent if "the invention was ...

on sale in this country, more than one year prior to the date of the application for patent in the

United States." 35 U.S.C. § 102(b).

The Fifth Amended Complaint is deficient in that it fails to identify and/or explain, at a minimum: (1) why the unidentified document allegedly constitutes an offer for sale and is thus material; (2) which claims of the patents-in-suit, and which limitations in those claims, the allegedly withheld document is relevant to; and (3) where in the allegedly withheld document the material information is found. Consequently, ICM fails to allege sufficient details to explain both "why" the information is allegedly material and "how" the examiner would have used this information in assessing the patentability of the claims. *See Exergen*, 575 F.3d at 1329-30.

These deficiencies themselves are fatal under Rule 9(b). *Id.* at 1330. In addition to these fatal deficiencies, ICM's allegations in its Fifth Amended Complaint do not give rise to a reasonable inference of scienter, including both (1) knowledge of the allegedly withheld material information or falsity of the alleged material misrepresentation, and (2) specific intent to deceive the PTO. *See id.* ICM simply alleges that, by virtue of the existence of an alleged "written offer", CleanTech "knowingly and intentionally withheld material information" from the PTO." [Dkt. # 56, ¶ 20] ICM's vague and conclusory allegations provide no factual basis to reasonably infer that Mr. Cantrell knew of what ICM now alleges to be material information contained in the unidentified document. *See Exergen*, 575 F.3d at 1329-30.

Moreover, ICM's factual allegations - scarce as they are - even if true, "do not plausibly suggest any deliberate decision to withhold a known material reference or to make a knowingly false misrepresentation - a necessary predicate for inferring deceptive intent." *Id.* at 1331.

Under the teachings of *Exergen* in connection with Rule 9(b), ICM's failure to set forth the factual details to support any of its allegations of inequitable conduct, Court II of its Fifth Amended Complaint (to the extent it seeks a declaration that the patents-in-suit are unenforceable) must be dismissed under Rule 12(b)(6) for failure to comply with Rule 9(b).

18

2.   ICM's Claims For Declaratory Judgment Under
Count II Should Be Dismissed For Lack of Standing
Under Rule 12(B)(1)

ICM's declaratory judgment claims should be dismissed because there was no
controversy between ICM and Defendants when ICM filed suit and this defect cannot be
corrected.  GreenShift did not send either the July or October Letter to ICM.  Therefore, there is
no controversy between the Plaintiff and Defendants.

The Declaratory Judgment Act provides, in pertinent part, "[i]n a case of actual
controversy within its jurisdiction ... any court of the United States, upon the filing of an
appropriate pleading, may declare the rights and other legal relations of any interested party
seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. 2201(a).
Therefore, this Court must consider both jurisdiction and the prudence of maintaining the action
in Kansas, while a similar action is pending in the State of New York.[6]

ICM's claims for declaratory judgment should also be dismissed under Fed. R. Civ. P.
12(b)(1) because ICM lacked standing when suit was filed.  For this Court to have jurisdiction
over the declaratory judgment claims, "the dispute [must] be definite and concrete, touching the
legal relations having adverse legal interests and that it be real and substantial and admit of
specific relief through a decree of a conclusive character, as distinguished from an opinion
advising what the law would be upon a hypothetical state of facts."  *Micron Technology, Inc. v.
Mosaid Technologies, Inc.,* 518 F.3d 897, 901 (Fed. Cir. 2008) (internal quotations and citations
omitted).  "[T]he question in each case is whether the facts alleged, under all the circumstances,

---

[6]  "The proper relationship between an action under this act for a declaration of patent rights and a later-filed
infringement suit triggers [the Federal Circuit's] special responsibility to foster national uniformity in patent
practice; [the Federal Circuit does] not defer to the procedural rules of other circuits."  *Serco Services Co., L.P. v.
Kelley Co., Inc.,* 51 F.3d 1037, 1038 (Fed. Cir. 1995); *see Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937
(Fed. Cir. 1993), *overruled on other grounds by Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995).

19

show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (internal quotations and citations omitted).

No controversy between ICM and Defendants existed when ICM filed suit. The October Letter cited by ICM as the basis for the dispute between it and Defendants was not sent to ICM; rather, it was sent to ICM's customer, Lifeline. Therefore, no controversy existed between ICM and Defendants.

GS CleanTech's filing of the NY Patent Infringement Case against ICM does not correct the subject matter jurisdictional defect in this case because the issue must be evaluated as of the time the case was filed, not today. *See Prasco, LLC v. Medicis Pharmaceutical Corp.,* 537 F.3d 1329, 1337 (Fed. Cir. 2008) ("while later events may not create jurisdiction where none existed at the time of filing, the proper focus in determining jurisdiction are the facts existing at the time the complaint under consideration was filed") (internal quotations and citations omitted).

Prior to filing of suit in New York, Defendants made no overtures towards ICM. Jurisdiction cannot arise simply because ICM perceived that the patents-in-suit posed some risk to it or its customers that received letters. *See Prasco,* 537 F.3d at 1339 ("jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee") (internal quotations and citations omitted).

ICM's declaratory judgments claims should, therefore, be dismissed under Rule 12(b)(1).

3. In Its Discretion, This Court Should Decline To
Exercise Jurisdiction To Hear ICM's Declaratory
Judgment Claims Under Count II

"Even when jurisdiction is present [in a declaratory judgment action], district courts retain some measure of discretion to decline to hear the case." *Micron Technology,* 518 F.3d at 902; *see Wilton,* 515 U.S. at 289; *see also Sprint Corp. v. Aerotel, Ltd.,* Case No. 99-2547, 2000 WL 382031, at *2 (D. Kan. Mar. 17, 2000). "The word 'may' within the language of the Declaratory Judgment Act means that a court has discretion to accept a declaratory judgment action in the first place: 'In a case of actual controversy within its jurisdiction ... any court ... *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Micron Technology,* 518 F.3d at 903 (quoting 28 U.S.C. § 2201(a)).

The Federal Circuit provides the following guidance for district courts when considering a declaratory judgment action filed to anticipate a latter filed mirror patent infringement complaint in another forum:

> The general rule favors the forum of the first-filed action, whether or not it is a declaratory judgment action. The trial courts have discretion to make exceptions to this general rule in the interest of justice or expediency, as in any issue of choice of forum. These exceptions are not rare. A district court may consider a party's intention to preempt another's infringement suit when ruling on the dismissal of a declaratory action, but that consideration is merely one factor in the analysis. Other factors include the convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, and the possibility of consolidation with related litigation.

*Micron Technology,* 518 F.3d at 904 (internal quotations and citations omitted) ("trial court must weigh the factors used in a transfer analysis as for any other transfer motion"); *see Genentech,* 998 F.2d at 937-38; *see also Electronics for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1348 (Fed. Cir. 2005). "Eventually, robust consideration of these factors will reduce the incentives for a

race to the courthouse because both parties will realize that the case will be heard or transferred to the most convenient or suitable forum." *Micron Technology,* 518 F.3d at 905.

This Court should decline to exercise jurisdiction over ICM's declaratory judgment claims because it would be unjust and inefficient to allow ICM's anticipatory suit to proceed. First, ICM's filing of a declaratory judgment action against the Defendants immediately after the '858 patent issued was a "preemptive strike" against Defendants to secure a preferable forum. It would be unjust to allow ICM suit to proceed in the District of Kansas, particularly where ICM's jurisdictional claim is based on a letter to a third party. *See Nacogdoches Oil & Gas, L.L.C. v. Leading Solutions, Inc.,* Case No. 06-2551, 2007 WL 2402723, at *2-*3 (D. Kan. Aug. 17, 2007) (noting exception to first-filed rule when first-filed declaratory judgment suit is merely a "preemptive strike" that mirrors an anticipated adversary filing another jurisdiction).

"Though it is an acknowledged risk of the rule, the first-filed rule is not intended to create a race to the courthouse." *Aurora Corp. of America v. Fellowes, Inc.,* Case No. 07-8306, 2008 WL 709198, at * 1 (C.D. Cal. Feb. 27, 2008). "Application of the first-filed rule here, where the parties filed nearly simultaneous actions in competing jurisdictions the first day that courts were open after the [patent-in-dispute] was issued, would invoke none of the merits of the first-filed rule, while promoting the sort of race to the courthouse that is the worst feature of the rule." *Id.* "[I]n other contexts,…the first-filed rule is of no utility where competing cases are filed within a short interval of one another." *Id.; see Nacogdoches,* 2007 WL 2402723, at *3 ("when competing actions are filed within a short time of each other (seven (7) weeks), courts may disregard the first-filed rule").

GS CleanTech amended its patent infringement case to bring claims against ICM in the Southern District of New York only two days after ICM filed its declaratory judgment action in

22

Kansas.  *See Serco Services,* 51 F.3d at 1039 (affirming district court's dismissal of declaratory

judgment action to allow mirror patent infringement action filed three days later to proceed).

Defendants submit that forum shopping alone motivated ICM to file this action in the

District of Kansas on the day the '858 patent issued, premised entirely on a letter sent to a third

party in another state.  *See Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081 (Fed. Cir. 1989)

(an exception to the first-to-file rule is "where forum shopping alone motivated the choice of

sites for the first suit").

The convenience and availability of witnesses appears to be at best a neutral factor and

does not favor ICM or the Defendants.  ICM and the Defendants will have to travel to engage in

discovery regardless of the location of the trial court.  However, should this Court allow this case

to proceed to trial in Kansas, the inconvenience and duplicative trial costs to the Defendants in

Kansas and New York will be immense.

Based on the above factors, this Court should decline to hear the declaratory judgment

claims.  The fact that ICM filed its declaratory judgment two days prior to GS CleanTech filing

its patent infringement claims against ICM does not dictate a result under the First-to-File Rule.

Further, ICM's declaratory judgment action will not settle the controversy, nor will it clarify the

legal relations at issue because the same controversy is pending in New York, along with claims

of patent infringement against ICM.

C.  Alternatively, ICM's Claims Should be Transferred
to the Southern District of New York for Trial

If this Court is not inclined to dismiss all of ICM's claims, then, in the interest of justice,

Defendants seek transfer of the ICM's claims to the Southern District of New York for all post-

MDL proceedings where the NY Patent Infringement Case is pending.  See 28 U.S.C. § 1406(a)

("The district court of a district in which is filed a case laying venue in the wrong division or

district shall dismiss, or if it be in the interest of justice, transfer such case to any district or

division in which it could have been brought.")

## IV.  CONCLUSION

For the reasons set forth above, (a) Count I of ICM's Fifth Amended Complaint should

be dismissed under Rule 12(b)(6); (b) any claims arising out of any alleged violation of the

Kansas Consumer Protection Act under Count I should also be dismissed under Rule 12(b)(1);

(c) Count II of ICM's Fifth Amended Complaint should be dismissed under Rule 12(b)(6) for

failure to plead with particularity under Rule 9(b) to the extent that Count II seeks a declaration

that the patents-in-suit are unenforceable; (d) Count II should be dismissed for lack of standing

under Rule (12)(b)(1).  Alternatively, if this Court is not inclined to dismiss all of ICM's claims,

then, in the interest of justice, Defendants seek transfer of ICM's claims to the Southern District

of New York for all post-MDL proceedings where the NY Patent Infringement Case is pending.

Dated: August 15, 2012     Respectfully submitted,


          <u>/s/ Michael J. Rye</u>
          Michael J. Rye, Esq.
          Charles F. O'Brien, Esq.
          CANTOR COLBURN LLP
          20 Church Street, 22d Floor
          Hartford, CT 06103
          Telephone: (860) 286-2929
          Facsimile: (860) 286-0115
          mrye@cantorcolburn.com
          cobrien@cantorcolburn.com

          ***Counsel for Defendants***
          ***GS CleanTech Corporation and***
          ***GreenShift Corporation***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2012, a copy of the foregoing **DEFENDANTS GS CLEANTECH CORPORATION AND GREENSHIFT CORPORATION'S SUBSTITUTED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF, ICM INC.'S FIFTH AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) OR, ALTERNATIVELY, TO TRANSFER** was filed electronically.  Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system**.**

<div align="right">
/s/ Michael J. Rye_____<br>
Michael J. Rye
</div>

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| ICM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-cv-01315-WEB-KMH |
| | ) | |
| v. | ) | |
| | ) | |
| GS CLEANTECH CORPORATION | ) | |
| GREENSHIFT CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' NOTICE TO WITHDRAW FED. R. CIV. P. 12(B)(2) BASIS ONLY FROM DEFENDANTS' MOTION TO DISMISS

Defendants GS CleanTech Corporation ("GS CleanTech") and GreenShift Corporation ("GreenShift") (collectively, "Defendants") hereby provide notice to the Court that they withdraw their Fed. R. Civ. P. 12(b)(2) basis only for lack of personal jurisdiction in support of their Motion to Dismiss Plaintiff ICM, Inc.'s ("ICM") Complaint. Defendants submit the following:

1.     On November 5, 2009, Defendants filed a Motion to Dismiss ICM's Complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) or, alternatively, Motion to Transfer this action (declaratory judgment claims only after the Kansas state law claims are dismissed) to the Southern District of New York. *See* Docket No. 16.

2.     On December 2, 2009, the Court granted the Parties' Joint Motion for Expedited Jurisdictional Discovery.

3.     The Parties engaged in jurisdictional discovery including Defendants' production of documents and answers to interrogatories in response to ICM's discovery requests.

4.     Based on the discovery exchanged, Defendants now believe that sufficient contacts with this jurisdiction exist that this Court can assert personal jurisdiction over

Defendants. Therefore, Defendants withdraw this basis only in support of their Motion to Dismiss.

5.      Defendants continue to seek dismissal of ICM's Complaint and rely on all other bases set forth in their Motion to Dismiss and Memorandum in Support of their Motion to Dismiss. *See* Docket Nos. 16 and 17.

WHEREFORE, Defendants GS CleanTech and GreenShift respectfully provide notice to this Honorable Court that they withdraw their Fed. R. Civ. P. 12(b)(2) basis only for lack of personal jurisdiction in support of their Motion to Dismiss Plaintiff ICM, Inc.'s Complaint.

Dated: February 23, 2010

Respectfully submitted,

s/Ken M. Peterson
Ken M. Peterson, SC #07499
Will B. Wohlford, SC #21773
Kristen Wheeler Maloney, SC #22600
MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHTD.
300 N. Mead, Suite 200
Wichita, KS 67202
Telephone: 316-262-2671
Facsimile: 316-262-5991
kpeterson@morrislaing.com

and

Michael J. Rye, Esq.
Charles F. O'Brien, Esq.
CANTOR COLBURN LLP
20 Church Street, 22d Floor
Hartford, CT 06103
Telephone: (860) 286-2929
Facsimile: (860) 286-0115
mrye@cantorcolburn.com
cobrien@cantorcolburn.com

***Counsel for Defendants***
***GS CleanTech and GreenShift***

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2010, I caused to be filed a true and correct copy of

the foregoing pleading with the Clerk of the Court by using the CM/ECF system which will send

a notice of electronic filing to counsel of record.


s/Ken M. Peterson
Ken M. Peterson, S.C. No. 07499

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

_____
)
)
ICM, INC.,                                      )
)          Civil Action No. 09-1315-WEB-KMH
Plaintiff,          )
)
v.                              )          JOINT MOTION TO MERGE CROSS-
)          MOTIONS, TO GRANT EXPEDITED
GS CLEANTECH CORPORATION         )          JURISDICTIONAL DISCOVERY AND
GREENSHIFT CORPORATION,          )          RESET BRIEFING SCHEDULE
)          FOLLOWING JURISDICTIONAL
Defendants.   )          DISCOVERY
_____)

The parties through their respective counsel hereby jointly move the Court for an

order (1) merging Plaintiff ICM, Inc.'s Motion to Enjoin Defendants' Prosecution of a

Second-Filed Action Against Plaintiff and Defendants GS CleanTech Corporation and

Greenshift Corporation's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ.

P. 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6), or, Alternatively, Motion to Transfer, (2)

staying further briefing of both parties pending completion of limited jurisdiction discovery

of Defendants[1], and (3) granting expedited limited jurisdictional discovery in the form of

requests for production of documents, interrogatories, F.R.C.P. 30(b)(6) depositions of the

defendants, and depositions of David Winsness and David Cantrell, said discovery to be

completed by February 10, 2010.  The parties jointly move the Court to set the following

briefing schedule:

---

[1]    Plaintiff ICM's brief in opposition to Defendants' motion to dismiss is currently due
November 30, 2009.  By consent of Plaintiff ICM, Defendants' opposition to ICM's motion for
preliminary injunction has been reset for November 30, 2009.

(1) briefs in opposition to the respective parties' initial memorandum of law filed and served by February 26, 2010; and

(2) reply briefs filed and served by March 12, with a consolidated hearing on the pending motions thereafter to be scheduled.

Defendant GS CleanTech Corporation joins in this motion, but reserves its rights under Rule 11 of the Federal Rules of Civil Procedure to seek sanctions and remedies for ICM's continued assertion of personal jurisdiction without reasonable factual justification. The parties therefore jointly request that the above motion be granted.

Respectfully submitted,


/s/ Lyndon W. Vix

Charles E. Millsap, SC #09692
    cmillsap@fleeson.com
Lyndon Vix, SC #12375
    lvix@fleeson.com
FLEESON, GOOING, COULSON
    & KITCH, L.L.C.
1900 Epic Center
301 N. Main
Wichita, Kansas 67202
Tel.: (316) 267-7361


John M. Weyrauch (221,879) (pro hac vice)
Michael A. Bondi (237,309) (pro hac vice)
DICKE, BILLIG & CZAJA, PLLC
100 South Fifth Street, Suite 2250
Minneapolis, Minnesota 55402
Telephone: (612) 767-2512
Facsimile: (612) 573-2005

ATTORNEYS FOR PLAINTIFF


/s/ Ken M. Peterson

Ken M. Peterson, SC #07499
    kpeterson@morrislaing.com
Will B. Wohlford, SC #21773
    wwohlford@morrislaing.com
Kristen Wheeler Maloney, SC #22600
    kmaloney@morrislaing.com
MORRIS, LAING, EVANS, BROCK
    & KENNEDY, CHTD.
300 N. Mead, Suite 200
Wichita, Kansas 67202
Tel.: (316) 262-2671


Michael J. Rye, Esq. (pro hac vice)
Charles F. O'Brien (pro hac vice)
CANTON COLBURN, LLP
20 Church Street, 22nd Floor
Hartford, Connecticut 06109
Tel: (860) 286-2929
Facsimile: (860) 286-0115

ATTORNEYS FOR DEFENDANTS